# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------x

BINH THANH IMPORT EXPORT PRODUCTION     :    Index No.:
TRADE JOINT STOCK CO., D/B/A GILIMEX, INC.  :    Date Purchased:
    :
                            *Plaintiff,*    :    **SUMMONS**
    :
                  -v-    :    Plaintiff designates New York
    :    County as the place of the trial
AMAZON.COM SERVICES LLC, D/B/A    :    pursuant to CPLR § 509.
AMAZON ROBOTICS    :
    :    Venue is proper pursuant to
                  *Defendant.*    :    CPLR § 501 because the
    :    parties contractually consented
------------------------------------------------------------------------x    to venue in New York County.

TO THE ABOVE-NAMED DEFENDANT:

    YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a

copy of your answer on Plaintiffs' attorneys within twenty (20) days after the service of this

summons, exclusive of the day of service, or within thirty (30) days after the service is complete

if this summons is not personally delivered to you within the State of New York.  In case of your

failure to appear or answer, judgment will be taken against you by default for the relief demanded

in the complaint.

Dated: December 13, 2022

    New York, New York

                  **KASOWITZ BENSON TORRES LLP**

                  By: */s/* Marc E. Kasowitz
                      Marc E. Kasowitz
                      Edward E. Filusch
                      Victor J. Brienza
                      Jonathan-Michael K. Pryor

                      1633 Broadway
                      New York, New York 10019
                      Tel.: (212) 506-1962
                      Fax: (212) 506-1800

Daniel A. Saunders (*pro hac vice forthcoming*)

2029 Century Park East, Ste. 2000
Los Angeles, California 90067
Tel.: (424) 288-7904
Fax: (323) 978-2583

Jason S. Takenouchi (*pro hac vice forthcoming*)

101 California Street, Suite 3000
San Francisco, California 94111
Tel.: (415) 655-4354
Fax: (415) 358-4408

ThucMinh Nguyen (*pro hac vice forthcoming*)

333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065
Tel.: (650) 453-5420
Fax: (650) 362-9302

*Attorneys for Plaintiff, Binh Thanh Import Export
Production & Trade Joint Stock Co. D/B/A Gilimex,
Inc.*

TO:

AMAZON.COM SERVICES LLC, D/B/A AMAZON ROBOTICS
c/o Corporation Service Company
80 State Street
Albany, New York 12207

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------------x

BINH THANH IMPORT EXPORT PRODUCTION &    :
TRADE JOINT STOCK CO., D/B/A GILIMEX, INC.   :     Index No.
                                                    :
                    *Plaintiff,*           :
                                                      :
                  -v-                :     **COMPLAINT**
                                                      :
AMAZON.COM SERVICES LLC, D/B/A           :
AMAZON ROBOTICS                       :     **JURY TRIAL**
                                                    :     **DEMANDED**
                  *Defendant.*          :
                                                      :

--------------------------------------------------------------------------x

## COMPLAINT

Plaintiff Binh Thanh Import Export Production & Trade Joint Stock Co. D/B/A Gilimex, Inc. ("Gilimex" or "Plaintiff"), for its complaint against defendant Amazon.com Services LLC D/B/A Amazon Robotics (collectively with its predecessor-in-interest Amazon Robotics LLC, "Amazon Robotics," "Amazon," or "Defendant"), a subsidiary of Amazon.com, Inc. ("Amazon.com"), alleges:

## INTRODUCTION

1.     Amazon Robotics, which manufactures robotic storage and delivery systems for organizing and transporting inventory within Amazon.com's massive warehouse distribution centers, pressured Gilimex, a Vietnamese company that manufactures steel and fabric storage containers, called Fabric Pod Arrays ("FPAs" or "pods"), for use in those systems, to dramatically expand its production capacity to enable Amazon.com to meet the rapidly growing demands of its burgeoning e-commerce business. Relying on Amazon's repeated assurances that the two companies were engaged in a "strategic partnership," and that Amazon would protect Gilimex from business downturns by, among other things, (i) providing advance forecasts of changes in demand and, (ii) if demand decreased, continuing to purchase substantial quantities of pods to enable Gilimex to gradually ramp down production, Gilimex agreed to build new production facilities,

increase its work force, and cease selling pods to any customer other than Amazon. However, in the spring of 2022, when Amazon's forecasts for pod purchases abruptly dropped, Amazon failed to provide any advance warning, and refused to (i) accept pods that Gilimex built in reliance on earlier forecasts and experience, (ii) compensate Gilimex for raw materials purchased in reliance on such forecasts and experience, or (iii) provide Gilimex any time to gradually ramp down production, resulting in the immediate and virtually total destruction of Gilimex's business. Moreover, Amazon refused even to discuss the situation in good faith with Gilimex, locking Gilimex's CEO and management team out of Amazon's headquarters in North Reading, Massachusetts after the Gilimex team had traveled thousands of miles from Vietnam for a meeting. Such conduct amounts to an egregious breach of Amazon's representations, and fiduciary and other obligations to Gilimex.

2.     Amazon.com is one of the largest and most profitable companies in the world and the leading force in retail e-commerce. The key to Amazon.com's success is its unparalleled ability to execute customer orders, which it accomplishes effectively through more than 175 enormous distribution warehouses, called fulfillment centers, throughout the world. Those fulfillment centers operate at peak efficiency because of robotic delivery systems transporting pods filled with inventory between work stations and shipping departments for delivery to consumers' homes and businesses.

3.     As a key supplier of pods from 2014 to 2022, Gilimex has been critical to Amazon.com's unprecedented growth and success in the e-commerce retail market, particularly during the COVID-19 pandemic. At Amazon's insistence, and to satisfy Amazon's surging demand, Gilimex dramatically expanded its manufacturing capacity for pods, spending millions of dollars to dedicate all six of its factories exclusively to Amazon's production, severing ties with other major customers, and hiring a workforce of over 7,000 employees.

2

4.      These investments were made in reliance on the trust and confidence that Gilimex placed in Amazon as its acknowledged strategic partner, as well as on Amazon's unique expertise in accurately forecasting the volume of pods that Amazon would require to meet the fast-growing needs of its business, which forecasts Amazon was contractually obligated to provide to Gilimex.

5.      From the beginning, Gilimex made clear, and Amazon understood, that Gilimex relied heavily on Amazon's superior size, sophistication, resources, and access to information to be able to forecast accurately and sufficiently in advance the pod quantities that would be demanded of Gilimex.  Gilimex repeatedly told Amazon that, in agreeing to invest large sums toward FPA production on behalf of Amazon and forgoing other customers to service Amazon's needs, it was relying on Amazon to exercise care in preparing its forecasts, to provide advance communication of any changes in demand, and to allow sufficient time to gradually ramp down production in the event that demand decreased.

6.      As conveyed repeatedly to Amazon, and as Amazon clearly understood, this was due to the labor-intensive nature of pod manufacturing and the compressed season of highest demand, which required production to be maintained throughout the year to stockpile inventory. Amazon was aware of and acknowledged Gilimex's needs and induced Gilimex to put its trust and confidence in Amazon so that Gilimex would make the financial and other commitments necessary to ensure Gilimex would satisfy Amazon's dramatically increasing FPA demand.  Amazon thus owed fiduciary duties of care, good faith, loyalty, and disclosure in connection with its direction of the manufacture of FPAs and related forecasting.

7.      This was especially true during the COVID-19 pandemic and in the years leading up to 2022, when Amazon.com's business exploded as a result of the dramatic upsurge of e-commerce transactions.  In order to keep pace with that demand, Amazon made continually increasing demands that Gilimex steeply increase its production of FPAs.

3

8.      Through the spring of 2022, Amazon's FPA demand had only increased, and Amazon gave no indication that there would be any decrease in demand.  In reliance on the continuation of the parties' years-long business practice and forecasts provided until April 2022, Gilimex continued to purchase raw materials and to manufacture and stockpile FPAs, reasonably anticipating another extremely busy season.

9.      However, in April and May 2022, and without any warning, Amazon completely reversed itself and provided Gilimex – which had continued its high-volume production of pods in reliance on Amazon's forecasts – with forecasts that immediately changed and reduced the projected demand for new FPAs in 2022 and 2023 to a very small fraction of the prior forecasts and supply history.

10.      To maintain a continued high volume of FPA supply, and with full knowledge of Gilimex's reliance and massive investment to serve Amazon's needs, Amazon acted to cause Gilimex to believe, as a "strategic partner," that it would financially protect Gilimex from the adverse consequences of inaccurate forecasts or sudden reductions in demand, by continuing to purchase FPAs to allow Gilimex to gradually reduce production.

11.      However, on August 3, 2022, Amazon breached its obligations to Gilimex and reneged on its assurances.  It offered to buy a mere fraction of the inventory Gilimex had compiled – approximately 101,000 units – and refused to allow Gilimex any time to ramp down its production.

12.      Gilimex has suffered enormous damage as a result of Amazon's egregious breaches, including tens of millions of dollars in what is now worthless inventory, and tens of millions of dollars more in raw materials purchased from suppliers that cannot be returned.  Gilimex also faces tens of millions of dollars in costs to modify its facilities and train workers to manufacture products

4

Case 1:23-cv-00292-AT Document 1-1 Filed 01/12/23 Page 8 of 71

for prospective new customers, as well as tens of millions of dollars in lost profits as its factories

lie dormant while Gilimex seeks new customers.

13. Gilimex brings this action to hold Amazon accountable for its breaches of fiduciary

duty, breaches of contract, careless and false representations, and unfair business conduct.

## THE PARTIES

14. Gilimex is a Vietnamese corporation with its principal place of business in Ho Chi

Minh City, Vietnam. Gilimex manufactures and sells textile products.

15. Defendant Amazon.com Services LLC is a Delaware Limited Liability Company with

its principal place of business in Seattle, Washington. Amazon.com Services LLC is a wholly owned

subsidiary of Amazon.com. In January 2021, Amazon.com Services LLC merged with another

wholly owned subsidiary of Amazon.com: Amazon Robotics LLC, at that time a Delaware Limited

Liability Company based in North Reading, Massachusetts. After the merger, Amazon Robotics LLC

was absorbed by Amazon.com Services LLC and operates as a division of Amazon.com Services LLC

based in North Reading, Massachusetts doing business as Amazon Robotics. Amazon designs and

manufactures mobile robotic order fulfillment systems for use by Amazon.com in its more than 175

fulfillment centers worldwide.

## JURISDICTION AND VENUE

16. This Court has personal jurisdiction over Defendant because Defendant has

contractually consented to the jurisdiction of the state and federal courts in New York County.

17. Venue is proper in this Court because Defendant has contractually consented to

venue in the courts in New York County.

## FACTUAL BACKGROUND

### A. Origins Of The Parties' Relationship

18.    Since 2000, Gilimex has engaged in the business of manufacturing and selling textile-based products for personal household and industrial use. Its customers have included Amazon, IKEA, Puma, Decathlon, and Columbia Sportswear.

19.    In or around 2012, Amazon's predecessor, Kiva Systems ("Kiva"), approached Gilimex to develop, manufacture, and deliver FPAs to be used in connection with Amazon.com's robotic storage and fulfillment centers.

20.    An FPA is a storage structure that forms small bins or compartments of various sizes in which products can be stored. FPAs are typically used in conjunction with industrial robots called "drive units" that travel under the FPAs and pick them up in order to move them to a different part of a warehouse. FPAs typically have a frame made of steel posts and cross beams upon which is placed yellow woven polyester. Plastic sheets are lined up around the FPA to provide structure and stabilize the unit. The image below depicts an Amazon FPA and drive unit:



21.     These storage structures serve as inventory holders for mobile order fulfillment systems in which mobile drive units are dispatched and instructed to bring inventory to workstations, storage areas, or shipping stations in a warehouse.

22.     Later in 2012, Kiva was acquired by Amazon.com, and was renamed Amazon Robotics.

23.     When Kiva first approached Gilimex, Gilimex had two factories and 1,500 employees. Neither factory was ready to produce FPAs, and both would require significant time and investment to convert for FPA production.

24.     After its acquisition of Kiva, Amazon followed up with Gilimex to request that Gilimex become a key supplier of FPAs for Amazon's robotic delivery systems.

25.     From the beginning, Amazon demanded that Gilimex's design for its FPAs for Amazon be unique, which meant that FPAs manufactured for Amazon could not be sold to other customers.

26.     After the Amazon FPA designs were finalized in 2014, top Amazon executives traveled to Vietnam to convince Gilimex to place trust in Amazon's judgment, guidance, and direction, and to support Amazon's business by investing in the capacity to manufacture and produce FPAs for Amazon at a high volume.  In reliance on Amazon's offer of support and strategic partnership, Gilimex agreed to devote a substantial portion of its business to supply FPAs to Amazon and undertook millions of dollars in capital investment and expenditures.

27.     Gilimex made clear from the outset that, given the required investment and dedication of employee and other resources to meet Amazon's demands, it would need advance notice of at least one year of any significant changes in demand for FPAs.

28.     Gilimex's first shipment of FPAs to Amazon took place later in 2014.

7

**B. Gilimex's Amazon FPA Business Grows Steadily**

29.     Gilimex's supply of FPAs to Amazon grew steadily during the first few years, with units sold nearly doubling each year, from 47,161 in 2014 to 453,272 in 2018.  The number of FPA units sold by Gilimex to Amazon are represented in the graph below.



30.     Accordingly, Gilimex's revenue from Amazon FPA sales nearly doubled each year, from $4.2 million in 2014 to $59.5 million in 2018.



31.     As Amazon's demand grew during this period, Gilimex needed to increase its capacity and allocation of labor and production resources in order to fulfill the growing volume of purchase orders, which required substantial investment from Gilimex.  Over the years, Gilimex has invested approximately $70 million to expand its capacity to produce FPAs for Amazon.

32.     Gilimex made these investments in reliance on Amazon's assurances that it would support Gilimex as a "strategic partner."

### C.  The Parties' Understandings Regarding FPA Demand And Manufacturing

33.     Amazon's FPA demand typically follows a predictable and cyclical pattern each year, with most orders placed during March, April, and May.

34.     The manufacture of FPAs is time-consuming and labor-intensive, requiring the retention and training of a large workforce.  Therefore, to meet demand during peak months, it was necessary for Gilimex to maintain production of FPAs and to stockpile inventory all year long so that Amazon's orders could be filled in a timely fashion during the busiest months.  It was also necessary to keep production running throughout the year in order to retain skilled workers on the assembly line. Any significant interruption in production would significantly jeopardize future production because new workers would have to be hired and trained and returning workers would require significant re-training.

35.     To meet Amazon's volume requirements, Gilimex also had to purchase well in advance the raw materials needed to manufacture FPAs.  Without firm commitments of purchase orders months in advance, Gilimex would have been unable to fill Amazon's orders when demand typically surged in March, April, and May.

36.     From the beginning of its business relationship with Amazon, Gilimex emphasized the unique nature of FPA production, including: (1) the highly labor-intensive nature of FPA manufacturing, (2) the need to retain skilled workers, (3) the need to maintain production throughout

9

the year, and (4) the need to secure raw materials in advance of FPA order fulfillment. Gilimex also repeatedly expressed the need for at least one year's notice of any significant changes in demand.

37.    Amazon understood Gilimex's requirements and agreed to provide reasonable and substantial advance notice of any significant changes in its forecasted FPA demand. Indeed, this was embodied in the written agreement that Amazon compelled Gilimex to sign in 2021, which requires Amazon to provide to Gilimex rolling six-month forecasts for Gilimex's planning purposes. (*See* Ex. A, Amazon.com Services LLC Component Sale and Purchase Agreement ("CPA") ¶ 4.2.) Even before execution of the CPA, it was Amazon's standard practice to provide rolling forecasts at similar intervals, with knowledge that the forecasts would be relied on by Gilimex to secure materials and implement manufacture of FPAs to fulfill Amazon's projected needs.

38.    Amazon also expressly agreed that Gilimex could maintain production throughout the year and stockpile inventory consistent with the forecasted quantities for that year, even if Amazon had not yet issued formal purchase orders covering such quantities. Amazon did this because Amazon understood this was necessary for Gilimex to secure sufficient supply of FPAs so that Amazon's needs for FPAs would be satisfied when demand spiked, as was increasingly occurring, especially during the pandemic.

39.    Because Amazon wanted to ensure that Gilimex could meet its FPA needs, it agreed to pay fees for Gilimex to warehouse its inventory. For example, a November 10, 2020 e-mail from Amazon's Terry Sall to Gilimex's Khoa (Kevin) Thi said: "Gilimex also has a long history working with A[mazon] and understand our seasonal nature, so *this storage and warehousing requirement is well understood*. So please accept that this noted storage fee is the *standard A[mazon] operating requirement as all previous years*" (emphasis added).

40.    In fact, Amazon pressured Gilimex to continue FPA production and stockpile inventory during low demand periods to make certain that supply would be available when demand

was high.  A June 2, 2021 e-mail from Amazon's Sall to Gilimex's Thi stated: "Amazon claims that because Amazon sent Gilimex *forecasts* well in advanced [sic], Gilimex *should have been utilizing production capacity during the low demand periods to build and warehouse inventory* required to ship the full volumes during the high volume periods" (emphasis added).  Amazon thus expected Gilimex to rely on Amazon's forecasts and maintain production year-round to stockpile inventory and made clear that it would penalize Gilimex if it failed to stockpile sufficient quantities.

### D.  The Parties Had A Special Relationship Of Trust

41.     Throughout the parties' relationship, Amazon repeatedly encouraged Gilimex to place special trust in Amazon.  This was done to induce Gilimex to invest unprecedented effort and resources to feed Amazon's ever-increasing demand for FPAs.  As a Vietnamese company with modest resources and limited English language skills, Gilimex was induced to and did rely on Amazon's assurances and devoted itself to satisfying Amazon.

42.     In light of this special relationship built on loyalty and trust, and particularly given Amazon's expertise and specialized knowledge regarding FPA manufacture, demand, and market trends, Gilimex relied on – and Amazon purposely induced Gilimex to rely on – Amazon's judgment, honesty, and integrity to guide Amazon's business for the parties' mutual benefit.  Amazon thus assumed the duty to act as a fiduciary with respect to Gilimex.

43.     Indeed, in recognition of that special relationship of trust and loyalty, Amazon regularly referred to Gilimex as Amazon's "partner" and characterized their relationship as a "strategic partnership."

44.     Gilimex confirmed the partnership relationship with Amazon.  On June 18, 2021, Gilimex's Tuan Linh noted the "established partnership with Amazon for almost a[ ] decade" as justification for Gilimex's continued "huge amount of investment in the likes of labor force, real estates and facilities construction, machinery and all the necessary resources to uphold [its] quality

11

control process to maintain such capacity [for Amazon]." Tuan Linh went on to state that "[a]s a decade-long strategic partner to Amazon, we feel obligated to share with you [updates regarding the difficulty of manufacturing during COVID-19]." In response, Amazon stated "[w]e agree that the priorities that Gilimex has outlined for areas of focus over the next months are a good start to getting our two companies back into strategic alignment and supporting our Customers."

45. Thus, on July 7, 2021, Amazon's Terry Sall told Gilimex: "[A]s a valued partner of Amazon [ ], we would like to announce an update in our leadership structure. […] [The new Director of Robotic Operations] is looking forward to learning more about our strategic partnerships and how we can continue to grow and scale the Amazon [ ] portfolio of technology together."

46. On September 14, 2021, Rose Constance of Amazon e-mailed both Gilimex and Amazon representatives thanking Gilimex for an accurate update of their production progress during the COVID-19 pandemic, and stating "[w]e appreciate your diligence and partnership as we navigate this unusual year."

47. Based on these and other representations by Amazon, Gilimex placed substantial trust and reliance in its "business partner" and was induced to believe that, in return for Gilimex's massive investments in the relationship and attendant assumption of risk, Amazon would look out for Gilimex's best interests, including by (1) acting with care in connection with the development and communication of its demand forecasts, (2) providing advance notice of any significant changes in demand, and (3) allowing Gilimex sufficient time to gradually ramp down production should there be any significant decrease in demand.

48. Thus, when there were drops in forecasted demand, Amazon confirmed that it would continue to purchase product from Gilimex to mitigate any losses. For example, after years of steady growth, Amazon informed Gilimex in November 2018 that Amazon's forecasted demand for 2019

had decreased from 779,000 units to 590,000 units. In February 2019, the forecast was reduced again to just 364,000 units.

49.     Knowing that such an abrupt decrease in forecast quantities would cause Gilimex significant difficulties, and in view of the parties' fiduciary relationship, understandings, and past practices, the parties engaged in a series of meetings, during which Amazon agreed to submit orders sufficient to allow Gilimex to gradually ramp down FPA production over a period of three years. This experience, coupled with Amazon's other representations and assurances of strategic partnership, confirmed to Gilimex that Amazon would exhibit similar care and flexibility should demand decline rapidly in the future. As a result, Gilimex agreed to devote unprecedented additional expenditures and resources to Amazon FPA production in the years that followed.

### E. Gilimex Dramatically Increases Production To Satisfy Amazon's Surging Demand During The COVID-19 Pandemic

50.     During May and June 2020, at the beginning of the COVID-19 global pandemic, it appeared to Amazon that shifting consumer habits due to the pandemic would cause unprecedented growth of Amazon's e-commerce retail business and that there would thus be a sharp increase in FPA demand to supply Amazon.com's growing order fulfillment network.

51.     In 2020, Amazon demanded that Gilimex expand dramatically its FPA manufacturing capacity to accommodate the surge in demand due to COVID-19, which Gilimex agreed to do.

52.     As illustrated in the charts below, Gilimex more than doubled its FPA production capacity from 16,000 units per week in 2019 to over 32,000 units per week by 2021 to meet Amazon's surging demand for FPAs. Indeed, by 2022, Amazon's annual demand for FPAs from Gilimex ballooned to over 1,100,000 units, from roughly 518,000 units in 2019.

13





53.     In 2020 and 2021, to secure supply and at Amazon's request, Gilimex spent tens of

millions of dollars to build three new factories dedicated solely to Amazon FPA production.

54.     Gilimex also agreed to spend millions of dollars more to convert its three existing

manufacturing facilities to production solely for Amazon.  To do so, Gilimex was forced to sever

business ties with its other large customers, including IKEA, Decathlon, and Columbia Sportswear.

14

Each of these customers historically accounted for $40 million to $50 million in Gilimex's annual revenue.

55.    Gilimex also more than doubled its workforce allocated to Amazon FPA production, from 2,900 in 2019 to 6,600 total FPA workers in 2021.  The salary for these additional workers represented an incremental annual cost of over $16 million.

56.    Aside from the massive monetary investment and related risk, Gilimex and its employees expended tremendous effort and endured great sacrifice to ensure that Amazon's FPA demand was satisfied during the pandemic.  To avoid halts in production due to government quarantines and closures, Gilimex made provisions for its employees to live on factory premises and dedicated spaces for employees to sleep, eat, and shower (which also required Gilimex to expend resources on increasing food supply and utilities for prolonged periods of isolation).  With these measures, Gilimex kept all of its factories operational at 100% capacity for Amazon's benefit throughout the pandemic, but at substantial additional cost.

57.    Gilimex also employed various logistical maneuvers, such as the relocation of production and packing facilities, to minimize the impact of local COVID outbreaks and related government health safety measures.

58.    Thus, while Amazon enjoyed unprecedented increases in revenue during the pandemic due in large part to the explosion in online ordering by consumers from the safety and comfort of their homes, Gilimex management and laborers literally risked their lives on a daily basis to make such record growth a reality.

### F.  Amazon Induces Gilimex To Sign The One-Sided CPA

59.    During the first seven years of their relationship, Gilimex supplied FPAs to Amazon without a written agreement and instead relied on the parties' relationship of trust.  However, on

January 7, 2021, in the midst of Gilimex's ramp-up of manufacturing capacity and other efforts to satisfy Amazon's surging FPA demand, Gilimex was induced to sign a Component Sale and Purchase Agreement ("CPA"), on terms overwhelmingly favorable to Amazon.

60.     Gilimex had no choice but to sign the agreement given the extensive investments it had made to increase manufacturing capacity for Amazon and the fear that Amazon would cut its FPA orders if Gilimex did not execute the agreement.

61.     Amazon informed Gilimex that the CPA was a standardized contract with all of its suppliers and rejected efforts by Gilimex to negotiate more favorable terms.

62.     The CPA is replete with terms strongly favoring Amazon at the expense of Gilimex. For example, ¶16.2 permits Amazon to terminate the CPA without cause on 30 days' notice, with no reciprocal provision for Gilimex.

63.     Notwithstanding the unfavorable terms of the agreement, Gilimex agreed to sign it, both out of fear of repercussions by Amazon and in reliance on the parties' long-standing strategic partnership, fiduciary relationship, and course of dealing.  Based on Amazon's representations and conduct, Gilimex reasonably expected that Amazon, as a fiduciary, would act with care and in good faith to protect Gilimex's interests.

### G. Amazon Fails To Hold Quarterly Business Review Meetings

64.     Throughout the parties' business relationship, clear and timely communication regarding the parties' needs, concerns, and forecasts was considered essential.  To that end, it had been the parties' practice to hold "Quarterly Business Review" ("QBR") meetings each quarter, during which the parties would discuss outstanding business issues and future projections.  This was memorialized in the CPA, which required the parties to hold QBRs after each quarter.  (*See* Ex. A, CPA ¶ 1.3(b).)

16

65.     However, Amazon failed to hold any QBR meeting after May 2021, despite Gilimex's continued requests for such meetings.

66.     As a result, Gilimex was deprived of its contractual right to be informed regarding the state of Amazon's business and views regarding the future of the relationship.  Without this important opportunity for communication, Gilimex was kept largely in the dark regarding Amazon's analysis with respect to future demand and was left to rely only on Amazon's forecasts and purchase orders, which up until the spring of 2022 remained consistent with the recent pandemic demand and provided no indication that orders would decline.

### H. Amazon Slashes The 2022-2023 Forecast Without Reasonable Warning

67.     As recently as the spring of 2022, Gilimex had received no indication that there would be any significant change in Amazon FPA demand and therefore expected demand for the remainder of 2022 and 2023 to be in line with 2020, 2021, and the beginning of 2022, exceeding 1.1 million FPA units.  As such, and consistent with the parties' course of dealing and Amazon's prior demands, Gilimex continued its production of FPAs at the levels required to satisfy Amazon's demand in 2021.  Gilimex also contracted for the supply of raw materials consistent with 2021 production levels.

68.     Gilimex thus continued to manufacture FPAs and incur over $68 million in expenses for raw materials necessary to satisfy Amazon's anticipated demand.  Gilimex expended these resources in reasonable reliance on its strategic partner's heightened fiduciary duties to forecast changes in FPA demand with care and to protect Gilimex should demand decrease unexpectedly by allowing Gilimex to gradually ramp down production.

69.     On April 2, 2022, and without any warning of waning demand, Amazon provided Gilimex with a reduced forecast demand of 760,000 FPA units for the period of September 2022

17

through August 2023, in addition to any purchase orders that had been placed already.  Gilimex stood to receive an allocation of only a fraction of those orders, as Amazon typically divided its orders amongst a number of suppliers.

70.     Although lower than expected, Gilimex relied on this forecast to maintain its high rate of production and to secure raw materials.  Based on past practice and experience, such preliminary forecasts were often revised upward, and based on Amazon's failure to warn of a fundamental shift in demand, Gilimex reasonably believed that demand for 2022 and 2023 would be similar to recent years.  Gilimex also reasonably believed that, should demand ultimately decrease significantly, Amazon would continue to purchase a high volume of FPAs to allow Gilimex to ramp down production gradually.

71.     On May 28, 2022, Amazon inexplicably changed course and provided Gilimex with an even more dramatically reduced forecast for 2022 and 2023 that cut the projected FPA quantities to less than a third of the previously anticipated volume.  Amazon accordingly instructed Gilimex to effectively cease production and return any unused raw materials.

72.     The drastic and unexplained differences between Gilimex's expected FPA forecast demand entering 2022 and the April and May forecasts, as well as the complete failure of Amazon to warn of any decrease in demand prior to the spring of 2022, underscore that Amazon did not exercise due care in connection with formulating the forecasts.  Indeed, during an August 10, 2022 meeting between Gilimex and Amazon's former Director of Global Supply Chain and Logistics, Greg Delaney, Mr. Delaney stated candidly regarding the forecasts that "they [*i.e.*, Amazon] just had a bad forecast system, due to their limited competence."

18

73. Similarly, during a July 26, 2022 meeting between Gilimex and Amazon's former Supply Chain Manager, David Nelson, Mr. Nelson expressed his belief that the current team from Amazon did not appear to have a good understanding of operations and the supply chain.

74. Notwithstanding Amazon's instruction to cease production, Amazon was well aware and had previously acknowledged that it was impossible for Gilimex to stop production immediately in the spring and summer of 2022. Consistent with Amazon's past practices and in reasonable reliance on the parties' fiduciary relationship, Gilimex reasonably anticipated a "landing period" of not less than one year to gradually ramp down production. Accordingly, Gilimex continued to manufacture FPAs consistent with Amazon's obligation to continue to purchase FPA quantities sufficient to ensure an orderly wind down of production.

## I. The Parties Attempt To Find An Equitable Solution

75. Gilimex's expectations of a reasonable landing period were further bolstered by Amazon's verbal assurances that the parties would be able to work something out and by Amazon's efforts to schedule an in-person meeting in the Boston area to discuss the forecast and an amicable and equitable way forward. As such, Gilimex continued production and secured raw material, believing that an equitable resolution would be reached in keeping with past practice.

76. On June 17, 2022, Kevin Thi Pham of Gilimex reached out to Amazon's Principal of Global Commodities, Karthik Kailasam, by telephone. On that call, Mr. Kailasam promised to work with Gilimex on the landing plan.

77. Again, on June 22, 2022, Gilimex's CEO, Le Hung, called Amazon's Head of Strategic Sourcing, Ms. Jamie Brouillard, and Ms. Brouillard promised a favorable outcome for a landing plan.

78.     The parties ultimately scheduled a June 28, 2022 meeting of high-level executives at Amazon's headquarters in North Reading, Massachusetts.

79.     On the eve of that meeting, during the evening of June 27, 2022, senior Amazon and Gilimex representatives gathered for a dinner at Mystique Asian Restaurant & Lounge in Everett, Massachusetts.  In attendance for Amazon were Karthik Kailasam (Principal, Global Commodities), Kelly Jackson (Senior Global Commodity Manager), Grant Gatbach (Engineering Manager), and Amber Vishwakarma (Manufacturing Engineer).  Chairman and CEO Le Hung and Business Director Linh Duong participated for Gilimex.  At that dinner, the Amazon representatives made statements to alleviate Gilimex's concerns regarding the future of their business, assuring Gilimex that the parties would work something out to provide Gilimex with sufficient landing time to ramp down production if orders were in fact decreased significantly.

80.     During the June 27, 2022 dinner, Amazon also assured Gilimex that an Amazon delegation would make a trip to Vietnam in early July to visit the factories and familiarize new Amazon executives with the Gilimex facilities.  Amazon proposed that during its trip to Vietnam, Amazon and Gilimex should also plan to meet about making improvements in FPA manufacturing.

81.     Also during the June 27, 2022 dinner, Amazon reaffirmed its commitment to the strategic partnership with Gilimex and acknowledged to Gilimex that Amazon's extraordinary success was possible only because of Gilimex's hard work.  Amazon representatives also communicated that because Gilimex was such a strong strategic partner, during the planned trip to Vietnam, they would further discuss the appropriate length of time for ramping down production.

82.     The June 28, 2022 meeting at Amazon headquarters in North Reading, Massachusetts was attended by Gilimex's Le Hung and Linh Duong, and Amazon's Rose Constance (Director of Supply Chain), Jamie Brouillard (Head of Strategic Sourcing), Karthik

20

Kailasam (Principal, Global Commodities), Kelly Jackson (Senior Global Commodity Manager), Grant Gatbach (Engineering Manager), Amber Vishwakarma (Manufacturing Engineer), Paul Seay (Head of Advanced Manufacturing Engineering), and Philip Maio (Global Supply Chain Manager).

83.    At the June 28, 2022 meeting, the parties further discussed the details of a plan to gradually ramp down production over time, mirroring the similar discussions conducted in 2019. During the meeting, Amazon and Gilimex exchanged proposals regarding the appropriate ramp-down period and Amazon led Gilimex to believe that at least a one-year ramp-down period would be provided.

### J.    Amazon Refuses To Meet With Gilimex And Locks Gilimex Out Of North Reading Headquarters

84.    After the June 28, 2022 meeting, and in reliance on Amazon's indication that it would reach a compromise of at least one year for ramping down, Gilimex executives waited in the Boston area to complete discussions with Amazon regarding the ramp-down plan.  In reliance on Amazon's assurances that a sufficient ramp-down period would be provided, Gilimex maintained its salaried workforce, continued to manufacture FPAs, and purchased raw materials consistent with prior practice.

85.    Throughout July 2022, Gilimex pressed Amazon to conduct a follow-up meeting at Amazon's headquarters, but Amazon rejected these overtures.  On at least one occasion, on July 26, 2022, Gilimex's senior leadership visited Amazon's offices in North Reading, but were escorted out by security and barred from the office.

86.    Amazon finally agreed to hold a video conference meeting with Gilimex on August 3, 2022, even though Gilimex's delegation was still in Boston and wished to meet in person.  At that meeting, contrary to its prior representations that it would allow for a gradual ramp-down of

21

production, Amazon abruptly changed course and Amazon's Global Director refused to provide any ramp-down period whatsoever, stating that the hardships that would thus be suffered by Gilimex and its workers were "not [Amazon's] business."

87.    One day later, on August 4, 2022, Amazon provided by e-mail a formal proposal to resolve the dispute, which provided no time for Gilimex to ramp down production.  Instead, Amazon offered only to purchase 18,815 units subject to outstanding purchase orders valued at $2,746,058, as well as a fraction of the FPAs in Gilimex's inventory – 101,331 units – valued at $13,895,515, and certain quantities of labels valued at $657,680.  Amazon has refused to provide any further compensation or to entertain the possibility of allowing Gilimex to ramp down production over time.

### K.  Gilimex Suffers Extensive Damages Caused By Amazon's Wrongful Conduct

88.    The amounts offered by Amazon are wholly insufficient to compensate Gilimex for the harm Amazon has caused, which includes, but is not limited to:

i.      over $55 million in the value of Gilimex's inventory of over 400,000 FPAs;

ii.     over $68 million worth of raw materials and components secured by Gilimex and which cannot be returned to Gilimex's suppliers;

iii.    over $30 million of unrecouped investment in manufacturing facilities built at Amazon's urging to satisfy its demand during the COVID-19 pandemic;

iv.     over $37 million in cost that will be incurred by Gilimex to convert its six FPA manufacturing facilities to manufacture for other buyers (if Gilimex can find new buyers); and

v.      over $90 million in lost profits Gilimex will suffer while it works to secure new customers.

89.    Gilimex also continues to employ its workforce of 7,000 employees to ensure they maintain their livelihoods and to secure adequate labor if new customers are secured.

## FIRST CAUSE OF ACTION

### (Negligent Misrepresentation On Behalf Of Plaintiff Gilimex)

90.     Gilimex repeats and realleges each allegation contained in paragraphs 1 through 89 above.

91.     Gilimex and Amazon were engaged in a nearly decade-long strategic partnership and special fiduciary relationship of trust in which Amazon provided forecasts and Gilimex relied on and utilized those forecasts to purchase materials and build up inventory in anticipation of the placement of purchase orders.  Amazon agreed to provide Gilimex with forecasts at least every six months.

92.     Given Amazon's knowledge that Gilimex relied on Amazon's forecasts to incur significant expenses, including the production of inventory and purchase of materials, Amazon owed Gilimex a duty to exercise reasonable care in the formulation of the forecasts and to provide Gilimex advance notice of any significant changes in forecast FPA demand.

93.     Until April 2022, Amazon failed to provide notice of any significant decrease in FPA demand for the remainder of 2022 and 2023.  However, given the superior information and industry expertise to which Amazon had access, exercise of reasonable care in forecasting would have revealed that demand would markedly decrease from recent levels.

94.     On April 2, 2022, Amazon provided Gilimex with a forecast demand of 760,000 FPA units from September 2022 through August 2023.  This represented a significant decline in demand but still reflected substantial demand.

95.     Based on Gilimex's justified reliance on earlier forecasts, and Amazon's failure to disclose any anticipated reduction in demand prior to April 2022, Gilimex reasonably believed that there would be no significant decrease in Amazon's FPA demand in 2022 or 2023.  As a result of

23

this reliance, Gilimex expended millions of dollars to continue production of FPAs and to secure raw materials in accordance with production levels of the previous two years.

96.    On May 28, 2022, without warning or explanation for the change, Amazon provided Gilimex with a revised forecast that projected dramatically reduced additional FPA purchases from Gilimex through 2023 of less than a third of recently forecast volumes and historical supply in 2021 and 2022.

97.    Amazon was negligent in its preparation of the April 2, 2022 and earlier forecasts covering the period of 2022 and/or 2023 and otherwise negligently failed to warn of any significant decrease in demand prior to the spring of 2022.

98.    During the spring and summer of 2022, Amazon represented to Gilimex that, despite any forecast changes, Amazon would look out for Gilimex as its partner and continue purchasing FPAs to allow Gilimex to gradually ramp down its production.

99.    Gilimex justifiably relied on these representations and continued to purchase raw materials and manufacture FPAs.

100.    Amazon knew or reasonably should have known that its forecasts and representations would cause Gilimex to continue to purchase raw materials and manufacture FPAs.

101.    However, on August 3, 2022, Amazon abruptly changed course and offered to purchase only approximately 18,000 FPAs subject to outstanding purchase orders and a fraction of the inventory Gilimex had compiled – approximately 101,000 units – and refused to allow Gilimex any time to ramp down its production.

102.    As a result of its reliance on Amazon's misrepresentations, Gilimex has suffered enormous pecuniary loss, including tens of millions of dollars in what is now worthless inventory, tens of millions of dollars more in raw materials purchased from suppliers that cannot be returned,

24

and tens of millions of dollars in unrecouped investment in manufacturing facilities dedicated to Amazon. Gilimex also faces the loss of the tens of millions of dollars in costs it will incur to modify its facilities and train workers to manufacture products for prospective new customers, as well as lost profits while it works to locate new customers.

## SECOND CAUSE OF ACTION
### (Unfair Trade Practices On Behalf Of Plaintiff Gilimex)

103.    Gilimex repeats and realleges each allegation contained in paragraphs 1 through 102 above.

104.    Gilimex and Amazon are each persons engaged in the conduct of trade or commerce within the meaning of Massachusetts General Laws Annotated Chapter 93A, § 9.

105.    Amazon's acts and conduct, as described in the preceding paragraphs, constitute unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of Massachusetts General Laws Annotated Chapter 93A, §§ 2 and 11.

106.     For example, Amazon pressured Gilimex to expand its manufacturing capacity and penalized Gilimex for failure to meet Amazon's FPA volume demands, thus inducing Gilimex to incur significant expenditures. However, Amazon acted carelessly in providing demand forecasts to Gilimex. Amazon also acted to cause Gilimex to believe that it would support Gilimex if the forecasts proved to be incorrect or demand decreased unexpectedly, but refused to do so when Amazon slashed its forecasts in the spring of 2022.

107.    Amazon also unfairly and deceptively induced Gilimex to continue to purchase raw materials and manufacture FPAs when Amazon knew it was only going to buy a fraction of the inventory Gilmex had compiled and knew it was going to refuse Gilimex any time to ramp down its production.

108.    These wrongful acts occurred primarily and substantially within the Commonwealth of Massachusetts and were undertaken knowingly and willfully.

109.    As a consequence of Amazon's knowing, willful, and deliberate wrongful conduct, Gilimex has suffered pecuniary losses, including tens of millions of dollars in what is now worthless inventory, tens of millions of dollars more in raw materials purchased from suppliers that cannot be returned, and tens of millions of dollars in unrecouped investment in manufacturing facilities dedicated to Amazon.  Gilimex also faces the loss of the tens of millions of dollars in costs it will incur to modify its facilities and train workers to manufacture products for prospective new customers, as well as lost profits while it works to locate new customers.

110.    Amazon has also been unfairly enriched by reaping the benefits of Gilimex's expansion of production at Amazon's insistence while refusing to bear any share of the costs incurred when its aggressive forecasts proved to be in error.

### THIRD CAUSE OF ACTION
**(Breach Of Contract On Behalf Of Plaintiff Gilimex)**

111.    Gilimex repeats and realleges each allegation contained in paragraphs 1 through 110 above.

112.    Gilimex and Amazon entered into a contract, the January 7, 2021 CPA.

113.    Gilimex performed all of its obligations pursuant to the agreement.

114.    Under the specific terms of the agreement, Amazon was required to hold quarterly business review ("QBR") meetings at the end of each quarter.

115.    Despite repeated requests from Gilimex, Amazon failed to hold quarterly business reviews since May 2021 and thus has breached the CPA.

116.    As a consequence of this breach, Gilimex has been damaged.  The failure to hold the QBRs meant that Gilimex did not have a sufficient opportunity to discuss business trends and projections with Amazon, which was necessary to obtain an accurate understanding of Amazon's current and future FPA demand.  If equipped with such information, it is more likely than not that Gilimex would have learned from Amazon in advance of April 2022 that there was a risk of decreased FPA demand, and Gilimex thus would not have continued to purchase raw materials and manufacture FPAs at historical levels to its pecuniary detriment.

117.    As a result of Amazon's breach of contract, Gilimex has suffered tremendous pecuniary loss, including tens of millions of dollars in what is now worthless inventory, tens of millions of dollars more in raw materials purchased from suppliers that cannot be returned, and tens of millions of dollars in unrecouped investment in manufacturing facilities dedicated to Amazon.  Gilimex also faces the loss of the tens of millions of dollars in costs it will incur to modify its facilities and train workers to manufacture products for prospective new customers, as well as lost profits while it works to locate new customers.

## FOURTH CAUSE OF ACTION
### (Breach Of Fiduciary Duty On Behalf Of Plaintiff Gilimex)

118.    Gilimex repeats and realleges each allegation contained in paragraphs 1 through 117 above.

119.    Gilimex is in a position of great disparity and bargaining inequality relative to Amazon.

120.    Given Amazon's superior resources, expertise, experience, and access to information in the market of robotic order fulfillment systems and related components, Gilimex reposed its trust and confidence in Amazon to, among other things, act reasonably and with due

27

care and consideration for Gilimex's interests in connection with its supply of FPAs and related investments.

121.    Amazon was at all times aware of Gilimex's reliance, given Gilimex's commitment to invest tens of millions of dollars to manufacture Amazon FPAs, as well as Gilimex's abandonment of all its other customers to increase capacity exclusively for Amazon.

122.    Amazon was also aware that, having ramped up capacity for Amazon to unprecedented levels at the insistence of Amazon, Gilimex was relying on Amazon to provide advance warning of any significant changes in demand and sufficient time to gradually ramp down production if there was any substantial drop in demand. Amazon accepted this reliance and the duties that came along with it by continuing to encourage Gilimex to increase its FPA manufacturing capacity for Amazon's benefit.

123.    There thus was established a special relationship of trust pursuant to which Amazon owed fiduciary duties to Gilimex.

124.    Amazon breached its fiduciary duties of care, honesty, good faith, and disclosure by failing to exercise due care in formulating and communicating forecasts for the demand of FPAs and failing to warn Gilimex of a sharp decrease in FPA demand prior to May 2022.

125.    Amazon breached its fiduciary duties of care, honesty, good faith, loyalty, and disclosure by refusing to provide sufficient time for Gilimex to gradually ramp down production in an orderly manner after spending years pressuring Gilimex to dramatically expand its FPA manufacturing capacity for Amazon's benefit.

126.    As a consequence of these breaches, Gilimex has been damaged and suffered pecuniary losses, including tens of millions of dollars in what is now worthless inventory, tens of millions of dollars more in raw materials purchased from suppliers that cannot be returned, and

tens of millions of dollars in unrecouped investment in manufacturing facilities dedicated to Amazon. Gilimex also faces the loss of the tens of millions of dollars in costs it will incur to modify its facilities and train workers to manufacture products for prospective new customers, as well as lost profits while it works to locate new customers.

127.    Amazon has been unfairly enriched at Gilimex's expense by reaping the benefits of Gilimex's expansion of FPA production at Amazon's insistence while refusing to properly safeguard the interests of Gilimex when demand decreased.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Binh Thanh Import Export Production & Trade Joint Stock Co. D/B/A Gilimex, Inc. requests judgment against Defendant as follows:

a.    For damages in the amount of no less than $280,000,000;

b.    For such other and further relief as the Court may deem just and proper.

Dated: December 13, 2022

New York, New York

**KASOWITZ BENSON TORRES LLP**

By: /s/ Marc E. Kasowitz
       Marc E. Kasowitz
       Edward E. Filusch
       Victor J. Brienza
       Jonathan-Michael K. Pryor

       1633 Broadway
       New York, New York 10019
       Tel.: (212) 506-1962
       Fax: (212) 506-1800

29

Daniel A. Saunders (*pro hac vice forthcoming*)

2029 Century Park East, Ste. 2000
Los Angeles, California 90067
Tel.: (424) 288-7904
Fax: (323) 978-2583

Jason S. Takenouchi (*pro hac vice forthcoming*)

101 California Street, Ste. 3000
San Francisco, California 94111
Tel.: (415) 655-4354
Fax: (415) 358-4408

ThucMinh Nguyen (*pro hac vice forthcoming*)

333 Twin Dolphin Drive, Ste. 200
Redwood Shores, CA 94065
Tel.: (650) 453-5420
Fax: (650) 362-9302

*Attorneys for Plaintiff, Binh Thanh Import Export
Production & Trade Joint Stock Co. D/B/A Gilimex,
Inc.*

30

**Exhibit A**

DocuSign Envelope ID: 7F1E9A25-96BD-4AF8-A588-0F887A49FFB0
Case 1:23-cv-00292-AT   Document 1-1   Filed 01/12/23   Page 35 of 71

CC MISC 00531645 2020 TR

### AMAZON.COM SERVICES LLC
### COMPONENT SALE AND PURCHASE AGREEMENT

**This Component Sale and Purchase Agreement** ("**Agreement**") is between Amazon.com Services LLC, a Delaware limited liability company ("**Purchaser**"), and the "**Supplier**" listed in the table below. This Agreement sets the terms for Supplier to sell certain products to Purchaser and Approved Buyers. This Agreement consists of this signature page, the following terms and conditions, and attached Exhibits as indicated. Initially capitalized terms are defined at the end of the terms and conditions or elsewhere in this Agreement. The "**Effective Date**" of this Agreement is **January 7, 2021.**

| | |
|---|---|
| **Supplier**: | **BINH THANH IM-EX PRODUCTION AND TRADE JOINT STOCK CO.,** |
| **Entity Type/State or Country of Formation:** *(e.g., New York corporation)* | Vietnam Corporation |
| **NDA effective date:** | February 17, 2014 |

Agreed to by both parties:

| **PURCHASER** | **SUPPLIER** |
|---|---|
| By: *Kelly Cunning Riedel* | By: *Le Hung* |
| Name: Kelly Cunning Riedel | Name: Le Hung |
| Title: Authorized Signatory | Title: Chairman |
| Date Signed: January 7, 2021 | Date Signed: January 7, 2021 |

Each party's contacts to receive legal notices about this Agreement are:

| **Purchaser** | | **Supplier** |
|---|---|---|
| Amazon.com Services LLC 410 Terry Avenue North Seattle, WA 98109-5210 U.S.A. Fax: 206-266-7010 Attn: Senior Manager – Procurement | | BINH THANH IMP-EXP PRODUCTION AND TRADE JOINT STOCK CO. 334A Phan Van Tri St. Ward 11, Binh Thanh District Ho Chi Minh City 700000 Vietnam |
| With a copy to (one of the following): | | With a copy to: |
| By mail: c/o Amazon.com P.O. Box 81226 Seattle, WA 98108-1226 U.S.A. Attn: General Counsel Fax: 206-266-7010 | By courier or personal delivery: c/o Amazon.com **1.1** 2021 7th Avenue Seattle, WA 98121 U.S.A. Attention: General Counsel | *BINH THANH IMP-EXP PRODUCTION AND TRADE JOINT STOCK CO.* *334A Phan Van Tri St.* *Ward 11, Binh Thanh District* *Ho Chi Minh City 700000* *Vietnam* |
| | By e-mail: contracts-legal@amazon.com Attention: General Counsel | |

Each party may update its contacts above by notice to the other. Routine business and technical correspondence must be in English, and may be in electronic form. All legal notices given under this Agreement must be written, in non-electronic form, and in English, and will be effective when received by nationally recognized courier service, certified mail (return receipt requested), facsimile with electronic confirmation or personal delivery at the applicable address specified above.

legal

<h1 align="center">TERMS AND CONDITIONS</h1>

**1.    Products.**

**1.1    Products.** Supplier will make and sell the Product to Purchaser during the Term. Except as expressly permitted in the applicable <u>Exhibit A</u>, Supplier will not stop making the Product or stop, restrict, or overproduce the supply of the Product under this Agreement during the Term unless advised otherwise in writing by Purchaser.

**1.2    Adding Products and Conflicts.** After the Effective Date of this Agreement and upon mutual written agreement by Purchaser and Supplier, Purchaser may engage Supplier to sell additional Products to Purchaser under the terms of this Agreement.  The terms governing the production, delivery and sale of any such new Products will be set forth in additional, consecutively numbered <u>Exhibit As</u> (e.g., A-1, A-2, etc.) that refer to this Agreement. Each new <u>Exhibit A</u> will be incorporated into this Agreement upon execution of such new <u>Exhibit A</u> by both Purchaser and Supplier. References to the "Product" and terms relating thereto in this Agreement will apply independently to each Product added through another <u>Exhibit A</u>.  The terms and conditions of each <u>Exhibit A</u> shall apply only to the Product specified on the applicable <u>Exhibit A</u> and will not alter, supersede, change or limit the terms and conditions of any other <u>Exhibit A</u> or the Products specified thereon. The terms and conditions of this Agreement will control to the extent of any conflict with any <u>Exhibit A</u>, unless such <u>Exhibit A</u> expressly states otherwise.

**1.3    Prices.**

a)    The initial Product prices for a Product are set forth in the applicable <u>Exhibit A</u>. Except as set forth on the applicable <u>Exhibit A</u>, Supplier may not increase the prices for Products at any time.  During the Term, Supplier shall use best efforts to continually seek to achieve efficiencies in its supply chain and operations and in its manufacturing processes in order to reduce Product prices.

b)    At the end of each calendar quarter during the Term, Supplier and Purchaser shall meet (either by telephone or in person at Purchaser's designated place of business, at Purchaser's option provided that notice of the QBR including time, venue and participants must be sent to Supplier at least seven (7) days in advance) (each such quarterly meeting, a "**QBR**") to discuss all factors affecting the then-current Product pricing, including (1) Supplier's raw material and component costs, (2) any volume and other discounts achieved by Supplier with its third party suppliers, (3) any process, supply chain, manufacturing or other efficiencies achieved by Supplier, items related to or affecting the quality of the Product(s) and (4) any process, supply chain, manufacturing or other improvements proposed by the parties.  No fewer than thirty (30) days prior to each QBR, Supplier shall provide to Purchaser detailed documentation setting forth the information required by items (1)-(3) above and any other information affecting Product prices reasonably requested by Purchaser in advance of the QBR.

c)    At any time during the term of this Agreement (including in any QBR) the parties may negotiate in good faith changes to the initial Product pricing.  If the parties subsequently agree in writing on changes to pricing (the effective date of such writing, the "**New Pricing Effective Date**"), the Product prices agreed upon by the parties shall apply to all Products shipped by Supplier after the New Pricing Effective Date (whether the related Purchase Order was submitted prior to or after the New Pricing Effective Date) until the parties subsequently agree to further reduced pricing or pricing is otherwise adjusted in accordance with this Section.

d)    Without limiting any other part of this Section, Supplier agrees that it will automatically and without further action by Purchaser (i) reduce Product prices by the full amount of cost reductions that Purchaser introduces (whether in connection with a QBR or otherwise) and (ii) reduce Product prices if the applicable <u>Exhibit A</u> includes a volume discount and Purchaser qualifies for the volume discount based on Purchase Orders submitted to Supplier.  Supplier warrants that the Product and spare part prices do not exceed the lowest amounts that Supplier charges to any third party for similar products (taking into account all discounts, rebates and other indirect price reductions). If Supplier offers or provides to any third party a price for similar products that is lower than the price paid by Purchaser (taking into account all discounts, rebates and other indirect price reductions), then: (a) Supplier will promptly notify Purchaser; (b) this Agreement will be automatically amended to give Purchaser the same or more favorable terms.; and (c) Supplier will promptly refund to Purchaser the difference between the total amount Purchaser and all Approved Buyers paid under this Agreement and the amount they would have paid under those more favorable terms.

**1.4    Changes.** During the Term, Supplier will not change the Product's form, fit, function, design, appearance, materials, technology, manufacturing process or manufacturing location, or make any other change that affects or could reasonably affect Product quality, performance or compliance with the warranties set forth in Section 8, except, in each case, with Purchaser's prior written consent.

**Amazon Robotics Confidential**

**1.5    Preproduction Products.**  If Supplier develops and/or produces for Purchaser any Preproduction Products, then the parties shall agree in writing in either a Work Order or an <u>Exhibit A</u>, on the Lead Times, pricing, quality improvement processes and other details (that would otherwise be set forth in an <u>Exhibit A</u> for a production Product) that apply to such Preproduction Products only.  Such terms may vary for alpha, beta or pilot versions of a Product and shall apply solely to Preproduction Product units of the specified prototype version.  Unless otherwise set forth in the applicable Work Order or <u>Exhibit A</u>, requirements set forth in this Agreement for QBRs and Prices described in Section 1.3, Forecasts described in Section 4.2, EOL commitments referenced in Section 4.2, reports listed in Section 4.3, Epidemic Failures described in Section 9.1, and Disaster Recovery Plan requirements described in Section 12.1 shall not apply to Preproduction Products.

**1.6    Tooling and Equipment.**  Custom Tooling and Non-Standard Equipment may either be purchased or manufactured by Supplier, as Purchaser deems appropriate.  In either case, separate Purchase Orders will be issued between the parties for purposes of specifying Custom Tooling and Non-Standard Equipment.

a)    <u>Supplier Purchases.</u>

1)    Supplier may purchase or manufacture Custom Tooling and Non-Standard Equipment subject to Purchaser's pre-approval. Supplier shall purchase or manufacture the Custom Tooling and/or the Non-Standard Equipment at Supplier's cost and expenses.

2)    In the event that Purchaser has directed Supplier to purchase Custom Tooling or Non-Standard Equipment from a third party, prior to such purchase, Supplier shall provide Purchaser with relevant information about the third party and seek the Purchaser's approval of the purchase. Supplier shall agree to sign and execute documents and require and ensure that the third party sign any documents required by Purchaser in connection with the purchase to ensure that Purchaser retains all Intellectual Property Rights to such Custom Tooling or Non-Standard Equipment.  If Supplier purchases Custom Tooling or Non-Standard Equipment directly from Purchaser or manufactures Custom Tooling or Non-Standard Equipment at Purchaser's direction, Purchaser shall maintain all Intellectual Property Rights with respect to such Custom Tooling and the Non-Standard Equipment, provided that Supplier shall be entitled to use such Custom Tooling or Non-Standard Equipment as provided in this Section 1.6.  In both cases, Supplier agrees that Supplier shall own title to all Custom Tooling and Non-Standard Equipment; provided that Purchaser shall maintain all Intellectual Property Rights with respect to such Custom Tooling and Non-Standard Equipment.  Supplier shall affix to and maintain on the Custom Tooling and Non-Standard Equipment, in a conspicuous location, a notice stating that all Intellectual Property Rights associated with such Custom Tooling and Non-Standard Equipment is owned by Purchaser.  Supplier shall provide Purchaser or its designee with limited access to the Custom Tooling while in Supplier or its subcontractor's possession. Supplier and its Affiliates shall cooperate and assist Purchaser in any inspection, without demanding any further consideration therefor.

3)    Supplier will use such Custom Tooling and Non-Standard Equipment solely in connection with the performance of this Agreement and solely for the benefit of Purchaser and its Affiliates. If there is any loss, damage, theft or destruction of the Custom Tooling or Non-Standard Equipment while in the possession of Supplier, Supplier shall replace such Custom Tooling and Non-Standard Equipment at Supplier's own cost. Supplier may only use the Custom Tooling for purposes of providing Services under this Agreement.  If directed by Purchaser, Supplier must manufacture the Products by using the Custom Tooling and Non-Standard Equipment (in addition to other Tooling and Equipment), which is a condition precedent for Purchaser or an Approved Buyer to buy the Products.

4)    The obligations of Supplier set forth in this Section 1.6 (i) shall survive and continue after the termination of the Agreement, any applicable <u>Exhibit A</u> or any other applicable agreements with Purchaser, Affiliates, or Approved Buyers. Upon any such termination, Supplier may transfer the Custom Tooling and Non-Standard Equipment to Purchaser or its designee at an arm's length price as agreed upon by the Purchaser and Supplier.  In that event, such Custom Tooling or Non-Standard Equipment will be delivered DDP the point of delivery agreed in writing by the parties.  Title and risk of loss for the Custom Tooling or Non-Standard Equipment shall pass to Purchaser or its designee upon delivery to Purchaser or its designee at such location.  Supplier shall use commercially reasonable efforts to assist Purchaser or its designee with the removal of the Custom Tooling and Non-Standard Equipment if Supplier transfers the Custom Tooling and Non-Standard Equipment to Purchaser or its designee pursuant to this Section 1.6.  The relevant Non-Standard Equipment or Custom Tooling will be delivered DDP the point of delivery agreed in writing by the parties.

5)    Supplier shall not make any alterations, additions or improvements to the Custom Tooling or Non-Standard Equipment without the prior written consent of Purchaser. Supplier agrees that the Custom Tooling and Non-Standard Equipment shall be and remain personal property and shall not be so affixed to realty as to become a fixture or otherwise to lose its identity as the separate property of Supplier.

**Amazon Robotics Confidential**

a)  <u>Maintenance of Tooling and Equipment</u>.  Supplier will properly maintain and calibrate all Tooling and Equipment that Purchaser requests or that Supplier requires to perform the Services.  Supplier will keep the Tooling and Equipment in good repair, condition and working order and will provide a place of installation that conforms to the requirements of the manufacturer of the respective Tooling or Equipment.

b)  <u>Purchase of Additional Sets of Custom Tooling</u>.  Purchaser may purchase sets of the Custom Tooling for the Products from Supplier to support the repair of the Products and for internal development of Purchaser's products.  Supplier will develop and qualify each set and notify Purchaser when qualification is complete.  Supplier will provide, in a timely manner, all written specifications needed to enable applicable vendors to make additional sets of the Custom Tooling for the above specified purposes.  Supplier will promptly inform Purchaser of all updates and changes made to Custom Tooling that Supplier owns and will provide the written specifications needed by Purchaser to have Custom Tooling it purchases updated accordingly.

2.  **Approved Buyers, Affiliates**.

2.1  **Approved Buyers.** This Agreement is intended to extend certain benefits and protections to Purchaser, its Affiliates and Approved Buyers, including with respect to Purchaser Devices, regardless of whether Purchaser or its Affiliates or Approved Buyers submit a Purchase Order directly to Supplier for a Product.  If Purchaser determines to appoint an Approved Buyer to purchase Products from Supplier, Purchaser shall notify Supplier of such determination, and Supplier shall, within seven (7) days of receiving such notification, raise any objections Supplier may have with respect to such Approved Buyer.  Purchaser and Supplier will discuss in good faith any such objections and exercise their respective best efforts to resolve any concerns Supplier raises.  If Supplier declines to do business with the Approved Buyer, Purchaser may elect not to place the applicable Order with Supplier. If Supplier raises no objection to an Approved Buyer, the Approved Buyer and Supplier will enter into an agreement substantially in the form of <u>Exhibit E</u> (an "Approved Buyer Agreement").  Except as otherwise mutually agreed to by Supplier and Purchaser in writing and, in the event Supplier fulfills an Order from an Approved Buyer prior to execution of an Approved Buyer Agreement, each purchase of a Product by an Approved Buyer shall be subject to the terms and conditions of this Agreement, if such Product is intended for use in or with a Purchaser Device (including any device-related services provided by the Approved Buyer).  As such, each Approved Buyer may buy the Product under the same terms as those in this Agreement and may otherwise act under the same terms as those in this Agreement that apply to Purchaser (including in both cases obtaining the benefits and protections of indemnity, representations and warranties, and remedies under this Agreement to the same extent as Purchaser), subject to the exclusions listed in the Approved Buyer Agreement. Further, Purchaser is entitled to all rights under the Agreement for all Product purchased by Approved Buyers as if Purchaser had purchased the Product directly from Supplier. Each Approved Buyer, and not Purchaser, is liable for that Approved Buyer's failure to pay as required under this Agreement's terms. Quantities of Product purchased by Purchaser Affiliates and Approved Buyers will be included when determining the volume of Purchaser's purchases under this Agreement. If there is a conflict between this Agreement and any other agreement that Supplier may have with an Approved Buyer applicable to a Product, then Purchaser reserves to right, in its discretion, to apply the terms and conditions of this Agreement, in whole or in part, to such Product(s) and the purchase of such Product(s) by Approved Buyer as otherwise contemplated in this Section 2.1. A list of the Approved Buyers for a Product may be designated on the applicable Exhibit A or may be otherwise communicated to Supplier by Purchaser.

2.2  **Affiliates.** If any Affiliate wants to buy the Product directly from Supplier under this Agreement's terms, it must first sign an agreement in the form of <u>Exhibit B</u> (an "**Affiliate Agreement**"). Once an Affiliate signs an Affiliate Agreement, all of this Agreement's terms will automatically be incorporated by reference into that Affiliate Agreement, except that (a) "Purchaser" will mean the Affiliate that signed that Affiliate Agreement; (b) "Effective Date" will be defined in the Affiliate Agreement; and (c) notices given under the Affiliate Agreement will be effective when the Affiliate receives them via courier or personal delivery and addressed as stated in the Affiliate Agreement. Each Affiliate Agreement will be a separate agreement between Supplier and the Affiliate that has signed it. Once an Affiliate has signed an Affiliate Agreement, it will be binding on that Affiliate and on Supplier. Each Affiliate will be severally liable for its obligations under any Affiliate Agreement.

3.  **Ordering.**

3.1  **Purchase Orders.** Purchaser may submit Purchase Orders on paper, by fax or electronically. Supplier may not reject any Purchase Order that complies with this Agreement's terms (e.g., on price and Lead Time); provided that Supplier may require that Purchaser reduce a Purchase Order solely to the extent the quantity of a particular Product ordered in such Purchase Order would, when taken together with the aggregate quantity of such Product ordered by Purchaser during the then-current calendar quarter, exceed the forecast for such Product provided by Purchaser pursuant to Section 4.2 for such calendar quarter by more than twenty percent (20%) (an "**Excess Order**")").  In the event Purchaser issues an Excess Order, Supplier shall exercise its commercially reasonable efforts to fulfill such order, but will not be subject to the payment remedy described

4

DocuSign Envelope ID: 711F6A8F-05C9-41A7-AB5B-4788D8A1F4F4

in Section 3.4 or any other liability with respect to the Products exceeding the forecast. For the avoidance of doubt, Supplier may reject any Excess Order without any remedy as described in Section 3.4. A Purchase Order is Supplier's only authorization to ship Product units to Purchaser; provided however that Supplier may also ship Preproduction Product units to Purchase in accordance with the applicable Work Orders.

      **3.2**    **Lead Times.** Lead time for a Product will not be longer than the lead time stated in the applicable <u>Exhibit A</u> (**"Lead Time"**), which may be updated by written agreement. Supplier will, but not commit, use best efforts to continually reduce Lead Time for the Product and to accommodate any Purchaser requests for shorter Lead Times in particular cases.

      **3.3**    **Increase and Rescheduling.** If an Exhibit A includes terms regarding when and by what amounts and periods Purchaser may increase the quantity of units of that Product ordered under a Purchase Order or reschedule a Purchase Order's Delivery Date, then Purchaser may do so according to those terms.

      **3.4**    **Remedies for Rejection of Properly Placed Purchase Order.** Except as set forth in Section 3.1, if Supplier rejects a Purchase Order that complies with this Agreement's terms, Purchaser may procure the Product described in the Purchase Order from a third party and, in such event, Supplier shall pay to Purchaser, upon demand, an amount equal to the sum of (a) the difference between the purchase price paid by Purchaser to the third party for the products and the price that would have been payable by Purchaser to Supplier for those Products if Supplier had accepted and fulfilled the Purchase Order and (b) the amount of any costs actually incurred by Purchaser as a result of Supplier failing to accept the Purchase Order (excluding the purchase price paid to the third party for the products).

    **4.**    <u>**Operations.**</u>

      **4.1**    **Manufacturing Facilities, Supply Chain Management.** Supplier will manufacture the Product only at the facilities listed in the applicable <u>Exhibit A</u>. Supplier is solely responsible for managing its own supply chain and resources. Except as expressly provided in the applicable <u>Exhibit A</u> with respect to long lead time components, Purchaser has no liability for any aspect of Supplier's supply chain or operations, including for any costs associated with the sourcing of raw materials or components or the manufacture of Products. Supplier will comply with the Purchaser Standards and Requirements.

      **4.2**    **Capacity Planning and Allocation.** During the Term, Purchaser will give Supplier Forecasts for Supplier's ease of arrangement the production of the Products. As of the Effective Date, Purchaser intends to provide Supplier with rolling, 6-month Forecasts for Products. Forecasts are for planning purposes only, are non-binding, and are not an order, purchase or commitment. Supplier will allocate enough manufacturing capacity, components, raw materials and parts for the Product to be able to meet the given Purchase Order. If there is a capacity constraint, Supplier will give Purchaser priority allocation. If the manufacture of any Product requires the use of Custom Tooling, Supplier shall ensure at all times that it has a sufficient quantity of the Custom Tooling to comply with its obligations under this Agreement. Supplier shall provide Purchaser with any information and reports reasonably requested by Purchaser in respect of Custom Tooling, including information regarding manufacturing lead times, Supplier's inventory of Custom Tooling, and the status and remaining useful life of Custom Tooling. If Supplier utilizes any third party components or materials to manufacture Products, Supplier shall ensure that its third party suppliers are contractually committed to supply such components and materials to Supplier during the Term (or until the Product is EOL'd in accordance with the applicable <u>Exhibit A</u>). If any third party supplier breaches its obligation to Supplier to provide materials or components to Supplier, notwithstanding Supplier's reasonable efforts to enforce the terms of its agreement with the third party supplier, Supplier shall work together in good faith with Purchaser to identify a substitute provider or substitute components that meet the Purchaser's Standards and Requirements for the relevant Product and to mitigate the disruption in Supplier's supply chain. Purchaser shall have the right to terminate any outstanding Purchase Orders for Products (including Custom Products) incorporating the breaching third party's materials or component, without liability, with written notice to Supplier. At Purchaser's request, Supplier shall use its best efforts to purchase sufficient inventory of the relevant material or component to ensure a smooth transition to the substitute component based on Purchaser's Forecasts and to ensure that Supplier is able to comply with its obligations under this Agreement. Supplier will develop a dual sourcing strategy and arrange alternate suppliers for key custom components/raw materials and maintain approved inventory of long lead-time items both for cost reduction purposes and to mitigate supply risks.

      **4.3**    **Reports.** Supplier will give Purchaser the written reports listed below at the times indicated:

| Information to be reported: | When report is to be given: |
|---|---|
| Supply chain data including:<br><br>- Levels and status of raw materials, components and finished Products on hand, Product units in-transit, open Purchase Orders;<br><br>- Manufacturing and transportation lead times for all raw materials and components for each Product, listed by part number | When Purchaser requests with 5 days advanced written notice |

**Amazon Robotics Confidential**

DocuSign Envelope ID: 741EBAB9-DBSA-4H7E-A1CB-22E3F2167B1C
Case 1:23-cv-00292-AT   Document 1-1   Filed 01/12/23   Page 40 of 71

| Information to be reported: | When report is to be given: |
|---|---|
| - Delivery performance metrics – performance to Purchaser need and performance to Supplier commitments | |
| Quality data as specified in the Purchaser Quality Requirements, including: | When Purchaser requests with 5 days advanced written notice |
| - Incoming material quality | |
| - First time pass yield (with weekly and monthly trends), including outgoing Product inspection and yield reports with failure analysis at component level (reported weekly) | |
| - Returned Product root cause and corrective action (for Product returns from Purchaser) | |
| - Key sub-tier supplier performance metrics | |
| - Material shortage | |
| - Long lead time items | |
| - Potential supply/supplier risks | |
| Complete results of each inspection under Section 6.1 | When Purchaser requests or within 72 hours if there is an Epidemic Failure |

In addition, Supplier will provide Purchaser with such other reports and information as may be requested by Purchaser from time to time with advance notice sent at least 3 business days. All reports will be in a format, and will contain a level of detail, acceptable to Purchaser.

**4.4    Shipment; Cross-Border Transactions.** In case the applicable <u>Exhibit A</u> does not provide otherwise, Supplier will deliver any sale of Products within the same border DAP (*Incoterms 2010*) to the delivery location specified in the Purchase Order. Supplier will deliver any cross-border sale of Products DDP (*Incoterms 2010*) to the delivery location specified in the Purchase Order. To the extent that title to any digital or tangible property is transferred under this Agreement, title will transfer from Suppler to Purchaser upon receipt by Purchaser.  For the transfer of any property by Purchaser to Supplier, title will pass to Supplier upon delivery to common carrier. Unless otherwise directed by Purchaser or specified in an Exhibit A, Supplier will be the importer and exporter of record on all cross-border sales, will not list Purchaser on any import, export or other customs documentation, will be directly responsible for ensuring that cross-border sales comply with all export and import regulations (including export licensing, shipper's export declaration, and export invoice), will be directly responsible for Products clearing customs, and will pay all associated costs, duties, and taxes. Purchaser will incur no liability arising from any assistance it provides in preparing any documentation or applying for any licenses or other authorizations, and Supplier agrees to indemnify and hold Purchaser harmless from all liability and damages arising from that assistance. Supplier must obtain and provide to Purchaser tracking numbers or GPS information for each shipment. Supplier will cause any export or import document to, among other matters, separately itemize and state the separate value for each item of hardware, software, set-up, and any non-dutiable service. Except to the extent Purchaser expressly agrees in the applicable Exhibit A to reimburse Supplier for any such amounts, Supplier will be responsible for all duties, export charges and any other amounts imposed by any governmental agency related to such import and export. Supplier will be solely liable for and will defend, indemnify and hold Purchaser harmless against any liability or damages arising out of Supplier's breach of this Section 4.4, including any taxes, duties, interest or penalties. The failure of Supplier to comply with this Section 4.4 will be considered a material breach of the Agreement by Supplier. Despite the previous parts of this Section 4.4, for Product units delivered DDP Destination, Supplier agrees that any duties and taxes that may be recoverable by the Supplier will not be charged or collected from Purchaser.

**4.5    Trade Compliance.**   Supplier represents and warrants that:

a)    the country of origin of the Products is not a country subject to US or other applicable government authority sanctions prohibiting a US person or other individual, corporation, organization or entity from importing such Products at the time of import into the destination country or at the time Supplier delivers the Items to Purchaser;

**Amazon Robotics Confidential**

b)      the Products are not controlled under the US Export Administration Regulations ("EAR"), EU Dual-Use Regulations, US International Traffic in Arms Regulations ("ITAR"), or any other applicable government export laws and regulations, unless Supplier discloses to Purchaser in advance of shipment or transfer in writing and provides to Purchaser complete, accurate and up to date information necessary or that Purchaser may otherwise request to lawfully export the Products ("Export Information"), including, but not limited to, the US, EU or other government authority export control classification number(s), any applicable Commodity Classification (CCATS) or classification ruling, any applicable commodity jurisdiction rulings, a copy of the export license (where an export license is required), country of origin, and, where applicable, the General License type or license exception eligibility; and

c)      Supplier and its financial institution(s) are not subject to sanctions or otherwise designated on any list of prohibited or restricted parties or owned or controlled by such a party, including but not limited to the lists maintained by the United Nations Security Council, the US Government (e.g., the US Department of Treasury's Specially Designated Nationals list and Foreign Sanctions Evaders list and the US Department of Commerce's Entity List), the European Union or its member states, or other applicable government authority.

**4.6      Inventory System.** If <u>Exhibit A</u> designates an inventory management system for one or more Products, Supplier will implement and maintain that Product inventory management system for the indicated Product(s). If Purchaser requests, Supplier will postpone initial implementation of an inventory management system until a date Purchaser chooses.

**5.      Cancellation and Rescheduling; Untimely Delivery.**

**5.1**      Purchaser may cancel a Purchase Order or reduce the amount of units to be delivered under a Purchase Order at any time by giving written notice to Supplier. Any charges associated with cancellation or reduction are as outlined in the applicable <u>Exhibit A</u>.

**5.2**      If the amount of notice that Purchaser gives to Supplier before the Delivery Date of the cancellation or reduction of a Purchase Order is less than the applicable Lead Time and Supplier has already taken steps to fulfill the Purchase Order, the remainder of this Section 5.2 will apply. Promptly following receipt of any notice of cancellation or reduction, Supplier will submit a written estimate to Purchaser detailing costs and expenses that are both directly and indirectly caused by the cancellation or reduction and its planned steps to mitigate those costs and expenses. Those steps must include reducing or cancelling its purchase orders for Components, finding other uses for them, using them for future Purchase Orders or other Supplier products (unless prohibited by this Agreement), and using best efforts to return them. Purchaser will reimburse Supplier for those documented, non-recoverable costs and expenses that are both directly caused by the cancellation or reduction and are attributable to Components that are unique to or that have been customized for the cancelled or reduced units to the extent that those costs and expenses (a) are actually incurred and documented by Supplier, (b) are for Components ordered within their individual Lead Times no earlier than necessary to fulfill the cancelled or reduced Purchase Order, and (c) have not been mitigated in accordance with the written plan provided by Supplier to Purchaser under this Section 5.2 despite Supplier's best efforts to do so for that "**Mitigation Period**," which will be 180 days after Supplier's receipt of the reduction or cancellation notice. Purchaser's liability for a canceled Purchase Order or the reduced portion of a Purchase Order will never be more than the limits set forth in the applicable <u>Exhibit A</u>.

**5.3**      Amounts due by Purchaser under Section 5.2, if any, for the reduction or cancellation of a Purchase Order will be in accordance to the applicable <u>Exhibit A</u> and Supplier may issue invoices under Section 7.1 on the date that the applicable Mitigation Period ends. If Supplier does not submit its initial written estimate within 30 days after receiving the reduction or cancellation notice, or does not provide its claim within 30 days after the end of the Mitigation Period, Purchaser will have no obligation to Supplier for the reduction or cancellation.

**5.4**      In the first instance that a delivery of any Products or Prototypes ordered under any Purchase Order is delayed more than 15 days beyond the Delivery Date, Purchaser may cancel or modify the Purchase Order upon written notice to Supplier, without liability. For each subsequent delayed delivery, Purchaser may cancel or modify the Purchase Order upon written notice to Supplier, without liability, if the delay is more than 10 days beyond the Delivery Date. If an Epidemic Failure occurs, Purchaser may cancel, reschedule, or modify any outstanding Purchase Orders, regardless of status of shipment, upon written notice to Supplier, without liability. If Purchaser cancels or modifies a Purchase Order under this Section 5.4, Purchaser may procure the number of Products or Prototypes that Purchaser has cancelled or decreased from the Purchase Order from a third party supplier; and Supplier will reimburse Purchaser for its costs and expenses associated therewith after verification and agreement on such costs and expenses by both Parties. The foregoing remedies are not intended to be exclusive remedies and Purchaser shall have any other rights and remedies available to Purchaser under this Agreement, at law or in equity.

Amazon Robotics Confidential

6. **Inspection; Rejection; Effect of Acceptance; Returns.**

    6.1 **Supplier Inspection.** Supplier will inspect the Product units as required by the documents listed in <u>Exhibit C</u> (the "**Purchaser Quality Requirements**"). Supplier agrees to cooperate and implement any first article inspection process reasonably requested by Purchaser (including any first article inspection process included in the Purchaser Quality Requirements). Each party shall bear its own costs and expenses relating to the first article inspection process, provided, however, that if a Product fails the first article inspection process two (2) or more consecutive times, Supplier shall reimburse Purchaser for any costs and expenses reasonably incurred by Purchaser in connection with the second and any subsequent first article inspections for that Product. Unless Purchaser expressly agrees to the contrary in writing, Supplier shall not ship any Products under this Agreement until Purchaser has completed its first article inspection process (if any).

    6.2 **Purchaser Inspection.** Purchaser or its designee may perform a limited, non-detailed inspection of Product units at any Supplier facility (this includes any third party facility that Supplier may utilize) or any Purchaser or Approved Buyer facility to see whether they comply with this Agreement. If an Epidemic Failure occurs, Purchaser may also require Supplier to bear the expense (including reasonable travel-related costs) of Purchaser or its designee conducting inspections on any Products that were the subject of the Epidemic Failure, until the cause of the Epidemic Failure has been corrected and sufficient time has passed in order to reliably determine that the correction is effective. The parties agree that the purpose of any post Epidemic Failure inspections is to validate that the agreed corrective actions have addressed and eliminated the cause(s) of the Epidemic Failure. Inspections that are done, or not done, will not affect any of Purchaser's rights under this Agreement.

    6.3 **Rejection; Effect of Acceptance.** Purchaser may reject any Product which is delivered by Supplier if the Product is defective or damaged, does not comply with the warranties given by Supplier under Section 8, or otherwise fails to comply with the requirements of this Agreement. Purchaser's acceptance of a Product will not affect any of Purchaser's rights or Supplier's obligations under this Agreement.

    6.4 **Returns.** In case the applicable <u>Exhibit A</u> does not provide otherwise, if a Product is not a Custom Product and has not been configured specifically for Purchaser (*i.e.* is an off-the-shelf product), Purchaser may return the Product to Supplier for a full refund within thirty (30) days after the date of acceptance provided that the Product has not been modified or used by Purchaser and is in the same condition in which it was delivered to Purchaser. If Purchaser returns any Product units for any reason under this Agreement, such Product units will be returned *FCA* (*Incoterms 2010*) Supplier's place of business. To the extent that title to any digital or tangible property is transferred under this Agreement, title will transfer from Supplier to Purchaser upon receipt by Purchaser. For the transfer of any property by Purchaser to Supplier, title will transfer to Supplier upon delivery to the first carrier. If Purchaser elects to return a Product under this Section 6.4, Purchaser agrees that it shall reimburse Supplier for any pre-approved, out-of-pocket shipping costs actually and reasonably incurred in connection with the return of the Product to Supplier and further agrees to pay Supplier's standard restocking fee for returned products (unless a specific restocking fee is specified in the applicable <u>Exhibit A</u>, in which case that restocking fee shall apply).

7. **Invoices and Payment.**

    7.1 **Invoicing and Related Procedures.** Unless otherwise provided in the applicable <u>Exhibit A</u>, Supplier will issue invoices for all amounts due and owing to Supplier not later than ninety (90) days after such amounts become payable by Purchaser pursuant to this Agreement. Each invoice will be in form and content reasonably acceptable to Purchaser and will contain reasonable detail describing the basis for the invoiced amounts, including, without limitation, a reference to the applicable Purchase Order or Work Order and a description of all Products delivered, and/or Services performed, Work Product created, agreed-upon reimbursable expenses, and the like. Supplier will furnish such receipts, documents and other supporting materials as Purchaser may reasonably request to verify the contents and accuracy of any invoice. Unless otherwise provided in the applicable <u>Exhibit A</u>, all invoices will be stated in United States Dollars. Purchaser will remit all properly payable amounts on a correct and undisputed invoice submitted under this Agreement within 90 days after the later to occur of (a) Purchaser's receipt of the invoice and (b) Purchaser's acceptance of all Products and Services (including associated Deliverables) to which the invoice relates. Payments may be made according to Purchaser's then-current payment policies, which may include electronic payment. Payment of an invoice without asserting a dispute is not a waiver of any claim or right. Purchaser is not required to pay invoices received more than 90 days after delivery of the Product units (or completion of the Services, as the case may be) covered by the invoice and Supplier forever waives any such amount. Purchaser will make any required payments under this Agreement for anything other than Products on the same terms as those stated above in this Section 7. Purchaser may direct Supplier to send invoices for any Purchase Order issued under this Agreement to a "bill to" entity and address that is different from the "ship to" entity and destination. Purchaser and its Affiliates will have the right to setoff against or recoup or deduct from Supplier any amounts that are owed to Purchaser or its Affiliates by Supplier, incurred

**Amazon Robotics Confidential**

DocuSign Envelope ID: 7F6C6A45-8B8B-4194-A5EF-89E9EF2827E6

under or in connection with this Agreement, or any other agreement between the Parties, in each case whether contingent or fixed, with reasonable prior notice.

**7.2     Environmental Fees and Other Governmental Charges.** Supplier will, at no additional cost to Purchaser, comply with applicable legal regulations requiring Supplier to take back the Products (including, without limitation, the collection, treatment, recovery and reuse/recycling of the Products) or products which the Products are replacing on a like for like basis.

**7.3     Taxes.** Supplier may charge and Purchaser will pay applicable federal, state or local sales or use taxes or value added taxes that Supplier is legally obligated to charge ("**Taxes**"), provided that such Taxes are stated on the original invoice that Supplier provides to Purchaser and Supplier's invoices state such Taxes separately and meet the appropriate tax requirements for a valid tax invoice. Purchaser may provide Supplier an exemption certificate or equivalent information acceptable to the relevant taxing authority, in which case, Supplier will not charge or collect the Taxes covered by such certificate. Supplier will be responsible for all other taxes or fees (including interest and penalties) arising from transactions and the documentation of transactions under this Agreement. Purchaser may deduct or withhold any taxes that Purchaser determines it is obligated to withhold from any amounts payable to Supplier under this Agreement, and payment to Supplier as reduced by such deductions or withholdings will constitute full payment and settlement to Supplier of such amounts. Purchaser and Supplier acknowledge that the shipping terms for the Products agreed upon by the Parties may affect the applicable Taxes described in this Section. Throughout the term of this Agreement, either Party will provide with any forms, documents, or certifications, as required by law, for the other Party to satisfy any information reporting or withholding tax obligations with respect to any payments under this Agreement.

**8.    Warranties and General Compliance.**

**8.1     General.** Supplier warrants that: (a) all Product units will (i) conform to the Purchaser Standards and Requirements therein, (ii) be delivered new and unused (except in the case of Preproduction Product units used in testing), (iii) be provided with good and marketable title, free and clear of any and all liens, claims and other encumbrances, (iv) will comply with all applicable ordinances, codes, standards, laws, rules, regulations and orders of any governmental authority having jurisdiction over production of the Deliverables and Products ("**Laws**"), including health, safety and environmental regulations. Supplier will also hold and fully comply with all governmental approvals, licenses, permits, registrations and the like necessary for Supplier to perform under this Agreement; (b) use of Deliverables and any Supplier Processes and Tooling and Equipment for their intended purpose will not cause Purchaser, Approved Buyers or any purchaser or user of a Purchaser Device to violate any applicable law, including applicable health, safety or environmental regulations; (c) none of Products, Supplier Processes, Tooling and Equipment, Pre-Existing Work (or Purchaser's and Approved Buyers' exercise of rights hereunder with respect to Products, Deliverables, Supplier Processes, Tooling and Equipment and Pre-Existing Work) will infringe or misappropriate any Intellectual Property Rights or other rights of any third party; (d) Supplier did not misappropriate any third party's trade secrets in the development or acquisition of the Deliverables, Products, Supplier Processes, Tooling and Equipment, Pre-Existing Work; and (e) Supplier hereby assigns to Purchaser all warranties provided by the suppliers of any Component included in any Product. Or, if the warranties provided by those suppliers cannot be assigned to Purchaser, Supplier will promptly pass through the benefit of those warranties and will cooperate with Purchaser in this respect.

**8.2     Warranty Period.** Supplier warrants that for 3 years from Purchaser's acceptance of the Product or other Deliverable (including any repaired or replacement product provided by Supplier under Section 8.10) (the "**Warranty Period**"): (a) all Product units and other Deliverables will be free from defects in design, material and workmanship; (b) all Product units and other Deliverables will conform to the applicable Specifications; and (c) all Product units and other Deliverables will conform to Supplier's documentation for the Product or other Deliverable (to the extent that it does not conflict with the Specifications).

**8.3     Disclaimer.** EXCEPT AS SET FORTH IN THIS AGREEMENT, SUPPLIER DISCLAIMS ALL OTHER PRODUCT WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE.

**8.4     Conflict Minerals**. Supplier warrants that: (a) no Conflict Minerals that originated in the Democratic Republic of the Congo and/or any Adjoining Country (each of the foregoing as defined in the Dodd-Frank Act) are incorporated in, or necessary to, the functionality or production of any Product (including in any component that Supplier gets from a third party); and (b) Supplier has made and will make appropriate inquiries to confirm this, including by meeting the requirements of the Purchaser Standards and Requirements. Supplier shall complete and provide to Purchaser annually (and within 30 days after request by Purchaser) answers to the CMRT template for Conflict Minerals and, if at any time Supplier's

**Amazon Robotics Confidential**

answers are no longer accurate, Supplier will promptly notify Purchaser and provide updated answers. Supplier will additionally provide Purchaser with certifications, declarations, reports, audits (including any received from Supplier's subcontractors and suppliers), and other information and assistance to permit Purchaser to: (a) independently confirm and certify Supplier's compliance with this Section; and (b) comply with the requirements of Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (as it may be amended from time to time) ("Dodd-Frank Act") and associated regulations and any other Laws and regulations that may be applicable to Conflict Minerals, with respect to all Products. The sufficiency of the CMRT template answers and items described in the previous sentence will be determined by Purchaser in its sole discretion. Supplier will reimburse Purchaser for any costs, fines or penalties that Supplier incurs if Supplier does not comply with this Section.

**8.5      Anti-Bribery.** Supplier acknowledges that Purchaser's Code of Business Conduct and Ethics posted at http://phx.corporate-ir.net/phoenix.zhtml?c=97664&p=irol-govConduct (the "**Code**") prohibits the paying of bribes to anyone for any reason, whether in dealings with governments or the private sector.  In performing or otherwise fulfilling its obligations under this Agreement, Supplier will not (a) violate or knowingly permit anyone in Purchaser or its Affiliates to violate the Code's prohibition on bribery; (b) bribe any third party (including its own agents) for any reason, whether in dealings with governments or the private sector; or (c) violate any applicable anti-corruption laws. Notwithstanding anything to the contrary in this Agreement, Purchaser may (i) perform, or have its designee perform, unannounced audits at any time during the Term to validate whether Supplier is in compliance with this Section and the Supplier Code of Standards and Responsibilities (as referenced in Exhibit C); and (ii) immediately terminate or suspend performance under this Agreement if Supplier breaches this Section.

**8.6      Export Controlled Materials**, Supplier understands that some of the software, technology or related information that Supplier and its Personnel may have access to may be subject to export control laws and regulations (the "Export Controlled Materials").  Supplier will not, without prior written approval from Purchaser, allow any of its Personnel to have access to or use of any Export Controlled Materials if such access or use would require an export license. Supplier will provide Purchaser with such documents and other supporting materials as Purchaser may reasonably request to evidence Supplier's continuing compliance with this Section.

**8.7      Supplier Code of Conduct.**  In the performance of the Services, Supplier shall abide by Amazon's Supplier Code of Standards and Responsibilities as updated from time to time (the "Supplier Code"), located as of the Effective Date at: http://www.amazon.com/gp/help/customer/display.html?ie=UTF8&nodeId=200885140,

**8.8      InfoSec Policy.** Supplier shall comply with Amazon's information security policy, as updated from time to time (the "InfoSec Policy", and together with the Code of Conduct and the Supplier Code, the "Amazon Policies"). Amazon's current InfoSec Policy is attached hereto as Exhibit D.

**8.9      Failure to Comply.** Purchaser may immediately terminate or suspend performance under this Agreement if Supplier fails to comply with any of the Amazon Policies.  Supplier will maintain true, accurate and complete books and records concerning any payments made to another party by Supplier under this Agreement, including on behalf of Purchaser.

**8.10     Remedies and Limitations**. In the event of a breach by Supplier of the warranty set forth in Section 8.1(a), Supplier shall re-perform the Services, provided Purchaser shall have notified Supplier promptly after discovery of such breach, but in any event within 12 months after of discovery of such breach. In the event of a breach by Supplier of the warranty set forth in Section 8.1(b), Supplier shall cause such breach to be remedied promptly upon notice thereof from Purchaser, provided notice of such breach is provided promptly after discovery thereof, but in any event within 12 months after discovery of such breach.  In the event of a breach by Supplier of the warranties set forth in Sections 8.1(c), (d) and (e), the remedies set forth in Sections 11.4 and 11.5 shall apply, mutatis mutandis. In the event of a breach by Supplier of the warranties set forth in Sections 8.1(f), (g) and (h), Supplier shall cause such breach to be remedied promptly upon notice thereof from Purchaser provided notice of such breach is provided promptly after discovery thereof, but in any event within 12 months after discovery of such breach.

**8.11     Remedies for NC Products.** During the Warranty Period, Purchaser may return any NC Product to Supplier at Supplier's sole risk and expense. If Purchaser elects to return an NC Product, Purchaser personnel will contact Supplier to receive a Return Material Authorization (RMA) number. Supplier will provide an RMA number within 24 hours of Purchaser's contacting Supplier.  If Purchaser elects to return an NC Product to Supplier, Supplier will, within 5 days after the date Supplier is required to deliver the RMA to Purchaser, replace the NC Product with a new Product unit that is not a NC Product.  In lieu of the replacement remedy specified in the preceding sentence, Purchaser may, at its election, (1) require Supplier to repair any NC Product at Purchaser's facility (or the facility of its customer) at Supplier's cost, (2) repair (or

**Amazon Robotics Confidential**

DocuSign Envelope ID: 71E6ABC-4B13-411B-A83-23F3F7A-8FEA
Case 1:23-cv-00292-AT   Document 1-1   Filed 01/12/23   Page 45 of 71

engage a third party to repair) the NC Product directly and require Supplier to reimburse Purchaser for its costs and expenses associated therewith, (3) procure a replacement product from a third party and require Supplier to reimburse Purchaser for its costs and expenses associated therewith (including the amount by which the cost of the replacement product exceeds the price of the NC Product), (4) retain the NC Product as delivered and pay Supplier an equitably reduced purchase price for the NC Product, as reasonably determined by Purchaser, to account for the diminished value of the NC Product, or (5) require Supplier to issue a refund to Purchaser in the full amount of the price of the NC Product plus any related shipping and other charges paid by Purchaser. Any amounts required to be paid by Supplier under subparts (2), (3) or (5) above shall be paid within 5 days after a demand from Purchaser therefor.  Supplier will provide the remedy selected by Purchaser at Supplier's sole cost, risk and expense.

**9.**  **Epidemic Failure and Hazards.**

**9.1**  **Epidemic Failure.**

**(a)** An "**Epidemic Failure**" occurs when during any consecutive four-week period more than 3% three percent of units of a Product under warranty are determined to have a Defect.

**(b)**  **Epidemic Failure Remedies**.  If an Epidemic Failure occurs, then the following will apply:

**(i)**  Failure Analysis and Technical Resolution. If an Epidemic Failure occurs, or if Purchaser requests after any other Product failure occurs, then Supplier will give Purchaser: (a) a containment plan within 48 hours after Purchaser's notice; (b) an initial written failure analysis within 48 hours after receiving returned NC Products; and (c) a "root cause" failure analysis and a written corrective action plan within 72 hours after receipt of returned NC Products. Purchaser has the right to approve the containment plan and corrective action plan before Supplier implements them. Supplier will bear all risks and expenses of preparing its failure analyses and preparing and implementing its containment plan and corrective action plan. Supplier will also give related technical support as Purchaser reasonably requests. Purchaser may, in its discretion, prepare its own containment plan, root cause failure analysis, and corrective action plan. If Supplier fails to provide any of these to Purchaser within the time periods stated in this Section, then Supplier must accept the containment plan, root cause failure analysis, or corrective action plan that Purchaser proposes.

**(ii)**  Liability. Supplier will be responsible for all losses, liabilities, damages, costs and expenses that Purchaser incurs as a result of the Epidemic Failure and its root cause(s). By way of example only, this may include any costs (e.g., notification costs, return costs, field recall costs, freight (including redistribution to Purchaser's customers), labor costs, and rework, whether or not performed by Supplier) of (i) root cause analyses, testing, and Product inspections; (ii) any solution, workaround, recovery plan or engineering change required to remove the Epidemic Failure's causes; and (iii) any field stocking recall, customer-based recall, retrofit, and product recall.  Purchaser may also require Supplier to bear the expense (including reasonable travel-related costs) of Purchaser or its designee conducting inspections on any Products that were the subject of the Epidemic Failure, until the cause of the Epidemic Failure has been corrected and sufficient time has passed in order to reliably determine that the correction is effective.

**(c)**  **Other Remedies.** Purchaser may, at its sole option, return any inventory of Product units (including those returned to Purchaser by Purchaser's customers) whether or not such Product units are actually defective for a full refund (including shipping and insurance charges), immediately terminate this Agreement or any Purchase Orders upon notice without liability to Supplier, or both. Remedies under this Section 9.1 are in addition to remedies available under Section 8.11 and Exhibit C, and will be given even if the Warranty Period has expired for a particular Product.

**9.2**  **Hazards, Quality, Regulatory, and Restriction on Hazardous Substances.** Supplier will promptly notify Purchaser if it learns that any Product may present a Hazard. Supplier will give this notice before giving any notice to any government agency, unless the law expressly prohibits this. Supplier will promptly give Purchaser all relevant data, and review and discuss with Purchaser all information, tests, and conclusions about the Hazard and the basis for any contemplated recall or other remedial action. Even if the Warranty Period has expired, Supplier will be responsible for all costs that Purchaser incurs as a result of any Hazard, including those of any recall or other remedial action. If Purchaser asks, Supplier will give Purchaser and its designee all reasonable assistance in deciding how best to deal with the Hazard, and preparing and making presentations before any government agency that may have jurisdiction over any aspect of any Hazard. All information regarding a Hazard in any Purchaser Device or regarding a Hazard in any Purchaser Device that is caused by a Product is Purchaser's Confidential Information (as defined in the NDA). However, Purchaser will use commercially reasonable efforts to consult with Supplier before making any public statement that either (i) identifies Supplier or a Product as the cause of a Hazard or (ii) admits liability for a Hazard on Supplier's behalf.  Supplier will comply with any restriction on hazardous substances ("**Restriction on Hazardous Substances**" or "**RoHS**"), quality, and regulatory compliance policies and

**Amazon Robotics Confidential**

procedures which are listed or referred to in Exhibit C or which are otherwise provided by Purchaser to Supplier, as the same may be updated by Purchaser from time to time.

**10.    Proprietary Rights.**

**10.1    Products and Processes.**

**10.1.1**    Except with respect to Work Product, which is subject to Section 10.3 below, Supplier, on behalf of itself and its Affiliates, hereby grants to Purchaser and its Affiliates a non-exclusive, worldwide, perpetual, irrevocable, royalty-free, fully paid up license, under all current and future Intellectual Property Rights, to: (a) use, make, have made, sell, offer to sell, reproduce, perform, display, distribute, and import the Products, other Deliverables, and Supplier Processes; (b) adapt, modify, and create derivative works of the Products, other Deliverables and Supplier Processes; and (c) sublicense the foregoing rights through multiple tiers of sublicensees. Purchaser and its Affiliates will own all derivative works and modifications of the Products and other Deliverables made by or on behalf of Purchaser and its Affiliates or otherwise authorized under this Section.

**10.1.2**    The foregoing license includes the right to reproduce and use any documentation, manuals, manufacturing information, specifications, test materials and other works (and adaptations, modifications, and derivative works thereof) in connection with the manufacture, test, modification and support of Products, and derivative works and modifications thereof. At Purchaser's request, Supplier will provide copies of documentation, manuals, manufacturing information, specifications, test materials and other works in English, even if originally prepared in another language.

**10.1.3**    The provision of any Product or other Deliverable by or on behalf of Supplier under this Agreement includes a license, transferable with such Product, under any current and future patents owned or licensable by Supplier to the extent necessary to combine the Product or any derivative works or modifications thereof with any product, service, offering, software or intellectual property held, used, owned, acquired or licensed by or on behalf of Purchaser, Purchaser's Affiliates, Approved Buyers or any of their customers.

**10.1.4**    Supplier will consult with Purchaser regarding information and answer questions from Purchaser regarding the design, manufacture, production and testing of Products and the Products' use, support and maintenance.

**10.2    Supplier Tooling and Equipment.**  If Purchaser desires to obtain a license to use any Supplier Tooling or Equipment at any time during the term of this Agreement, Supplier shall provide a perpetual license on commercially reasonable terms.

**10.3    Work Product; Intellectual Property Rights; Pre-Existing Work.**

**10.3.1**    If Supplier creates or develops or is required to create or develop for Purchaser, Purchaser's Affiliates and Approved Buyers any work product in connection with the Product, other Deliverables or its performance of this Agreement, including but not limited to concepts, works, inventions, information, drawings, designs, specifications, customizations, documentation, programs (whether developed by Supplier or any of its Personnel, either alone or with others, and whether completed or in-progress) (collectively, "**Work Product**"), then Purchaser owns, or upon assignment by the creator will own, all right, title and interest (including, but not limited to, all Intellectual Property Rights) in such Work Product, except that Work Product does not include: (a) any inventions or developments made by Supplier prior to the Effective Date or after termination of this Agreement; or (b) any improvements Supplier may make to its own proprietary software or any of its internal processes in connection with the Product, other Deliverables or its performance of this Agreement, provided that such improvements do not infringe any Intellectual Property Rights of Purchaser or any of Purchaser's Affiliates ("**Pre-Existing Work**").

**10.3.2**    The Work Product has been specially ordered and commissioned by Purchaser.  Supplier agrees that the Work Product is a "work made for hire" for copyright purposes, with all copyrights in the Work Product owned by Purchaser.

**10.3.3**    To the extent that the Work Product does not qualify as a work made for hire under applicable law, and to the extent that the Work Product includes material subject to copyright, patent, trade secret, or any Intellectual Property Rights protection, Supplier hereby assigns and agrees to assign to Purchaser (or to such of Purchaser's Affiliates as Purchaser may designate), its successors and assigns, all right, title and interest in and to the Work Product, including, but not limited to, all rights in and to any Intellectual Property Rights embodied in the Work Product or developed in the course of Supplier's (or its Personnel) creation of the Work Product.  The foregoing assignment includes a license under any current and future patents owned or licensable by Supplier to the extent necessary to combine the Work Product or any derivative works or modifications thereof with any product, service, offering, software or intellectual property of Purchaser, Purchaser's Affiliates or Approved Buyers. To the maximum extent allowed, Supplier hereby irrevocably and unconditionally waives, in perpetuity, any rights it may have with respect to the Work Product under any applicable law relating to "the moral rights of authors" or any similar laws throughout the world. Supplier will execute any documents or take any actions in connection with such assignment that

**Amazon Robotics Confidential**

Purchaser may reasonably request to secure and preserve Purchaser's and its Affiliates' rights hereunder, or to enforce, defend or confirm their rights to exploit those rights. Supplier will enter into agreements with its Personnel or any other party as necessary to establish Purchaser's sole ownership in Work Product, and upon Purchaser's request, Supplier will provide Purchaser with copies of such agreements. Supplier appoints Purchaser, as its attorney-in-fact to execute assignments of, and register all rights to, the Work Product and the Intellectual Property Rights in Work Product. This appointment is coupled with an interest. At any time upon request from Purchaser and upon termination or expiration of this Agreement, Supplier will deliver to Purchaser in tangible form all materials containing Work Product, whether complete or in process.

10.3.4    Without limitation of the rights granted under Section 10.1, to the extent Pre-Existing Work of Supplier is included or embodied in any Work Product, Supplier, on behalf of itself and its Affiliates, hereby grants to Purchaser and its Affiliates solely to make, have made, maintain, enhance or support the Work Product a non-exclusive, worldwide, perpetual, irrevocable, royalty-free, fully paid up license, under all current and future Intellectual Property Rights, to: (a) use, make, have made, sell, offer to sell, reproduce, perform, display, distribute, and import such Pre-Existing Work and derivatives thereof; (b) adapt, modify, and create derivative works of such Pre-Existing Work; and (c) sublicense the foregoing rights through multiple tiers of sublicensees.

10.4    **Third Party Materials and Intellectual Property Rights.**  If Supplier proposes to include any third-party-owned materials or Intellectual Property Rights as or in any Work Product or other Deliverable, Supplier will identify those materials to Purchaser and must receive Purchaser's prior written approval before including them in any Work Product or other Deliverable. Further, if Supplier incorporates any third-party Intellectual Property Rights into any Work Product or other Deliverable, then Supplier will obtain all rights necessary to grant (and will be deemed to grant) Purchaser and Purchaser's Affiliates the same rights and licenses provided in Sections 10.1 and this 10.3.4, as applicable, for such third-party Intellectual Property Rights.

10.5    <u>**Work Product**</u>. If Work Product is delivered under this Agreement or otherwise in connection with any Deliverable, the term "Deliverable", "Product" or "Services", as applicable, will be deemed to include such Work Product, as applicable.

11.    <u>**Indemnification and Covenant Not to Sue.**</u>

11.1    **Indemnity.** Supplier will, at its sole expense and at Purchaser's written request, defend, hold harmless and indemnify Purchaser, its Affiliates, Approved Buyers, and their respective successors, assigns, directors, officers, employees, agents, representatives, customers, licensees, and distributors (each, an "**Indemnified Party**"), from all third party claims, demands, suits, actions, and any other proceedings ("**Claims**") and all losses, liabilities, damages, assessments, judgments, settlements, expenses and costs (including reasonable attorney's fees and legal expenses and/or those necessary to successfully establish the right to indemnification), incurred or suffered by any Indemnified Party in connection with any such Claim to the extent such Claim arises from or relates to:

11.1.1    any actual or alleged: (i) infringement or misappropriation by Supplier, its Personnel, or by any Deliverable, Supplier Process, Supplier Tool or Service of any Intellectual Property Rights or other rights of any third party; (ii) misappropriation by Supplier of a third party's trade secrets in the development of any Deliverable, Supplier Process, Supplier Tool or Pre-Existing Work or in the performance of any Services; (iii) breach of any of Supplier's warranties, representations and obligations in this Agreement, including Supplier's obligations with respect to any Confidential Information of Purchaser or its Affiliates; (iv) any bodily harm, illness, injury, death, or property damage caused by any Deliverable or Hazard or Supplier or any of its Personnel; (v) negligence, whether by act or omission, strict liability, or willful misconduct by Supplier, its Personnel; (vi) failure of Supplier or any Services, Deliverable, Supplier Process or Supplier Tool to comply with any applicable Law; or

11.1.2    that is brought by or for any Supplier subcontractor, supplier, employee or agent in connection with this Agreement.

11.2    **Waiver of Certain Immunities, Defenses, and Protections Relating to Employee Injuries.** In connection with any action to enforce Supplier's obligations under Section 11.1 with respect to any Claim arising out of any bodily injury (including death) to an employee of Supplier, Supplier waives any immunity, defense or protection under any workers' compensation, industrial insurance or similar laws in connection with any such Claim. This Section 11.2 is not a waiver of Supplier's right to assert any such immunity, defense or protection directly against any of its own employees or their estates or representatives. **Process.** Purchaser will give Supplier reasonable notice of each Claim for which it seeks indemnity under Section 11.1. Purchaser will also give Supplier its reasonable cooperation in the defense of each Claim, at Supplier's expense.

**Amazon Robotics Confidential**

Supplier will use counsel reasonably satisfactory to Purchaser to defend each Claim. Indemnified Party may participate in the defense at its option and own expense. If at any time Purchaser reasonably determines that any Claim might adversely affect any Indemnified Party, then without limiting Supplier's indemnification obligations, Purchaser may take control of the defense of the Claim, and in such event Purchaser and its counsel will proceed diligently and in good faith with that defense. Supplier may settle any Claim in its sole discretion if the settlement requires only a payment that Supplier must and does pay under this Section 11. Otherwise, Supplier will not settle any Claim without the Indemnified Parties' prior written consent, which may not be unreasonably withheld. Supplier will see that any settlement it makes of any Claim is made confidential, except where the law does not permit that. Supplier's duty to defend is independent of its duty to indemnify.

**11.4      Duty to Correct.** If an infringement Claim is made, or Purchaser reasonably concludes that there is a risk that one will be made, Supplier will, at Purchaser's option and Supplier's sole risk and expense do one or more of the following: (a) procure for Purchaser all rights necessary for Purchaser to continue to exercise all rights granted to Purchaser under this Agreement (including, where applicable, ownership rights or license rights); (b) replace the infringing Deliverable, Product, Supplier Process, Tooling and Equipment or Service,  with a non-infringing version of that item; and (c) modify the Product, Deliverable, Supplier Process, Tooling and Equipment or Service so that it becomes non-infringing.  Any replacement or modification must provide equivalent form, fit, function, features and performance as the original and meet Supplier's warranties and other Product requirements under this Agreement.  Further, any replaced or modified version of a Product, Deliverable, Supplier Process, Tooling and Equipment or Service will be deemed a "Product", "Deliverable", "Supplier Process", "Supplier Tool", or "Service", as the case may be, for purposes of this Agreement.  Without limiting Supplier's other obligations, if Supplier has not accomplished (a), (b) or (c) after best efforts to achieve each of them, it will refund to Purchaser all amounts paid by Purchaser and Approved Buyers under this Agreement in connection with the affected Product, Deliverable, Supplier Process, Tooling and Equipment or Service (and any other Product, Deliverable intended to be used in conjunction with the affected Product or Deliverable).

**11.5      Return of Infringing Products.** In addition to rights under Section 11.4, Purchaser may return any Product units in its inventory that are subject to any infringement Claim covered under Section 11.1, at Supplier's sole risk and expense. Supplier will refund the purchase price of such returned Product units, and all associated shipping and insurance charges, within 30 days after their return.  However, Supplier may not be required to refund the purchase price of any single Product unit under both Section 11.4 and Section 11.5.

**11.6      Adverse Claims Notice.** If the supply, use, resale, distribution or other disposition of any Product, Work Product or Pre-Existing Work under this Agreement is (or may reasonably be expected to be) enjoined for any reason, Supplier will give Purchaser notice as far in advance as reasonably possible.

**11.7      Covenant Not to Sue.** Supplier covenants that it will not assert against Purchaser, its Affiliates, any Approved Buyer or Purchaser's distributors or customers a claim of direct or indirect patent infringement arising from the manufacture, sale, import, use, distribution or other disposal of any Product or Purchaser Device.  Also, Supplier expressly waives any right to seek, obtain or enforce any injunction to directly or indirectly prevent or interfere with Purchaser's direct or indirect manufacture, use, import, sale, distribution or other disposal of Products or Purchaser Devices containing the Product, whether for breach of agreement, Intellectual Property Rights claim, or under any other theory at law or in equity.  If Purchaser breaches Section 14, this Section 11.7 will not bar Supplier from seeking an injunction solely to prevent Purchaser's use or disclosure of Supplier's Confidential Information that is barred under that Section, but any such injunction must not violate the previous sentence's restrictions.

**12.      Disaster Recovery Plan; Insurance and Limitations on Liability.**

**12.1      Disaster Recovery Plan.** Supplier will have and follow a written disaster recovery plan (the "**Disaster Recovery Plan**") to ensure the supply of the Product to Purchaser if a Force Majeure or other similar disruption occurs. Supplier will submit a proposed Disaster Recovery Plan to Purchaser for review and approval within 120 days after the Effective Date, and, if rejected by Purchaser, Supplier will promptly submit a suitably modified Disaster Recovery Plan to Purchaser for review and approval. The parties will repeat this procedure until approval by Purchaser. Supplier must get Purchaser's written approval (not to be unreasonably withheld) before making any material changes to the Purchaser-approved Disaster Recovery Plan. Supplier will promptly implement the Purchaser approved Disaster Recovery Plan upon any Force Majeure or similar circumstances.

**12.2      Insurance.** During the Term and for at least three years afterwards, Supplier will have insurance coverage as needed to secure its obligations and potential liabilities under this Agreement. Supplier will be solely responsible for all amounts that must be paid or retained for that insurance. Supplier's insurance will include at least the following coverage, the limits of which may be satisfied by combining primary liability and umbrella excess liability coverage:

Amazon Robotics Confidential

| Coverage Type | Minimum Coverage Limits |
|---|---|
| Commercial General Liability (including products/completed operations, advertising, and personal injury liability) | $5,000,000 per occurrence<br>$5,000,000 general aggregate |
| Business Automobile Liability (including coverage for all owned, non-owned and hired autos, and no fault coverage where applicable) | $1,000,000 per occurrence (injury and property damage combined) |
| "Professional Liability" or "Errors and Omissions" insurance | $1,000,000 per claim |
| Workers' Compensation (including coverage for all employer liabilities under workers' compensation and similar laws that may accrue for any Supplier employee, in all jurisdictions where Supplier has employees) | As required by law |
| Employer's Liability | $1,000,000 |
| Fidelity Bond (or similar policy covering employee dishonesty) | $500,000 per loss |

The insurance policies for the above must: (a) be issued by companies with a rating of A-/VII or better in the current Best's Insurance Reports published by A. M. Best Company, Inc.; (b) not be able to be cancelled or have coverage reduced without at least 30 days' notice from the Supplier to Purchaser; (c) for Commercial General Liability and Business Automobile Liability only, name Purchaser and its Affiliates, and their respective officers, directors, employees, successors, assigns, licensees, distributors, contractors and agents, as additional insureds; (d) provide coverage on an occurrence basis; (e) waive any insurer right of subrogation against Purchaser and its officers, directors, employees, agents, and contractors; and (f) provide primary coverage, without any right of contribution from any other insurance that Purchaser may have. Supplier will give Purchaser certificates of insurance for the above by the Effective Date and at each later policy renewal. Nothing in this Section 12.2 or Purchaser's actions under it modifies any of Supplier's obligations under this Agreement, including but not limited to liability under Section 11 above for claims exceeding required insurance limits.

**12.3    Exclusion of Certain Damages.**  EXCEPT FOR LIABILITY ARISING FROM (I) A BREACH OF SECTION 14 BY EITHER PARTY; (II) A BREACH OF SECTIONS 9.1 OR 9.3 BY SUPPLIER; (III) FULFILLMENT BY SUPPLIER OF THE LIABILITIES AND OBLIGATIONS THAT ACCRUE PURSUANT TO SECTION 11; (IV) VIOLATION OF PURCHASER'S INTELLECTUAL PROPERTY RIGHTS; (V) DEATH OR BODILY INJURY CAUSED BY ANY DELIVERABLE, PRODUCT OR BY SUPPLIER, ITS EMPLOYEES, AGENTS OR CONTRACTORS; OR (VI) GROSS NEGLIGENCE OR WILLFUL MISCONDUCT BY SUPPLIER, ITS EMPLOYEES, AGENTS OR CONTRACTORS, NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR ANY LOST PROFITS OR INDIRECT, INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES, EVEN IF IT HAS NOTICE OF THAT THOSE KINDS OF DAMAGES MAY OCCUR.

Amazon Robotics Confidential

**13.    Quality Improvement; Quarantine; Disposition of Certain Products; Reverse Logistics Support.**

   **13.1    Quality Improvement.** Supplier will work with Purchaser to continually improve Product processes, quality, and reliability, including based on agreed to targets and corrective actions that are designated from time to time. If Supplier becomes aware of the reasonable likelihood of a decline in Product quality or reliability, Supplier will immediately notify Purchaser of the potential decline and use its best efforts to prevent it.

   **13.2    Quarantine Process.** Purchaser or an Approved Buyer may issue stop ship or suspension of shipment notices from time to time to prevent delivery of Products with possible quality issues, and Supplier will comply with those notices. Purchaser or the Approved Buyer will provide Supplier all available details regarding the nature of the quality issue 5 (five) days before the issuance of the stop ship or suspension of shipment notices. After the quality issues are confirmed by Purchaser and Supplier, Supplier will have and follow a fully documented "stop ship" or quarantine process to remove and isolate affected Product units from Supplier's final shipping area and prevent their shipment to Purchaser or Approved Buyers.

   **13.3    Restrictions on Disposition of Certain Products.** Unless Purchaser agrees otherwise in writing, Supplier will not sell, transfer, distribute, or otherwise relinquish possession to any third party any Product unit, NC Product, or portion of a Product unit or NC Product if: (a) it bears Purchaser's or an Affiliate's trademark, service mark, trade name, part number, packaging, design scheme, or other identifier, (b) the Specifications used to manufacture the Product or NC Product included any Purchaser Design Element, (c) includes or embodies any Work Product; or (d) it is a Custom Product (each a "**Restricted Product**"). Supplier will recycle or destroy all manufacturing overruns of Restricted Product. Supplier will perform that recycling or destruction pursuant to Purchaser's instructions and will credit any proceeds to Purchaser, unless Supplier has provided a refund for that Restricted Product unit. If Supplier is instructed to destroy a Restricted Product, Supplier will give Purchaser written certification of that destruction, together with reasonable supporting documentation that Purchaser requests.

**14.    Repair and Warranty Support.** From the effective date of an <u>Exhibit A</u> until the date 03 (three) years after Purchaser and its Affiliates cease the commercial sale of Purchaser Devices into which the Product is incorporated, embodied, or included, if requested by Purchaser, Supplier will, at its own cost, provide reasonable manufacturing and technical support for the Product and maintain the technical expertise and capability to support the Products, including personnel with sufficient training to repair the Product, tooling and other equipment needed to manufacture or repair Product units, and historical and current manufacturing documents. Supplier will also, at Purchaser's cost and upon good faith consultation between the Parties to identify the most practical solution for provision of such support, support Purchaser's warranty and repair service operations, whether conducted by Purchaser or a third party, with any test, assembly, and debug equipment that Purchaser deems necessary to support those operations (e.g., Supplier platforms and fixtures that have been modified to support the Product). Supplier will provide the manufacturing, technical and warranty and repair support contemplated in this Section 13.3 in accordance herewith. Unless Supplier is obligated to provide warranty and repair support at its own cost for a Product under another Section of this Agreement (*e.g.* in connection with a warranty repair of NC Product), or unless otherwise agreed in writing by the parties, Purchaser shall pay Supplier for warranty and repair support for Purchaser's warranty and repair program at Supplier's then-current, standard time and materials rates. This Section does not limit Supplier's other obligations under this Agreement.

**15.    Confidentiality and Public Statements.** The parties' will comply with the terms of the nondisclosure agreement between Supplier and Purchaser (or Purchaser's Affiliates) (the "**NDA**") and activities in connection with this Agreement are subject to the NDA. In addition to its obligations under the NDA, Supplier will not issue any press releases, make any other disclosures regarding this Agreement or its terms or the nature or existence of any relationship between the parties, or use Amazon's or its Affiliates' trademarks, trade names or other proprietary marks in any manner in connection with this Agreement without the prior written consent of at least a Vice President of Amazon.

**16.    Term and Termination.**

   **16.1    Term.** This Agreement will be effective during the "**Term,**" which means the period starting on the Effective Date and ending three (3) years after the Effective Date. The Term will automatically extend for additional, successive one (1) year period thereafter unless (i) Purchaser gives Supplier a written notice of non-renewal not less than thirty (30) days prior to the end of the then-current Term, or (ii) Supplier gives Purchaser a written notice of non-renewal not less than three hundred and sixty (360) days prior to the end of the then-current term..

   **16.2 Termination by Purchaser.** Purchaser may terminate this Agreement, any Work Order, or one or more <u>Exhibit As</u> for cause by giving notice to Supplier if: (a) Supplier breaches Section 14; (b) Supplier materially breaches any of this Agreement's other provisions, and does not cure that breach within 30 days of notice from Purchaser; (c) there is any permanent, long-term or temporary suspension or interruption of the Product by Supplier or any of its Personnel due to any cause; (d) the applicable Purchaser Affiliate has the right to terminate any Affiliate Agreement for cause under the terms of

Amazon Robotics Confidential

such Affiliate Agreement; (e) Supplier becomes insolvent or becomes the subject of any proceeding under any bankruptcy, insolvency or liquidation law, which is not resolved favorably to Supplier within 60 days;  (e) Supplier becomes subject to property attachment, court injunction or court order which has a Material Adverse Effect on its operations; (f) if Supplier's performance is delayed or otherwise affected by any Force Majeure for more than fifteen (15) days, the Purchaser may terminate the affected Work Order, Purchase Order upon written notice to the Supplier and will only be responsible for fees that accrue up to the date of such termination or (g) Purchaser also may terminate this Agreement or one or more <u>Exhibit As or Work Orders</u> without cause by giving at least 30 days' notice to Supplier, and as stated in other parts of this Agreement.

      **16.3**    **Termination by Supplier.** Supplier may terminate this Agreement (a) by giving at least 30 days' notice if Purchaser becomes the subject of any proceeding under any bankruptcy, insolvency or liquidation law, which is not resolved favorably to Purchaser within 60 days; or (b) by giving an advance notice at least 90 days in case of Force Majeure regardless influence to Purchaser or Supplier; or (c) without cause by giving at least 360 days' notice to Purchaser.

      **16.4**    **Effect of Termination.** If Purchaser terminates this Agreement or an <u>Exhibit A</u> **for cause**, Purchaser and each Approved Buyer will have no obligation to Supplier other than, with respect to Purchase Orders, payment of any balance due for Product units it ordered and that were delivered to and accepted by Purchaser or the Approved Buyer before termination and, with respect to Work Orders, and liabilities incurred prior to expiration or termination; provided that if the fee set forth in the Work Order is a fixed amount, Purchaser will pay the fee to the extent the Project/Work Order is complete. If this Agreement or an <u>Exhibit A</u> is terminated **other than by Purchaser for cause**, Purchaser's sole liability and Supplier's exclusive remedy is payment for Product units that Purchaser and Approved Buyers accept under Purchase Orders that are outstanding as of the termination date and are not cancelled prior to the termination date. Purchaser will have no obligation to pay Supplier for any raw materials, parts, components or work-in-process. Supplier will fulfill all outstanding Purchase Orders that are not cancelled prior to the termination date. Also, upon termination, Purchaser may place a final Purchase Order and all terms of this Agreement shall apply to such Purchase Order.

      **16.5**    **Survival.** Sections 6.4, 7 (for payments for Product units accepted by Purchaser or Approved Buyers before termination), 8, 9, 10, 11, 12.2, 12.3, 13.3, 13.3, 14, 16.4, 16.5, 17 and 18 (together with all other provisions hereof, including all addenda and other attachments hereto, that reasonably may be interpreted as surviving cancellation, termination or expiration of this Agreement) will survive the cancellation, termination or expiration of this Agreement.

**17.**    <u>**Miscellaneous.**</u>

      **17.1**    **Communications.** Supplier will use communication systems that Purchaser reasonably requires to implement this Agreement (e.g., to receive and communicate about Forecasts and Purchase Orders, shipments, deliveries, returns, etc.).

      **17.2**    **Language; Interpretation; Currency.** This Agreement is executed in English only. Any translation of this Agreement into another language will be for reference only and without legal effect. The parties have fully negotiated this Agreement, and it will be interpreted according to the plain meaning of its terms without any presumption that it should be construed either for or against either party. Unless otherwise expressly stated, when used in this Agreement "include," "includes," and "including" are not exclusive or limiting; "Section" refers to this Agreement's provisions; "days" refers to consecutive calendar days including Saturdays, Sundays and holidays; "dollars" and the symbol "$" refer to United States dollars; and "Exhibit" refers to the Exhibits attached to this Agreement. Section headings in this Agreement are for ease of reference only.  Where a party's consent is required such consent is at the party's sole discretion.

      **17.3**    **Severability.** If any court of competent jurisdiction finds any part of this Agreement to be invalid or unenforceable, then that part will be deemed modified to the extent necessary in order to render it valid and enforceable. If it cannot be so saved, it will be severed, and the remaining parts will remain in full force and effect.

      **17.4**    **Governing Law; Venue.** This Agreement is governed by the substantive laws of the state of New York, excluding its conflicts of law provisions. The United Nations Convention on Contracts for the International Sale of Goods will not apply to this Agreement. Any dispute arising under, in connection with, or incident to this Agreement or about its interpretation will be resolved exclusively in the state or federal courts located in New York County, New York. Each party irrevocably submits to those courts' venue and jurisdiction. Each party waives all defenses of lack of personal jurisdiction and *forum non-conveniens*.

      **17.5**    **Continuing to Perform.** During a dispute or notice or cure period in connection with this Agreement, (a) Supplier will continue to fulfill all its obligations under this Agreement, including all Product delivery obligations, unless directed otherwise by Purchaser in writing; and (b) Purchaser will continue to pay correct and undisputed invoices for amounts payable by it under this Agreement. Supplier's breach of this Section 17.5 will be an incurable, material breach of this Agreement.

**Amazon Robotics Confidential**

DocuSign Envelope ID: 714E6A6E-9CF1-46AA-98B9-ACE70A512AE4

Case 1:23-cv-00292-AT   Document 1-1   Filed 01/12/23   Page 52 of 71

**17.6**    **Rights and Remedies Not Exclusive.** Except to the extent it is specifically agreed to in writing by the parties, all rights and remedies under this Agreement are not exclusive. The exercise of a right or remedy will not exclude or waive other rights or remedies under this Agreement, at law or in equity.

**17.7**    **Assignment.** Supplier will not assign any part or all of this Agreement without Purchaser's prior written consent.  Any attempted assignment without such consent will be void. Purchaser may freely assign this Agreement (or any of its rights and obligations under this Agreement or any Work Order): (a) to any of its Affiliates; or (b) in connection with any merger, consolidation, reorganization, sale of all or substantially all of its assets or any similar transaction

**17.8**    **Subcontracting.**  Supplier will not subcontract or delegate any of its obligations under this Agreement to any subcontractors, affiliates, or delegates ("**Subcontractors**") without Purchaser's prior written consent, except to Affiliates of Supplier.  Notwithstanding the existence or terms of any subcontract or delegation, Supplier will remain responsible for the full performance of its obligations under this Agreement. The terms and conditions of this Agreement will be binding upon Supplier's Subcontractors and their respective employees, contractors, and agents.  Supplier (a) will ensure that its Subcontractors and their respective employees, contractors and agents comply with this Agreement, and (b) will be responsible for all acts, omissions, negligence and misconduct of its Subcontractors and their respective employees, contractors and agents.

**17.9**    **Modification; Waiver.** This Agreement may not be modified except by a written agreement dated after the Effective Date and signed in a non-electronic form by the party against which it is to be enforced. A party does not waive any right under this Agreement by failing to insist on compliance with any of the terms of this Agreement or by failing to exercise any right hereunder.  A waiver of one breach under this Agreement is not a waiver of any other breach. No waiver will be effective unless signed in a non-electronic form by the waiving party.

**17.10**    **Independent Contractors; Personnel.** Supplier will perform under this Agreement as an independent contractor of Purchaser, and this Agreement will not be construed to create a partnership, joint venture, agency, employment or any other relationship between Supplier and Purchaser.  Supplier will not represent itself to be an employee or agent of Purchaser.  Supplier will have no authority to enter into any agreement on Purchaser's behalf or in Purchaser's name.  Supplier will retain: (a) full control over the manner in which it manufactures all Products provided to Purchaser; (b) exclusive control over its Personnel; (c) its labor and employee relations and its policies relating to wages, hours, working conditions and other employment conditions; and (d) exclusive right to hire, transfer, suspend, lay off, recall, promote, discipline, discharge and adjust grievances with its Personnel.  Supplier is solely responsible for all salaries and other compensation of its Personnel who manufacture the Products to Purchaser, and for making all deductions and withholdings from its employees' salaries and other compensation and paying all contributions, taxes and assessments.  Supplier and Supplier's Personnel are not entitled to and are not eligible to participate in any workers' compensation, retirement, insurance, stock options or any other benefits afforded to employees of Purchaser. Supplier will be solely responsible for all theft, damage and/or misconduct related to its Personnel.

**17.11**    **Records, Audit, Inspection.** Supplier will maintain true, accurate, complete and up-to-date written books and records in accordance with generally accepted accounting principles in the normal course of its business, including records about Supplier's performance under this Agreement (including by way of example only, quality programs, test documentation, Conflict Minerals and any payments made to another party by Supplier in connection with this Agreement). Purchaser and its agents may, upon reasonable notice during normal business hours, have limited access and make copies of those books and records. Supplier will keep those books and records during the term of this Agreement and for 1 year thereafter, but in all cases for at least three years from the date of the events being documented. Also, Purchaser or its agent may, at any reasonable time during the Term, inspect Supplier's manufacturing facilities, operations and processes for the Products, for purposes reasonably related to this Agreement. If any audit reveals either (a) that Supplier has failed to comply with any material obligation under this Agreement or (b) the existence of any overpayment of 1.0% or more by Purchaser for any invoice, then Supplier will immediately pay Purchaser for the full costs of that audit, and (1) in the case of noncompliance under sub-clause (a) above, Supplier will cure the noncompliance within 15 days of the audit, and (2) in the case of a payment shortfall or overpayment under sub-clause (b) above, Supplier will, within 15 days of the audit, pay or refund to Purchaser the total amount of the discrepancy plus interest at 1% per month or the highest rate permitted by applicable law, whichever is lower.  Supplier will promptly comply with any reasonable requirements Purchaser may specify in connection with physical security and facilities (including fire protection and access controls).

**17.12**    **No Obligation.** Purchaser will have no obligation to (a) place any Purchase Order or purchase any minimum volume of Products or (b) use or include the Product in any Purchaser Device. Nothing in this Agreement restricts Purchaser's ability to directly and indirectly acquire, license, develop, manufacture or distribute similar products with the same or similar functions as the Product.

**Amazon Robotics Confidential**

17.13    **Force Majeure.** In no event shall either party be liable for non-payment, delays in payment, non-delivery or delays in delivery of the Products, Work Product or Deliverables or for failure or delay in the performance of any other obligations under this Agreement or any Purchase Order or Work Order if and to the extent arising directly or indirectly from (i) acts of God, (ii) fire, (iii) flood, (iv) acts of any governmental authority (de jure or de facto), (v) war (declared or undeclared), (vi) riot or civil insurrection, or (vii) epidemics, (a "**Force Majeure**"), provided that such delay or failure in performance could not have been avoided or corrected through the exercise of reasonable diligence by the party whose performance is affected by a Force Majeure (the "**Affected Party**"). The Affected Party must promptly notify the other party in writing of the Force Majeure, giving details of the Force Majeure circumstances, its anticipated effect upon the Affected Party's performance under this Agreement and the steps that the Affected Party is taking to remedy the delay. The obligations of the Affected Party will be suspended for such period of time as is required by the Affected Party to overcome the Force Majeure, provided that the Affected Party uses commercially reasonable efforts to remedy the delay, including if Supplier is the Affected Party, implementing its Disaster Recovery Plan.

17.14    **Entire Agreement.** This Agreement, including all Exhibits and Work Orders, together with the NDA, is the entire agreement between Purchaser and Supplier regarding the purchase and sale of the Product and its other subject matter. It supersedes all prior and contemporaneous agreements and communications about its subject matter. This Agreement may be executed by facsimile or by affixing an E-signature and in counterparts, each of which (including signature pages) will be deemed an original, but all of which together will constitute one and the same instrument.

The parties may use standard business forms or other communications, but use of such forms is for convenience only and does not alter the provisions of this Agreement. NEITHER PARTY WILL BE BOUND BY, AND EACH SPECIFICALLY OBJECTS TO, ANY PROVISION THAT IS DIFFERENT FROM OR IN ADDITION TO THIS AGREEMENT (WHETHER PROFFERED VERBALLY OR IN ANY QUOTATION, INVOICE, SHIPPING DOCUMENT, ACCEPTANCE, CONFIRMATION, CORRESPONDENCE, OR OTHERWISE), UNLESS SUCH PROVISION IS SPECIFICALLY AGREED TO IN A WRITING SIGNED BY BOTH PARTIES.

18.    **Definitions.**

For this Agreement, the following capitalized terms have the meanings listed here:

18.1    "**Affiliate**" means an entity that a party directly or indirectly controls, is controlled by, or is under common control with.

18.2    "**Approved Buyer**" means any third party designated by Purchaser as an "Approved Buyer" for purposes of this Agreement. If Purchaser, at any time, notifies Supplier that a party is no longer an "Approved Buyer," Supplier shall immediately cease accepting Purchase Order from that party following receipt of such notice.

18.3    "**Custom Product**" means a Product that is designed and manufactured specifically for Purchaser including a product, part or subcomponent for inclusion in one or more Purchaser Devices. Custom Products must not be sold, re-sold or otherwise provided by Supplier or its Personnel to any of Supplier's other customers or distributors or other third parties not authorized by Purchaser. Custom Products shall be identified as such in the applicable Exhibit A or Work Order.

18.4    "**Custom Tooling and Equipment**" means any current or future products, devices, apparatus, works, documents, materials, information, equipment, tools or other items, including documentation, manuals, designs, diagrams, charts, reports, analyses, scripts, models, drawings, programs, software, utilities and code, developed or used by Supplier specifically for Purchaser in connection with the design, manufacture, production, testing, demonstration, support and repair of Products.

18.5    "**Dead on Arrival**" or "**DOA**" means any Product unit for which any of the following are true when initially put into service by any customer, or within 120 days after that date: (a) the Product fails to operate properly, (b) the Product unit does not comply with the Product's BOM (e.g., the Product includes a Component that is not on, or does not include a Component that is on, the Bill of Materials); or (c) the Product has any Defect.

18.6    "**Deliverable**" means all deliverables, products, documents, materials, information, tools and other items that Supplier delivers or is required to deliver in connection with the performance of this Agreement, including Products, Work Product, documentation, manuals, designs, diagrams, charts, reports, analyses, scripts, models, drawings, programs, inventions, discoveries, improvements, devices, apparatus, designs, practices, processes, methods, formulae or know-how.

18.7    "**Delivery Date**" means the delivery date stated in a Purchase Order or Work Order or, if the Purchase Order is rescheduled as permitted under this Agreement the rescheduled delivery date.

**Amazon Robotics Confidential**

**18.8** "**Defect**" means any failure by any Product unit or other Deliverable to conform to any representation, warranty or other requirement in this Agreement.

**18.9** "**E-signature**" means a generic technology neutral signature, sound, symbol or process that is attached to or logically associated with a record and that is executed or adopted with the intent to sign the record including a digitized image of a signature.

**18.10** "**Forecast**" means each Purchaser and Approved Buyer forecast of anticipated Product quantities and delivery dates.

**18.11** "**Hazard**" means any risk of bodily injury, illness or property damage.

**18.12** "**Intellectual Property Rights**" means all trade secrets, patents, utility models, copyrights, trademarks, moral rights, mask works, database rights, know-how, and all other intellectual or industrial property or proprietary rights (whether registered or unregistered), whether now known or hereinafter invented or recognized, irrespective of whether such rights arise under U.S., foreign or international laws, and any application, registrations for any of the foregoing and all reissues, divisions, continuations, continuations-in-part, renewals and extensions for these, and any causes of action related to any violation, infringement or misappropriation thereof and all other equivalent or similar rights that may exist anywhere in the world.

**18.13** "**Material Adverse Effect**" means any result, occurrence, fact, change, event or effect  that individually, or taken together with all other results, occurrences, facts, changes, events or effects, have had or would reasonably be likely to have a materially adverse effect or change on the business, operations, properties, condition (financial or otherwise), results of operations, assets, liabilities (including contingent liabilities) or prospects of the impacted party.

**18.14** "**Non-Conforming Product**" or "**NC Product**" means a Product unit that does not comply with the Supplier's warranties in Section 8 and the other requirements of this Agreement.

**18.15** "**Personnel**" means Supplier's employees, representatives, agents, contractors and subcontractors.

**18.16** "**Preproduction Product**" means product prototypes, such as alpha, beta or pilot versions, intended primarily for testing and evaluation and not for production and distribution to Purchaser's customers

**18.17** "**Product**" means each Supplier product identified in an Exhibit A or in a Work Order, including any Preproduction Product or Custom Product to be developed or furnished to Purchaser pursuant to this Agreement.

**18.18** "**Purchaser Device**" means any product of Purchaser or its Affiliates, including products intended for internal business use.

**18.19** "**Purchaser Design Element**" means any custom design or specification for part or all of a Product that is provided by Purchaser to Supplier for use in connection with a specific Exhibit A.  The term "Purchaser Design Element" does not include any Work Product.

**18.20** "**Purchaser Standards and Requirements**" means all requirements in the documents listed in Exhibit C.

**18.21** "**Specifications**" means the specifications for a Deliverable or Product referenced in Exhibit A or the applicable Work Order, including any Purchaser Design Elements for the applicable Product.

**18.22** "**Supplier Processes**" means any current or future business process, technique, method, information, procedure, concept, invention, discovery, improvement, design, practice, formula, know-how or idea developed or used by Supplier in connection with the design, manufacture, production, testing, demonstration, support and repair of Products or similar items, that is not delivered or required to be delivered to Purchaser under this Agreement, including as embodied in or practiced by any Supplier Tooling and Equipment, but excluding as embodied in or practiced by any Custom Tooling or other Work Product.

**18.23** "**Supplier Tooling and Equipment**" means any current or future products, devices, apparatus, works, documents, materials, information, equipment, tools or other items, including documentation, manuals, designs, diagrams, charts, reports, analyses, scripts, models, drawings, programs, software, utilities and code, developed or used by Supplier in connection with the design, manufacture, production, testing, demonstration, support and repair of Products or similar items, that is not delivered or required to be delivered to Purchaser under this Agreement, but excluding any Custom Tooling or other Work Product.

**18.24** "**Tooling and Equipment**" means Supplier Tooling and Equipment and any Custom Tooling and Equipment that Supplier creates for Purchaser under this Agreement.

[The remainder of the page is intentionally left blank.]

Amazon Robotics Confidential

INDEX NO. 653145/2022
RECEIVED NYSCEF: 12/13/2022
DocuSign Envelope ID: 741D6ADE-05FB-4374-A3D2-58E27AF7FE94
Case 1:23-cv-00292-AT   Document 1-1   Filed 01/12/23   Page 55 of 71

Amazon Robotics Confidential

DocuSign Envelope ID: 71D69A46-9F8D-40D5-A4DE-BA6A1C7FEF93

CC MISC 005531645 2020 TR

# Exhibit A – Form of Product Schedule

**Product, Lead Time, Prices, and Related Terms**

This Product Schedule is part of the Component Purchase Agreement between Amazon Robotics LLC ("Purchaser") and the "Supplier" identified in the table below (the "Agreement").
The date of Purchaser's signature below is this Product Schedule's effective date (the "Effective Date").

**Supplier Name** | **Binh Thanh Imp-Exp Production & Trade Joint Stock Co., (GILIMEX)**

| AR Part Number | Supplier Factory Location | Custom/Off the Shelf | Product Price | Standard Lead-time (Weeks) | Lead-time with Forecast (Weeks) | Cancellation Liability Terms for Non_Std Products | | | | | | | | PO Reschedule | | Upside Availability | |
| | | | | | | Finished Product | | Unfinished Product | | Raw Materials | | | | | | | |
| | | | | | | Weeks | % of Unit Cost | Weeks | % of Unit Cost | Weeks | % of Unit Cost | | | Percent | Weeks | Percent | Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400-02602 (H8) | Vietnam | Custom | **126.86** | 16 | 16 | 13 | 100% | 10 | 90% | 8 | 50% | | | 100% | 7 | 50% | 6 |
| 400-02604 (H10) | Vietnam | Custom | **139.91** | 16 | 16 | 13 | 100% | 10 | 90% | 8 | 50% | | | 100% | 7 | 50% | 6 |
| 400-02605 (H11) | Vietnam | Custom | **141.47** | 16 | 16 | 13 | 100% | 10 | 90% | 8 | 50% | | | 100% | 7 | 50% | 6 |
| 400-02606 (H12) | Vietnam | Custom | **123.60** | 16 | 16 | 13 | 100% | 10 | 90% | 8 | 50% | | | 100% | 7 | 50% | 6 |

Note:Lead time
base on working for
6 days per week

**Supplier Signature:** _____

**Name:** _____

Amazon ] Robotics Confidential

legal

CC MISC 00531645 2020 TR

Title: _____

Date: _____

Purchaser Signature: _____

Name: _____

Title: _____

Date: _____

Amazon Robotics Confidential

DocuSign Envelope ID: 71D69A46-9F8D-40D5-A4DE-BA6A1C7FEF93

DocuSign Envelope ID: 71E6A9C9-BA1A-4185-8F9C-8FF5A6EC1E0A
Case 1:23-cv-00292-AT   Document 1-1   Filed 01/12/23   Page 58 of 71

## ATTACHMENT 1 TO EXHIBIT A

For purposes of this the upside availability column on this Exhibit A, an increase that results from a reschedule of an earlier order shall not be deemed a Purchase Order increase.

If Supplier elects to build Product units into finished goods form sooner than required by the manufacturing lead time to fulfill the affected Purchase Order, then Supplier will be compensated based solely on the difference between what the WIP would have been and the standard purchase price for the quantity of Products in the Purchaser Order that is the subject of the reduction or cancellation.

When determining the cancellation charges that are payable by an Approved Buyer for Products which are not yet in finished goods form, under no circumstances may the charges for materials or components of such Products include profit or mark-up.

**Long Lead Time Items List:** Supplier will maintain a minimum inventory of long lead time components/raw materials on hand to support unplanned surge in demand within the range set forth in the upside availability column on this Exhibit A or as otherwise agreed by Purchaser and Supplier. Purchaser's obligations in this paragraph apply only to those items which are designated by Purchaser as long lead time components or raw materials and which are purchased by Supplier with prior written authorization from Purchaser. Such items will be used in the manufacture of Products on a "first in, first out" ("FIFO") basis. It will be Supplier's sole responsibility to procure, store, and keep proper inventory count of such items. If such items become obsolete solely due to Purchaser's reduction in demand or the expiration or termination of the Agreement and cannot be returned or used in any other product for 180 days, then Purchaser will pay the actual purchasing cost of the obsolete items to Supplier, and Supplier will deliver to Purchaser or otherwise dispose of the obsolete items in accordance with Purchaser's written directions. Supplier will review the inventory of long lead time items with Purchaser in each QBR. The initial list of long lead time items is provided below and may be updated from time to time in writing by both parties.

**Previous Purchases:** With respect to any inventory or material purchased for use in the Product prior to the date hereof, the terms and conditions of the Agreement and this Exhibit A (excluding any differences in pricing) will also apply to any Products listed above that Purchaser bought from Supplier before this Exhibit A's effective date.

**Certifications:** Supplier will, at its sole expense, obtain for the Products, and maintain in effect as of the date Product units are delivered, the certifications and approvals identified in the Specifications or this Exhibit A, if any (the "**Minimum Certifications**"). If Purchaser requests, Supplier will give Purchaser copies of the corresponding certificates and compliance reports for the Minimum Certifications and will appropriately affix on each Product the safety and emissions marks of each applicable testing body in accordance with its requirements. If third party certifications are required for any Product, Supplier must have tested and approved the Products according to the associated requirements in effect as of the time the Product is delivered.

**Product Commitment; End-of-Life Procedure:** Supplier agrees that it shall accept Purchase Orders for the Product(s) described in Exhibit A until the date that is ten years after the Exhibit Effective Date (the "**Product Commitment Period**") and that Supplier shall not end-of-life ("**EOL**") the Product during the Product Commitment Period. Supplier may EOL a Product at any time after the end of the Product Commitment Period with not less than three hundred sixty-five (365) days' prior written notice to Purchaser (an "**EOL Notice**"). Any EOL Notice delivered to Purchaser under the preceding sentence shall specify the Product(s) to be subject to EOL and the EOL date(s). Following receipt of an EOL Notice Purchaser may elect to deliver an updated Forecast to Supplier which includes Purchaser's "last buy" requirements for the Products. Notwithstanding Supplier's delivery of an EOL Notice for a Product, Purchaser may continue to submit Purchase Orders through the end of the EOL effective date for the Product and Supplier shall accept and fulfill such Purchase Orders in accordance with the terms of the Agreement. The delivery of an EOL Notice shall not affect or limit Supplier's continuing obligations in respect of the Product subject to

**AMAZON CONFIDENTIAL**

DocuSign Envelope ID: 7F1E6A66-9623-4FF1-4B19-E8BDD4EF78FD
Case 1:23-cv-00292-AT   Document 1-1   Filed 01/12/23   Page 59 of 71

EOL under the Agreement.

### Inventory Management System Details

If required by Purchaser, Supplier will promptly but no later than 15 days after Purchaser's initial written request enter into separate exhibit(s) for a VMI System or Just in Time inventory management system.

### Warranties and Reverse Logistics

Supplier will perform RL Services for the Product at only the following approved facilities:

| Approved RL Services Facilities | Approved Role |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

### Approved Contractors

The following Supplier contractors are "Approved Contractors" with respect to the Product, but solely for the approved role(s) described in the following table:

| Approved Contractors | Approved Role(s) |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

### Other Terms and Information

1.    Pricing. Notwithstanding Section 1.3 of the Agreement, after the initial year of the Term, Supplier may propose a price increase to Purchaser not more than twice per year, in March and September.  In connection with such proposal, Supplier will provide relevant data, including raw material and other cost increases, that would support any proposed increase.  In the event of any such proposal, Purchaser and Supplier will negotiate a price in good faith.

2.    Indemnification.  Purchaser will, at its sole expense and at Supplier's written request, defend, hold harmless and indemnify Supplier, its Affiliates and their respective successors, assigns, directors, officers, employees, agents, and representatives (each, a "Supplier Indemnified Party") from all third party claims, demands, suits, actions and any other proceedings ("Supplier Claims") and all losses, liabilities, damages, assessments, judgements, settlements, expenses and costs (including reasonable attorneys' fees and legal expenses and/or those necessary to successfully establish the right to indemnification), incurred or suffered by any Supplier Indemnified Party in connection with any such Claim to the extent arising from or relating to Supplier's strict compliance with the Specifications or Purchaser Standards or Requirements for the Products provided by Purchaser.  The provisions of Section 11.3 of the Agreement shall apply mutatis mutandis to any claims for indemnification brought pursuant to this paragraph 2.

3.    Remedies for NC Products.  Notwithstanding Sections 8.11 and 14 of the Agreement, during the Warranty Period,

Case 1:23-cv-00292-AT Document 1-1 Filed 01/12/23 Page 60 of 71

Purchaser shall maintain records of any NC Products and, during the pricing discussions in March and September of each calendar year contemplated by paragraph 1 above, review those records with Supplier. At such time, Purchaser and Supplier shall negotiate in good faith to agree upon a portion of the aggregate purchase price for all NC Products received by Purchaser within the previous six months that will be, at Purchaser's option, either (i) applied as a credit against Purchaser's next Order for the Products or (ii) refunded to Purchaser. Supplier acknowledges and agrees that the delivery of NC Products may result in an increase in future Orders to replace such NC Products ("Replacement Products"). Orders for Replacement Products will not be considered in the calculation of Excess Orders under Section 3.1 of the Agreement and shall not be considered an increase for purposes of Exhibit A-1.

4.      Shipping Terms. Notwithstanding Section 4.4 of the Agreement, Supplier will deliver any sale of Products FCA Supplier's warehouse (*Incoterms 2010*).

5.      Invoicing and Related Procedures. Notwithstanding Section 7.1of the Agreement, upon delivering the Products to the carrier as nominated by the Purchaser at the Supplier's warehouse, Supplier will send softcopies of the shipping documents including commercial invoice, packing list, and bill of lading **("Shipping Documents")** via email to Purchaser for Purchaser's verification and payment arrangement. The Certificate of Origin (C/o) of the Products will be issued not later than three (03) business days from the delivery date. Supplier will issue original invoices for all amounts due and owing to Supplier right after the dispatch date of Products and all the issued invoices shall be paid right after:

(i)      the Products are delivered to Purchaser's warehouse in United States always provided that no later than 55 (fifty five) days from the date that the Products are dispatched from Supplier's warehouse; or

(ii)     the Products are delivered to Purchaser's warehouse or other delivery points in European Union always provided that no later than 75 (seventy five) days from the date that the Products are dispatched from Supplier's warehouse.

* * * * * *

**AMAZON CONFIDENTIAL**

DocuSign Envelope ID: 7F1D8A0C-3D3A-4D1A-BD59-8442FEF1A3C4

**Attachment 2 to Exhibit A-1**
**Product Specifications**

[*Insert specs*]

Agile Reference

legal

**AMAZON CONFIDENTIAL**

DocuSign Envelope ID: 74E5546F-... Case 1:23-cv-00292-AT Document 1-1 Filed 01/12/23 Page 62 of 71
CONSK INDEX NO. 165520204 K2022
RECEIVED NYSCEF: 12/13/2022

## EXHIBIT B

### Affiliate Agreement

This Affiliate Agreement ("**Agreement**") is entered into pursuant to the Component Purchase Agreement between Amazon Robotics LLC ("**Amazon**") and the "**Supplier**" identified in the table below (the " **Component Purchase Agreement**"). Initially capitalized terms used, but not defined, in this Agreement have the meaning given to them in the Component Purchase Agreement.

| | |
|---|---|
| **Supplier**: | |
| **Component Purchase Agreement Effective Date**: | |

The entity that signs this Agreement below ("**Signing Affiliate**") represents and warrants that it is an Affiliate of Amazon and agrees to and be bound by the Agreement's terms applicable to Amazon. Once the Signing Affiliate has signed this Agreement, it becomes binding on the Signing Affiliate and on Supplier. This Agreement is a separate agreement between Supplier and the Signing Affiliate.

All of the Agreement's terms are incorporated by this reference into this Agreement, except that (a) "**Purchaser**" means the Signing Affiliate; (b) the "**Effective Date**" is the date on the Date Signed line below; and (c) notices given under this Agreement will be effective when the Signing Affiliate receives them via courier or personal delivery and addressed as stated below.

Signing Affiliate's contacts for routine business and technical correspondence regarding this Agreement are:

| | **Affiliate** |
|---|---|
| **Technical Contact** | |
| Name and title | |
| email | |
| **Business Contact** | |
| Name and title | |
| email | |
| **Other Contact** | |
| Name and title | |
| email | |

Signing Affiliate's contacts to receive legal notices about this Agreement are:

| | **Affiliate** |
|---|---|
| **Primary Address for Notices** | |
| Address: | |
| Attention: | |
| **With a Copy to:** | |
| Address: | |
| Attention: | |

Signing Affiliate may update its contacts above by notice to Supplier.

legal          **AMAZON CONFIDENTIAL**

**AFFILIATE**

By: _____

Name: _____

Title: _____

Date Signed:

**SUPPLIER**

By: _____

Name: _____

Title: _____

Date Signed:

**AMAZON CONFIDENTIAL**

## EXHIBIT C

### Purchaser Standards and Requirements

Supplier and all Products must strictly conform to the documents listed below and any successors to them that Purchaser may make available to Supplier. A copy of each of these documents has been made available to Supplier by Purchaser. (A document may be made available in paper or electronic form, including via Purchaser's electronic document management system.)

| Document Number | Document Name |
|---|---|
| 960-0015 | Amazon Robotics Supplier Quality Manual |
| **Available via the following URL:** http://www.amazon.com/gp/help/customer/display.html?ref=hp_sn_sup?nodeId=200885140 | Supplier Code of Standards and Responsibilities |

legal   **AMAZON CONFIDENTIAL**

# EXHIBIT D

## INFOSEC POLICY

**1. SCOPE; DEFINITIONS**

1.1 Security Policy. Supplier will comply in all respects with Amazon's information security requirements set forth in this Addendum C (the "**Security Policy**"). The Security Policy applies to Supplier's performance under the Agreement and all access, collection, use, storage, transmission, disclosure, destruction or deletion of, and security incidents regarding, Amazon Information. This Security Policy does not limit other obligations of Supplier, including under the Agreement or laws that apply to Supplier, Supplier's performance under the Agreement, the Amazon Information or the Permitted Purpose. To the extent this Security Policy directly conflicts with the Agreement, Supplier will promptly notify Amazon of the conflict and will comply with the requirement that is more restrictive and more protective of Amazon Information (which may be designated by Amazon).

1.2 Definitions.

    1.2.1 "**Aggregate**" means to combine or store Amazon Information with any data or information of Supplier or any third party.

    1.2.2 "**Anonymize**" means to use, collect, store, transmit or transform any data or information (including Amazon Information) in a manner or form that does not identify, permit identification of, and is not otherwise attributable to any user, device identifier, source, product, service, context, brand, or Amazon or its affiliates.

    1.2.3 "**Amazon Information**" means, individually and collectively: (a) all Amazon Confidential Information (as defined in the Agreement or in the non-disclosure agreement between the parties); (b) all other data, records, files, content or information, in any form or format, acquired, accessed, collected, received, stored or maintained by Supplier or its affiliates from or on behalf of Amazon or its affiliates, or otherwise in connection with the Agreement, the services, or the parties' performance of or exercise of rights under or in connection with the Agreement (including [Amazon Data]); and (c) derived from (a) or (b), even if Anonymized.

    1.2.4 "**Testing**" means vulnerability management scanning and/or port scanning upon devices and includes cybersecurity testing activities concerning the Supplier's systems, including testing and equipment code, that are installed on Amazon's environment.

    1.2.5 "**Escrow Agreement**" means an escrow agreement substantially in the form attached as Exhibit A.

    1.2.6 "**Escrow Agent**" means Iron Mountain Intellectual Property Management, Inc. or any other third party mutually agreed to in writing by Amazon and Supplier to act as the escrow agent under the Escrow Agreement.

1.3 Permitted Purpose. Except as expressly authorized under the Agreement, Supplier may access, collect, use, store, and transmit only the Amazon Information expressly authorized under the Agreement and solely for the purpose of providing the services under the Agreement, consistent with the licenses (if any) granted under the Agreement (the "**Permitted Purpose**"). Except as expressly authorized under the Agreement, Supplier will not access, collect, use, store or transmit any Amazon Information and will not Aggregate Amazon Information, even if Anonymized. Except with Amazon's prior express written consent, Supplier will not (1) transfer, rent, barter, trade, sell, rent, loan, lease or otherwise distribute or make available to any third party any Amazon Information or (2) Aggregate Amazon Information with any other information or data, even if Anonymized.

**2 AMAZON SECURITY POLICY.**

2.1 Basic Security Requirements. Supplier will, consistent with current best industry standards and such other requirements specified by Amazon based on the classification and sensitivity of Amazon Information, maintain physical, administrative and technical safeguards and other security measures (i) to maintain the security and confidentiality of Amazon Information accessed, collected, used, stored or transmitted by Supplier, and (ii) to protect that information from known or reasonably anticipated threats or hazards to its security and integrity, accidental loss, alteration, disclosure and all other unlawful forms of processing. Without limitation, Supplier will comply with the following requirements:

    2.1.1 Firewall. Supplier will install and maintain a working network firewall to protect data accessible via the Internet and will keep all Amazon Information protected by the firewall at all times.

    2.1.2 Updates. Supplier will keep its systems and software up-to-date with the latest upgrades, updates, bug fixes, new versions and other modifications necessary to ensure security of the Amazon Information.

    2.1.3 Anti-malware. Supplier will at all times use anti-malware software and will keep the anti-malware software up to date. Supplier will mitigate threats from all viruses, spyware, and other malicious code that are or should reasonably have been detected.

    2.1.4 Encryption. Supplier will encrypt data at rest and data sent across networks in accordance with industry best practices.

    2.1.5 Testing. Supplier will regularly test its security systems and processes to ensure they meet the requirements of this Security Policy.

    2.1.6 Certificate based authentication. Any equipment that will connect to the Amazon network shipped to Amazon after January 1, 2019 must support 802.1x certificate based authentication to allow the devices to be identified and trusted upon connecting to the Amazon network.

    2.1.7 Patching. Operating systems must be patched at least quarterly. Operating systems must be on a currently supported platform and must never run on deprecated versions which are not currently under support.

    2.1.8 Insecure Protocols. Insecure protocols such as Telnet, FTP and HTTP, which allow credentials to pass in clear text, must never be used.

    2.1.9 Access Controls. Supplier will secure Amazon Information, including by complying with the following requirements:

        **i.** Supplier will assign a unique ID to each person with computer access to Amazon Information.

        **ii.** Supplier will restrict access to Amazon Information to only those people with a "need-to-know" for a Permitted Purpose.

        **iii.** Supplier will regularly review the list of people and services with access to Amazon Information, and remove accounts that no longer require access. This review must be performed at least once every 90 days.

        **iv.** Supplier will not use manufacturer-supplied defaults for system passwords and other security parameters on any operating systems, software or other systems. Supplier will mandate and ensure the use of system-enforced "strong passwords" in accordance with

10    legal    **AMAZON CONFIDENTIAL**

the best practices (described below) on all systems hosting, storing, processing, or that have or control access to, Amazon Information and will require that all passwords and access credentials are kept confidential and not shared among personnel.

- o Password best practices. Passwords must meet the following criteria:
  - ▪ contain at least 8 characters;
  - ▪ not match previous passwords, the user's login, or common name;
  - ▪ must be changed whenever an account compromise is suspected or assumed; and
  - ▪ are regularly replaced after no more than 90 days.

**v.** Supplier will maintain and enforce "account lockout" by disabling accounts with access to Amazon Information when an account exceeds more than ten (10) consecutive incorrect password attempts.

**vi.** Except where expressly authorized by Amazon in writing, Supplier will isolate Amazon Information at all times (including in storage, processing or transmission), from Supplier's and any third party information.

**vii.** If additional physical access controls are requested in writing by Amazon, Supplier will implement and use those secure physical access control measures.

**viii.** Supplier will provide to Amazon, on an annual basis or more frequently upon Amazon's request, (1) log data about all use (both authorized and unauthorized) of Amazon's accounts or credentials provided to Supplier for use on behalf of Amazon (e.g., social medial account credentials), and (2) detailed log data about any impersonation of, or attempt to impersonate, Amazon personnel or Supplier personnel with access to Amazon Information.

**ix.** Supplier will regularly review access logs for signs of malicious behavior or unauthorized access.

2.1.10  Code.  If Supplier develops code as part of the services or solutions it provides, evidence of a Secure Development Lifecycle or program must be made available upon request.

2.1.11  Supplier Policy.  Supplier will maintain and enforce an information and network security policy for employees, subcontractors, agents, and suppliers that meets the standards set out in this policy, including methods to detect and log policy violations. Upon request by Amazon, Supplier will provide Amazon with information on violations of Supplier's information and network security policy, even if it does not constitute a Security Incident.

2.1.12  Subcontract.  Supplier will not subcontract or delegate any of its obligations under this Security Policy to any subcontractors, affiliates, or delegates ("Subcontractors") without Amazon's prior written consent.  Notwithstanding the existence or terms of any subcontract or delegation, Supplier will remain responsible for the full performance of its obligations under this Security Policy.  The terms and conditions of this Security Policy will be binding upon Supplier's Subcontractors and Personnel.  Supplier (a) will ensure that its Subcontractors and Personnel comply with this Security Policy, and (b) will be responsible for all acts, omissions, negligence and misconduct of its Subcontractors and Personnel

2.1.13  Remote Access.  Supplier will ensure that any access from outside protected corporate or production environments to systems holding Amazon Information or Supplier's corporate or development workstation networks requires multi-factor authentication (e.g., requires at least two separate factors for identifying users).

2.1.14  "In Bulk" Access.  Except where expressly authorized by Amazon in writing, Supplier will not access, and will not permit access to, Amazon Information "in bulk" whether the Amazon Information is in an Amazon- or Supplier-controlled database or stored in any other method, including storage in file-based archives (e.g., flat files), etc. For purposes of this section, "in bulk" access means accessing data by means of database query, report generation or any other mass transfer of data. Specifically, this section prohibits any access to Amazon Information except for access to individual records as needed for the Permitted Purpose. Supplier will preserve detailed log data on attempted or successful "in bulk" access to Amazon Information, and provide reports from these logs as part of its obligations under Section 2.7 (Security Review). In the event that Amazon provides written authorization for access to Amazon Information "in bulk", Supplier will (1) limit such access only to specified employees  with the "need to know", and (2) use tools that limit access and require explicit authorization and logging of all access.

2.1.15  Supplier Personnel.  Amazon may condition access to Amazon Information by Supplier personnel on Supplier personnel's execution and delivery to Amazon of individual nondisclosure agreements, the form of which is specified by Amazon.  If required by Amazon, Amazon requests that Supplier's personnel execute the individual nondisclosure agreement.  Supplier will obtain and deliver to Amazon signed individual nondisclosure agreements from Supplier personnel that will have access to the Amazon Information (prior to granting access or providing information to the Supplier personnel).  Supplier will also (i) maintain a list of all Supplier personnel who have accessed or received the Amazon Information and provide that list to Amazon upon request within an agreed upon timeframe, and (ii) notify Amazon no later than 24 hours after any specific individual Supplier personnel authorized to access Amazon Information in accordance with this Section: (y) no longer needs access to Amazon Information or (z) no longer qualifies as Supplier personnel (e.g., the personnel leaves Supplier's employment).

2.2  Access to Amazon Extranet and Supplier Portals.  Amazon may grant Supplier access to Amazon Information via web portals or other non-public websites or extranet services on Amazon's or a third party's website or system (each, an "**Extranet**") for the Permitted Purpose.  If Amazon permits Supplier to access any Amazon Information using an Extranet, Supplier must comply with the following requirements:

2.2.1  Permitted Purpose.  Supplier and its personnel will access the Extranet and access, collect, use, view, retrieve, download or store Amazon Information from the Extranet solely for the Permitted Purpose.

2.2.2  Accounts.  Supplier will ensure that Supplier personnel use only the Extranet account(s) designated for each individual by Amazon and will require Supplier personnel to keep their access credentials confidential.

2.2.3  Systems.  Supplier will access the Extranet only through computing or processing systems or applications running operating systems managed by Supplier and that include: (i) system network firewalls in accordance with Section **Error! Reference source not found.** (Firewall); (ii) centralized patch management in compliance with Section **Error! Reference source not found.** (Updates); (iii) operating

**AMAZON CONFIDENTIAL**

DocuSign Envelope ID: 7EE66FE0-0EE2-4715-AD87-D2F81A19B2E2

Case 1:23-cv-00292-AT   Document 1-1   Filed 01/12/23   Page 67 of 71

system appropriate anti-malware software in accordance with Section 2.1.3 (Anti-malware); and (iv) for portable devices, full disk encryption.

2.2.4  <u>Restrictions</u>.  Except if approved in advance in writing by Amazon, Supplier will not download, mirror or permanently store any Amazon Information from any Extranet on any medium, including any machines, devices or servers,.

2.2.5  <u>Account Termination</u>.  Supplier will terminate the account of each of Supplier's personnel and notify Amazon no later than 24 hours after any specific Supplier personnel who has been authorized to access any Extranet (a) no longer needs access to Amazon Information or (b) no longer qualifies as Supplier personnel (e.g., the personnel leaves Supplier's employment).

2.2.6  <u>Third Party Systems</u>.

  **i.**  Supplier will give Amazon prior notice and obtain Amazon's prior written approval before it uses any Third Party System that stores or may otherwise have access to Amazon Information, unless a) the data is encrypted in accordance with this Security Policy, and b) the Third Party System will not have access to the decryption key or unencrypted "plain text" versions of the data. Amazon reserves the right to require an Amazon security review (in accordance with Section 2.7 (Security Review)) of the Third Party System before giving approval.

  **ii.**  If Supplier uses any Third Party Systems that store or otherwise may access unencrypted Amazon Information, Supplier must perform a security review of the Third Party Systems and their security controls and will provide Amazon periodic reporting about the Third Party System's security controls in the format requested by Amazon (e.g., SAS 70 or its successor report), or other recognized industry-standard report approved by Amazon).

2.3  <u>Data Retention and Destruction</u>.

2.3.1  <u>Retention</u>.  Supplier will retain Amazon Information only for the purpose of, and as long as is necessary for, the Permitted Purpose.

2.3.2  <u>Return or Deletion</u>.  Supplier will promptly (but within no more than 72 hours after Amazon's request) return to Amazon and permanently and securely delete all Amazon Information upon and in accordance with Amazon's notice requiring return and/or deletion. Also, Supplier will permanently and securely delete all live (online or network accessible) instances of the Amazon Information within 90 days after the earlier of completion of the Permitted Purpose or termination or expiration of the Agreement.  If requested by Amazon, Supplier will certify in writing that all Amazon Information has been destroyed.

2.3.3  <u>Archival Copies</u>.  If Supplier is required by law to retain archival copies of Amazon Information for tax or similar regulatory purposes, this archived Amazon Information must be stored in one of the following ways:

  **i.**  As a "cold" or offline (i.e., not available for immediate or interactive use) backup stored in a physically secure facility; or

  **ii.**  Encrypted, where the system hosting or storing the encrypted file(s) does not have access to a copy of the key(s) used for encryption.

2.3.4  <u>Recovery</u>.  If Supplier performs a "recovery" (i.e., reverting to a backup) for the purpose of disaster recovery, Supplier will have and maintain a process that ensures that all Amazon Information that is required to be deleted pursuant to the Agreement or this Security Policy will be re-deleted or overwritten from the recovered data in accordance with this Section 2.3 within 24 hours after recovery occurs.  If Supplier performs a recovery for any purpose, no Amazon Information may be recovered to any third party system or network without Amazon's prior written approval. Amazon reserves the right to require an Amazon security review (in accordance with Section 2.7 (Security Review)) of the third party system or network before permitting recovery of any Amazon Information to any third party system or network.

2.3.5  <u>Deletion Standards</u>.  All Amazon Information deleted by Supplier will be deleted in accordance with the NIST Special Publication 800-88  Revision  1,  Guidelines  for  Media  Sanitation  December  18,  2014  (available  at http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-88r1.pdf ), or through degaussing of magnetic media in an electromagnetic flux field of 5000+ GER, or by shredding or mechanical disintegration, or such other standards Amazon may require based on the classification and sensitivity of the Amazon Information. With respect to Amazon Information encrypted in compliance with this Security Policy, this deletion may be done by permanently and securely deleting all copies of the keys used for encryption.

2.4  <u>Forensic Destruction</u>.  Before disposing in any manner of any hardware, software, or any other media that contains, or has at any time contained, Amazon Information, Supplier will perform a complete forensic destruction of the hardware, software or other media so that none of the Amazon Information can be recovered or retrieved in any form.  Supplier will perform forensic destruction in accordance with the standards Amazon may require based on the classification and sensitivity of the Amazon Information.

2.4.1  Supplier will not sell, resell, donate, refurbish, or otherwise transfer (including any sale or transfer of any such hardware, software, or other media, any disposition in connection with any liquidation of Supplier's business, or any other disposition) any hardware, software or other media that contains Amazon Information that has not been Forensically Destroyed by Supplier.

2.5  <u>Vulnerability Assessment</u>.

2.5.1  <u>Authorization to perform Testing</u>.  Supplier hereby authorizes Amazon to perform those certain cybersecurity testing activities concerning Supplier's systems, including testing equipment and code, that are installed in Amazon's environment. Amazon may perform vulnerability management scanning and/or port scanning upon any devices that will be installed on or have access to Amazon's corporate networks.

2.5.2  <u>Supplier responsibilities</u>.  Supplier acknowledges that the Testing may require Amazon to gain access, or to attempt to gain access, to technology infrastructures, confidential information, data, assets, or devices that are owned by Supplier or that are licensed or leased from, or hosted or otherwise provided and owned by third parties (collectively, the "Supplier Property").  In performing the Testing, Amazon may, if relevant to the Testing pursuant to this Authorization, circumvent technology or physical measures designed to protect against unauthorized access to Supplier Property, including those that effectively control access to material protected by various intellectual property laws, as well as use or provide technology to achieve any such circumvention.  Supplier and Amazon understand and acknowledge that the performance of the Testing pursuant to this Authorization may, regardless of specific consent, notice or authorization given, violate laws applicable to Supplier or Amazon in a manner not anticipated by the parties, and/or internal Company policies or applicable industry standards.

legal

**AMAZON CONFIDENTIAL**

2.5.3 <u>Timeline</u>. Supplier will publish vulnerability information to ICS-CERT upon identification and inform Amazon of vulnerability and/or availability concerns by contacting asoc-vm-external-reports@amazon.com. Supplier will take all actions necessary to remediate vulnerability and/or defect within agreed upon SLA.

SLA Schedule for Testing and Deploying US-CERT Updates

| Vulnerability Rating | Completion |
|---|---|
| Critical | Within four (4) days |
| High | Within five (5) days |
| Moderate | Within fifteen (15) days |
| Low | Within two hundred seventy (270) days |

**NOTE:** *Clock starts at 8:00 A.M. EST the second Wednesday of each month, or when release notices for Critical updates are made available.*

2.5.4 <u>Supplier's representations</u>. Supplier hereby represents and warrants that: (i) it owns and controls, directly or indirectly, or has procured, and will maintain all necessary rights to use and access and provide Amazon the right to use and access, all of the Supplier's property that may be used or accessed by Amazon to perform the Testing; (ii) Supplier has the full power and authority to engage and direct Amazon to access Supplier property and to perform the Testing; (iii) this Authorization will not violate any term or condition of any agreement that Supplier has with any third party. Supplier is solely responsible for (i) obtaining any consents necessary for Amazon to perform the Testing and for (ii) providing any notices required in connection with the Testing and Amazon's access or potential access to the Supplier Property in the course Amazon's performance of the Testing. Supplier will provide all necessary guidelines for Amazon to access or circumvent Supplier Property, as are reasonably required for Amazon to perform the Testing. Supplier shall be solely responsible for compliance with laws applicable to its business or the Testing, including without limitation, any laws relating to network integrity or security or to data privacy.

2.5.5 <u>Intellectual Property</u>. Supplier hereby grants to Amazon, a non-exclusive, fully paid, worldwide, non-transferable, limited right and license to permit Amazon, and its subcontractors, to use Supplier Retained Intellectual Property, for the purposes of conducting the cybersecurity testing and scanning. Upon completion of the Testing, Amazon.com hereby grants to Supplier a perpetual, worldwide, non-transferable, non-exclusive, irrevocable right and license to use, and copy deliverables provided to Supplier under this Authorization, if any, for purposes of Supplier's and its affiliated companies' internal business only.

2.5.6 <u>Subcontractors</u>. Amazon.com may, at its own expense and in its sole discretion, retain advisors and consultants with respect to any and all Testing and may, in its sole discretion, delegate or subcontract the performance of any such Testing hereunder to one or more subcontractors.

2.5.7 <u>Indemnification</u>. Supplier will indemnify, save, hold harmless and defend Amazon, its affiliates, successors, and their directors, officers, employees, agents and representatives against all claims, costs, expenses, demands, damages, regulatory fines, penalties, lawsuits, and liabilities (including, without limitation, interest, penalties, settlement amounts, attorneys' fees and court costs) to the extent caused by, or arising from any allegation or claim in criminal or civil law based on the activities authorized and contemplated under this Authorization, including but not limited to: (i) any claims arising out of Supplier's use of the Testing or any deliverables hereunder; (ii) Supplier's failure to obtain any third-party consent or authorization required to be obtained hereunder.

2.5.8 IN NO EVENT WILL AMAZON BE LIABLE FOR ANY: (A) CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL OR PUNITIVE DAMAGE, LOSS OR EXPENSES OR (B) LOSS, DAMAGE OR EXPENSES ARISING FROM BUSINESS INTERRUPTION, LOST BUSINESS, LOST PROFITS OR LOST SAVINGS, LOSS OR CORRUPTION OF DATA OR NETWORK, DENIAL OF SERVICE RESULTING IN DOWNTIME OR LOSS OF NETWORK CONNECTIVITY, SERVER OR WORKSTATION CORRUPTION, ACCESS TO CORPORATE USER ACCOUNTS, VIEWING OF DATA ON NETWORKS INCLUDING EMAIL, WEB AND FILE TRANSFER TRAFFIC, TRANSACTION LOSS, CROSS-BORDER DATA TRANSFER, COMPROMISED SYSTEMS, INADVERTENT TRESPASS OF DATA REGULATORY REGIMES, WHETHER DIRECT OR INDIRECT OR (C) LOSS OR CLAIM ARISING OUT OF OR IN CONNECTION WITH SUPPLIER'S IMPLEMENTATION OF ANY CONCLUSIONS OR RECOMMENDATIONS MADE BY AMAZON BASED ON, RESULTING FROM, ARISING OUT OF OR OTHERWISE RELATED TO THIS AGREEMENT. SUPPLIER ACKNOWLEDGES THAT SECURITY IS NOT IMPENETRABLE AND THAT SUPPLIER IS ULTIMATELY RESPONSIBLE FOR THE SECURITY OF ITS SYSTEMS. UNINTENDED CONSEQUENCES ARE INHERENT IN CYBERSECURITY TESTING ACTIVITIES AND SUPPLIER ACKNOWLEDGES THAT, IN THE COURSE OF PROVIDING THE TESTING THERE MAY BE DAMAGE OR LOSS CAUSED TO SYSTEMS INCLUDING BUSINESS INTERRUPTION, LOSS OF DATA, LOSS OF SERVICES, LOSS OF FINANCES AND/OR OTHER UNINTENDED FLOW ON CONSEQUENCES.

2.6 Escrow of Source Code

2.6.1 <u>Escrow</u>. Within thirty (30) days of Supplier's receipt of a written request from Amazon, the parties will duly execute and deliver the Escrow Agreement, and Supplier will deliver to the Escrow Agent a complete master, reproducible copy of all Source Code relating to

**AMAZON CONFIDENTIAL**

DocuSign Envelope ID: 7F1E6DDA-DEFE-441F-AB82-DE9F12B4F5EC

the Software that is on the equipment on Amazon's network. Supplier promptly will update the Source Code in escrow to reflect all revisions, modifications and enhancements to the Software that are provided to Amazon hereunder. If Amazon ceases using Supplier's equipment, Amazon will cease use of the Supplier's source code upon such termination.

2.6.2  Release of Source Code. Upon occurrence of the conditions described below (each, a "Release Condition"), the Source Code placed in escrow will be delivered to Amazon for use in accordance with its rights under this Agreement. If (A) a Major Failure occurs related to the Software and the Supplier fails to respond to and perform its warranty or maintenance obligations and Supplier does not cure such failure to respond and perform within ten (10) business days after written notice thereof from Amazon, (B) Supplier fails to offer maintenance or software support services to Amazon as reasonably required by Amazon for it to continue its use of the Equipment as contemplated herein or in a particular Work Order, (C) there is a Security Incident (as defined in Section 2.8.1) involving Supplier's software or equipment systems, or (D) Supplier (1) becomes insolvent or bankrupt or makes an assignment for the benefit of creditors, (2) has a receiver or trustee in bankruptcy appointed for it, or (3) has any proceeding in bankruptcy, receivership or liquidation instituted against it which is not dismissed within 30 days following the commencement thereof, Amazon shall be entitled to the Source Code as provided for in the Escrow Agreement.

2.6.3  License; Ownership. Supplier hereby grants and agrees to grant to Amazon a perpetual, non-exclusive, worldwide license to use, copy, modify, reverse engineer and create derivative works of the Source Code following the occurrence of any Release Condition, and also to exercise all of the foregoing rights in and to the Source Code upon its delivery to Amazon, all solely in connection with Amazon's and its contractors' use, maintenance and support of the Software. Amazon may sublicense the rights set forth in this Section to its Affiliates and any third parties who perform services on behalf of Amazon or its Affiliates. Amazon will be the exclusive owner of any modifications to, or derivative works of, the Source Code created by or for Amazon under this Agreement.

2.7  Security Review.

2.7.1  Amazon reserves the right to periodically request Supplier to complete a new Amazon risk assessment questionnaire.

2.7.2  Certification. Upon Amazon's written request, Supplier will certify in writing to Amazon that it is in compliance with this Agreement.

2.7.3  Other Reviews. Amazon reserves the right to periodically review the security of systems that Supplier uses to process Amazon Information. Supplier will cooperate and provide Amazon with all required information within a reasonable time frame but no more than 20 calendar days from the date of Amazon's request.

2.7.4  Remediation. If any security review identifies any deficiencies, Supplier will, at its sole cost and expense take all actions necessary to remediate those deficiencies within an agreed upon timeframe.

2.8  Security Incidents.

2.8.1  Supplier will inform Amazon by contacting security@amazon.com within 24 hours of detecting any actual or suspected unauthorized access, collection, acquisition, use, transmission, disclosure, corruption or loss of Amazon Information, or breach of any environment (i) containing Amazon Information, or (ii) managed by Supplier with controls substantially similar to those protecting Amazon Information (each, a "**Security Incident**"). Supplier will remedy each Security Incident in a timely manner and provide Amazon written details regarding Supplier's internal investigation regarding each Security Incident. Supplier agrees not to notify any regulatory authority, nor any customer, on behalf of Amazon unless Amazon specifically requests in writing that Supplier do so and Amazon reserves the right to review and approve the form and content of any notification before it is provided to any party. Supplier will cooperate and work together with Amazon to formulate and execute a plan to rectify all confirmed Security Incidents.

2.8.2  Supplier will inform Amazon within 24 hours when its data is being sought in response to legal process or by applicable law (e.g. 18 U.S.C. §2705(b)).

2.8.3

legal       **AMAZON CONFIDENTIAL**

## EXHIBIT E

### Approved Buyer Agreement

This Approved Buyer Agreement ("**Agreement**") is entered into pursuant to the Component Purchase Agreement between Amazon Robotics LLC ("**Amazon**") and the "**Supplier**" identified in the table below (the "**Component Purchase Agreement**"). Initially capitalized terms used, but not defined, in this Agreement have the meaning given to them in the Component Purchase Agreement.

| | |
|---|---|
| **Supplier**: | |
| **Component Purchase Agreement Effective Date:** | |

The entity that signs this Agreement below ("**Signing Approved Buyer**") represents and warrants that it is an Approved Buyer of Amazon and agrees to and be bound by the Component Purchase Agreement's terms applicable to Amazon. Once the Signing Approved Buyer has signed this Agreement, it becomes binding on the Signing Approved Buyer and on Supplier. This Agreement is a separate agreement between Supplier and the Signing Approved Buyer.

The Component Purchase Agreement's terms are incorporated by this reference into this Agreement, and the Signing Approved Buyer shall have all of the rights and obligations assigned to an Approved Buyer therein. For the avoidance of doubt and without limiting the foregoing, the rights of Purchaser and its Affiliates pursuant to Section 10 of the Component Purchase Agreement shall remain those of Purchaser and its Affiliates and shall not vest with the Approved Buyer other than in that the Approved Buyer may enforce such rights against Supplier on Purchaser's behalf. Additionally, with respect to the Component Purchase Agreement, (a) the "**Effective Date**" shall be deemed the date on the Date Signed line below; and (b) notices given under this Agreement will be effective when the Signing Approved Buyer receives them via courier or personal delivery and addressed as stated below.

Supplier acknowledges and agrees that Amazon is not acting as a guarantor with respect to the acts or omissions of the Signing Approved Buyer. Without limiting the generality of the foregoing, Amazon will not be liable for any act or omission of the Signing Approved Buyer, including without limitation the Signing Approved Buyer's failure to purchase forecasted quantities or pay for Products delivered to the Signing Approved Buyer. Supplier acknowledges and agrees that to the extent that it accepts Purchase Orders from the Signing Approved Buyer, such Signing Approved Buyer shall be solely responsible and liable for payment, and that Amazon bears no liability or responsibility for any payment disputes between Supplier and the Signing Approved Buyer.

Further, the Signing Approved Buyer acknowledges and agrees that Amazon is entitled to all rights under the Component Purchase Agreement for all Products purchased by the Signing Approved Buyer as if Amazon had purchased the Products directly from Supplier.

Signing Approved Buyer's contacts for routine business and technical correspondence regarding this Agreement are:

| | **Approved Buyer** |
|---|---|
| **Technical Contact** | |
| Name and title | |
| email | |
| **Business Contact** | |
| Name and title | |
| email | |
| **Other Contact** | |

**AMAZON CONFIDENTIAL**

| Name and title | |
|---|---|
| email | |

Signing Approved Buyer's contacts to receive legal notices about this Agreement are:

| | **Approved Buyer** |
|---|---|
| **Primary Address for Notices** | |
| Address: | |
| Attention: | |
| **With a Copy to:** | |
| Address: | |
| Attention: | |

Signing Approved Buyer may update its contacts above by notice to Supplier.

**APPROVED BUYER**

By: _____

Name: _____

Title: _____

Date Signed:

**SUPPLIER**

By: _____

Name: _____

Title: _____

Date Signed:

legal

**AMAZON CONFIDENTIAL**