UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BINH THANH IMPORT EXPORT
PRODUCTION & TRADE JOINT
STOCK CO., d/b/a GILIMEX, INC.,

               Plaintiff,

-against-

AMAZON.COM SERVICES, LLC, d/b/a
AMAZON ROBOTICS,

               Defendant.

Case No. 1:23-cv-00292-LGS

---

**DEFENDANT AMAZON.COM SERVICES LLC'S**
**<u>POST-HEARING BRIEF IN SUPPORT OF ITS MOTION FOR SANCTIONS</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT.................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................................... 1

    A.    Gilimex's Complaint Sought $68 Million for Raw Materials Purchased in 2022 .................................................................................................................................... 1

    B.    Gilimex Initially Produced Fabricated POs from 2022 Totaling $69 Million.............. 2

    C.    Gilimex First Produced the $69 Million Blazemax PO and Fabricated Excel Minutes in Expert Discovery ...................................................................................... 2

    D.    Gilimex Admitted the Excel Minutes Are Inauthentic, but Produced New "Hardcopy" Minutes in Response to Amazon's Motion *in Limine* ............................. 3

    E.    Amazon Reported the Fraud to the Court, but Gilimex Denied Its Fraud................... 4

    F.    The Court Scheduled a Hearing and Permitted Additional Discovery ........................ 5

    G.    Gilimex Admitted it Produced Fake Documents and then Fabricated a Story About How They Were Created........................................................................................ 5

    H.    Gilimex Produced More Never-Before-Seen "Hardcopy" Documents, Including "Color" Versions of the Blazemax PO and Minutes ................................. 6

    I.    The Hearing ................................................................................................................ 7

LEGAL STANDARD .................................................................................................................. 8

ARGUMENT ............................................................................................................................... 8

I.        GILIMEX IS COMMITTING A FRAUD ON THE COURT ...................................... 8

    A.    The Evidence Shows Gilimex Produced Fabricated POs in Discovery ...................... 9

    B.    The Evidence Shows the Blazemax PO Is Fraudulent .............................................. 10

    C.    The Evidence Shows Gilimex Is Committing an Ongoing Fraud on the Court ......... 15

II.       GILIMEX'S FRAUD ON THE COURT REQUIRES DISMISSAL ........................ 22

    A.    Gilimex's Fraud on the Court Warrants Terminating Sanctions ................................ 23

    B.    Other Sanctions Are Wholly Inadequate to Redress Gilimex's Conduct .................. 28

III.      AMAZON IS ENTITLED TO ATTORNEYS' FEES AND COSTS ......................... 30

CONCLUSION........................................................................................................................... 31

## TABLE OF AUTHORITIES

Page(s)

### Cases

*CAT3, LLC v. Black Lineage, Inc.*,
    164 F. Supp. 3d 488 (S.D.N.Y. 2016)...................................................................25

*Century Pac., Inc. v. Hilton Hotels Corp.*,
    528 F. Supp. 2d 206 (S.D.N.Y. 2007)....................................................................8

*Cerruti 1881 S.A. v. Cerruti, Inc.*,
    169 F.R.D. 573 (S.D.N.Y. 1996) ...................................................................26, 30

*Chalfin v. Go Big Solar, LLC*,
    2025 WL 2022012 (S.D.N.Y. July 17, 2025) ........................................................28

*Colella v. Republic of Argentina*,
    2020 WL 4700930 (S.D.N.Y. Aug. 13, 2020) ...................................23, 24, 25, 26

*DAG Jewish Directories, Inc. v. Y & R Media, LLC*,
    2010 WL 3219292 (S.D.N.Y. Aug. 12, 2010) ......................................................26

*Doe v. City of New York*,
    2024 WL 307994 (S.D.N.Y. Jan. 26, 2024) .........................................................22

*Enmon v. Prospect Cap. Corp.*,
    675 F.3d 138 (2d Cir. 2012).................................................................................23

*Garcia v. Berkshire Life Ins. Co. of Am.*,
    569 F.3d 1174 (10th Cir. 2009) .....................................................................24, 25

*Hargrove v. Riley*,
    2007 WL 389003 (E.D.N.Y. Jan. 31, 2007) ............................................25, 26, 28

*Ide v. Brit. Airways PLC*,
    529 F. Supp. 3d 73 (S.D.N.Y. 2021).....................................................................15

*Lawrence v. City of N.Y.*,
    2018 WL 3611963 (S.D.N.Y. July 27, 2018) ...........................8, 10, 15, 23, 24, 25, 27, 28, 29

*McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*,
    191 F. Supp. 2d 440 (S.D.N.Y. 2002)...........................................16, 23, 24, 26, 28

*Miller v. Time-Warner Commc'ns*,
    1999 WL 739528 (S.D.N.Y. Sept. 22, 2019)........................................................26

*Network Data Rooms, LLC v. Saulrealism LLC*,
    2022 WL 17404501 (S.D.N.Y. Dec. 2, 2022) ...................................8, 15, 27, 28, 29

## TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Rossbach v. Montefiore Med. Ctr.*,
   81 F.4th 124 (2d Cir. 2023) ...................................................................................8, 23, 25, 28

*Scholastic, Inc. v. Stouffer*,
   221 F. Supp. 2d 425 (S.D.N.Y. 2002)...................................................................................30

*Shangold v. Walt Disney Co.*,
   2006 WL 71672 (S.D.N.Y. Jan. 12, 2006) ........................................................26, 27, 28, 30

*Skywark v. Isaacson*,
   1999 WL 1489038 (S.D.N.Y. Oct. 14, 1999) .......................................................................28

Defendant Amazon.com Services LLC ("**Amazon**") respectfully submits this post-hearing brief regarding the evidence presented at the August 12, 2025, evidentiary hearing (the "**Hearing**"), in support of Amazon's motion for sanctions against Plaintiff Gilimex ("**Gilimex**").

## PRELIMINARY STATEMENT

Amazon proved by clear and convincing evidence that Gilimex committed a fraud on the Court as part of its effort to obtain $69 million in raw-materials damages. The evidence shows Gilimex produced fake documents, first in fact discovery—as Gilimex concedes—and then in expert discovery, each time adding up to $69 million in damages. After Amazon caught the fraud in connection with motions *in limine*, Gilimex engaged in a brazen coverup, fabricating new documents in advance of the Hearing and then lying about the fraud at the Hearing. But none of Gilimex's false testimony or evidence can overcome the substantial mass of real, documentary evidence establishing the fraud. There is only one adequate remedy: dismissal of all claims.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Gilimex's Complaint Sought $68 Million for Raw Materials Purchased in 2022

After Amazon exercised its contractual right to stop purchasing pods from Gilimex, Gilimex sued Amazon on December 13, 2022. Dkt. 1-1 ("**Complaint**"). Gilimex sought damages for "over $68 million worth of raw materials and components secured by Gilimex…which cannot be returned to Gilimex's suppliers." *Id.* ¶88.ii. In the Complaint, Gilimex suggested its raw-materials damages were based on purchases made in 2022—*after* Amazon had sent a reduced forecast in April 2022, *id.* ¶¶69-70, and *after* a June 28, 2022 meeting among Gilimex and Amazon executives, *id.* ¶84. The Complaint did not mention a November 18, 2021 Blaze Max Hong Kong Limited ("**Blazemax**") purchase order (DX101, the "**Blazemax PO**").[1]

---

[1] Nor does the February 5, 2024 Amended Complaint. Dkt. 83.

**B.      Gilimex Initially Produced Fabricated POs from 2022 Totaling $69 Million**

Gilimex produced more than 68,000 electronic documents in fact discovery. App. 2.[2] These documents, produced with the metadata required by the Court's ESI protocol, Dkt. 31, included over 23,000 emails and over 14,000 Excel spreadsheets. None of these documents reference the Blazemax PO.

Toward the end of fact discovery, Gilimex produced documents related to its raw-materials-damages claim, including 66 purported purchase orders to Gilimex's suppliers (the "**66 POs**"), and 39 purported demand letters from those suppliers (the "**Demand Letters**"). App. 2. Unlike the earlier discovery, the 66 POs and the Demand Letters were produced without metadata reflecting the custodian of the documents or who created them. DX913; Tr. 98:22-99:3. Many of the documents were created by printing Excels to PDF on July 31, 2023. DX913; Tr. 92:11-93:5. But Gilimex has never produced the underlying Excels and claims it does not have them—clear spoliation of evidence, if true.

Added together, the 66 POs total approximately $69 million, consistent with Gilimex's damages request. DX920; Tr. 107:15-110:4. Gilimex has since acknowledged that most of these documents are fake. PX246.

**C.      Gilimex First Produced the $69 Million Blazemax PO and Fabricated Excel Minutes in Expert Discovery**

Gilimex disclosed its damages expert's report on November 20, 2023. App. 2. But Gilimex's expert did not consider the 66 POs or the Demand Letters in calculating damages. Dkt. 153-1, Appendix 2. Instead, the expert relied on an entirely *new* document Gilimex produced the same day: the Blazemax PO. App. 2-3.

---

[2] "App." refers to the chronology attached as Appendix A, requested by the Court. Tr. 168:23-169:7.

The Blazemax PO reflects a single order for approximately $69 million—strikingly similar to the total value of the 66 POs first produced to support Gilimex's damages claim, and far more than any other Gilimex order. DX920; DX905-06. Gilimex produced the Blazemax PO as a black-and-white scan of a hardcopy document, DX101, but produced no electronic versions or drafts of the PO with metadata showing when the original electronic document was created. Tr. 95:14-96:4. None of the emails or Excel spreadsheets produced by Gilimex in fact discovery reference the Blazemax PO. Tr. 36:18-24, 68:5-69:3, 160:12-17; *infra* §§I.B.2-3, I.B.6. In addition to the Blazemax PO, Gilimex produced seven Excel files, purportedly memorializing meetings beginning in January 2022 between Blazemax and Gilimex about the Blazemax PO (DX102-08, the "**Excel Minutes**"). App. 2-3.

Although Gilimex never paid for or received the raw materials in the Blazemax PO, Gilimex's expert relied on that PO for Gilimex's claim for $69 million in raw-materials damages. The expert report did not disclose the owner of Blazemax: Le Thi Kim Oanh, the sister-in-law of Gilimex Chairman Le Hung ("**Hung**") and a significant Gilimex shareholder. Dkt. 153-1.

### D.    Gilimex Admitted the Excel Minutes Are Inauthentic, but Produced New "Hardcopy" Minutes in Response to Amazon's Motion *in Limine*

During trial preparation, Amazon discovered that the Excel Minutes' metadata showed they were created during fact discovery in March 2023, not in 2022 when the meetings supposedly took place. Dkt. 138 at 4-5; Dkt. 142 ¶¶9-10. Amazon moved to exclude the Excel Minutes and Blazemax PO. Dkt. 138.

Gilimex responded by producing never-before-seen versions of the Excel Minutes: black-and-white photocopies of hardcopy printouts of the Excel files, with stamps and signatures (DX111, the "**Black-and-White Minutes**"). App. 3. Unlike the Excel files, the Black-and-White Minutes lacked metadata showing when the original, underlying electronic documents were created.

3

Tr. 95:14-96:4. And although the Black-and-White Minutes were clearly created on a computer, Hung represented in a sworn declaration that there were no contemporaneous electronic versions of the Black-and-White Minutes. DX818 ¶5. He further represented that the photocopied documents were "originals" with "physical signatures and physical stamps," and the Blazemax PO, too, had "physical signatures and physical stamps" and "no electronic version." *Id.* ¶¶4-5.

Because Hung's declaration raised serious concerns about document authenticity, Amazon requested to inspect the Black-and-White Minutes, the Blazemax PO, the 66 POs, and the Demand Letters. DX819. Gilimex rejected Amazon's request: it represented that "[o]ne glance" at the Black-and-White Minutes, as well as the 66 POs and Demand Letters, shows that the documents have "wet signatures and physical stamps." DX820 at 1 & n.1.

### E.    Amazon Reported the Fraud to the Court, but Gilimex Denied Its Fraud

Amazon discovered that Gilimex's representations were false. Two Gilimex suppliers submitted sworn declarations confirming certain of the 66 POs and Demand Letters were fraudulent. Dkts. 176-3, 176-4. Jean Chow-Callam, a forensic accountant, determined that many of the signatures and stamps on the 66 POs and Demand Letters appeared to be copied and pasted. Dkt. 176-5. And Alberto Orozco, a forensic accountant, analyzed Gilimex's raw-materials inventory reports and found they contained no reference to the Blazemax PO. Dkt. 176-6. Amazon reported the fraud to the Court and sought sanctions. App. 3-4.

In opposition, Gilimex accused the suppliers of lying and being under Amazon's control. Dkt. 183. Gilimex's CEO Nguyet Pham even swore that the fake POs were authentic. Dkt. 183-4 ¶¶1-19. Yet, in response to Amazon's expert declaration proving many of the 66 POs and Demand Letters have copied and pasted signatures, Gilimex backtracked from its original representation that those documents had "wet signatures," claiming some suppliers permitted the use of "e-

stamps." *Id.* ¶20 & Ex.4C. In response, Amazon submitted a declaration from a third supplier, attesting that additional POs and a demand letter were fraudulent. Dkt. 186-1.

### F.    The Court Scheduled a Hearing and Permitted Additional Discovery

On June 23, the Court ordered the Hearing and permitted limited discovery. Dkt. 190. Amazon sought disclosure of the location of the warehouse supposedly housing the Blazemax raw materials and requested permission to inspect it. Dkt. 196 at 2. But Gilimex provided no information on the warehouse—not even its location—claiming it was unable to obtain such information from Blazemax. Dkt. 198 at 2; PX245-T.

Amazon also sought discovery on legitimate Blazemax orders appearing in the inventory reports (the "**Legitimate POs**"), as well as the production of any unproduced documents relating to the Blazemax PO. Dkt. 196 at 2. On July 16, Gilimex produced over 5,000 documents in response to Amazon's requests, including copies of the Legitimate POs. DX831. None of those 5,000 documents references the Blazemax PO.[3]

### G.    Gilimex Admitted it Produced Fake Documents and then Fabricated a Story About How They Were Created

When it was no longer possible to dispute that the 66 POs and Demand Letters were fake, Gilimex came up with a new story: a rogue employee, Tien Luong ("**Luong**"), had fabricated certain POs and demand letters and placed them in Gilimex's files in an incomplete attempt to defraud Gilimex. Dkt. 206 at 2. According to Gilimex, the supposed fraud never came to fruition and did not involve Blazemax documents. *Id.* at 2-3.

---

[3] Many of these documents were also responsive to Amazon's original document requests but were not produced during fact discovery.

In response, Amazon requested all contemporaneous electronic documents, with metadata, corroborating this new story. App. 6. Gilimex was unable to produce any such documents; Luong testified he did not provide any electronic documents to counsel for Gilimex. Tr. 20:10-22.

### H.    Gilimex Produced More Never-Before-Seen "Hardcopy" Documents, Including "Color" Versions of the Blazemax PO and Minutes

Although Gilimex was unable to produce electronic documents corroborating the Blazemax PO or the Luong story, it produced a jumble of hardcopy documents as the Hearing approached. These hardcopy documents included: (1) scans of different versions of previously-produced POs; (2) scans of package logbooks; and (3) a scan of an August 3, 2022 PowerPoint presentation allegedly presented to Amazon by Zoom.[4]

*(i)    The POs*

In response to Amazon's request for color scans, Gilimex produced new versions of the Blazemax PO and Black-and-White Minutes. App. 6. But these versions are not scans of the same documents—they each have different signatures and stamps. DX101-C (the "**Color Blazemax PO**"); PX54 (the "**Color Minutes**"); DX924. In the production cover letter, Gilimex suggested for the first time that there were actually *two* versions of the Blazemax PO all along, and that—contrary to Hung's sworn declaration, DX818 ¶¶4-5—the previously-produced Blazemax PO and Black-and-White Minutes (DX101 & DX111) were not originals at all. DX826. In addition to these color versions, a week before the Hearing, Gilimex produced a new version of the Color Blazemax PO, with writing on the back pages. App. 7; PX40. Gilimex has never explained why these documents were not produced earlier in response to Amazon's discovery requests.

---

[4] Gilimex produced numerous other hardcopy documents up to 48 hours before the Hearing, such as new versions of the Legitimate POs and sticky notes supposedly attached to certain of the 66 POs, that, if real, should have been produced in discovery. App. 8.

Because the newly-produced Color Blazemax PO has a different signature than the original Blazemax PO, Amazon requested to inspect the document with an expert. App. 7. Gilimex initially agreed, but when Amazon noted the expert was an ink-dating expert who would determine the recency of the ink, Gilimex refused. App. 8.

### (ii) The Logbooks

Gilimex also produced scans of supposed "logbooks" which it claims document incoming and outgoing mail. Tr. 163:1-164:12. Initially, Gilimex merely produced the scanned cover of a hardcopy logbook and two single-page excerpts from a logbook. App. 5. But after Amazon asked for and Gilimex produced the full logbook, it turned out that only one of the two excerpted pages was actually in the logbook. App. 6. A week before the Hearing, Gilimex produced five more logbooks. App. 7. And mere hours before the Hearing, Gilimex reproduced one of the previously produced logbooks, now containing an additional page with an additional entry: Blazemax. App. 8.

### (iii) The PowerPoint Presentation

On August 4, Gilimex produced a scan of a hardcopy PowerPoint presentation Gilimex supposedly presented to Amazon over Zoom. App. 7; PX137. Gilimex contemporaneously sent Amazon a link to the document after the presentation, but it apparently no longer has an electronic version of the presentation (and the link is no longer active). PX138 at 3. Gilimex has failed to explain why it does not have the electronic version of the presentation, when it previously produced electronic documents from this timeframe. App. 1.

### I.    The Hearing

At the Hearing, Amazon called four witnesses: Kelly Jackson, a Supply Chain Manager at Amazon who worked with Gilimex and testified that Gilimex never disclosed the Blazemax PO to Amazon; Orozco, who conducted the forensic accounting and found no trace of the Blazemax PO; Chow-Callam, who analyzed the stamps on the POs and Black-and-White Minutes and found that

newly-produced versions of those documents have signatures and seals that are inconsistent with the originally-produced versions; and Andrew Tappeto, a forensic expert who testified about metadata and demonstrated that the Excel Minutes were created during this litigation, not contemporaneously. Gilimex called Luong and Hung.

## LEGAL STANDARD

"A court may sanction a party under its inherent power to deter abuse of the judicial process and prevent a party from perpetrating a fraud on the court." *Network Data Rooms, LLC v. Saulrealism LLC*, 2022 WL 17404501, at *3 (S.D.N.Y. Dec. 2, 2022) (Schofield, J.), *aff'd*, 2023 WL 7103280 (2d Cir. Oct. 27, 2023). The Court has discretion in "fashion[ing] an appropriate sanction," including "outright dismissal" of the offending party's claims. *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 141 (2d Cir. 2023).

"Fraud upon the court exists where a litigant attempts to improperly influence the trier of fact, lies to the court and [its] adversary intentionally, repeatedly, and about issues that are central to the truth finding process, or knowingly submits fraudulent documents to the [c]ourt." *Lawrence v. City of N.Y.*, 2018 WL 3611963, at *2 (S.D.N.Y. July 27, 2018) (alterations adopted). Such fraud must be proven by clear and convincing evidence. *See Network Data Rooms*, 2022 WL 17404501, at *3. "Given that evidence of fraud is rarely susceptible of direct proof," clear and convincing evidence may "be established by circumstantial evidence and the legitimate inferences arising therefrom." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007).

## ARGUMENT

## I.    GILIMEX IS COMMITTING A FRAUD ON THE COURT

The evidence shows Gilimex systematically faked documents to support its raw-materials-damages claim and continued this fraud by offering perjured testimony at the Hearing. Gilimex first produced dozens of fabricated POs in fact discovery, totaling over $69 million, to show it

8

supposedly owed dozens of suppliers money. In expert discovery, Gilimex pivoted: it claimed it owed one supplier—Blazemax—$69 million based on a single, fabricated PO and fabricated Excel Minutes. When Amazon challenged these POs, Gilimex engaged in a coverup, first denying it produced fabricated documents, then claiming *Gilimex* was the victim of a fraud, and last conjuring a multitude of never-before-seen paper documents mere days before the Hearing. At the Hearing itself, Gilimex's witnesses perjured themselves—including Luong, whose demonstrably false story was meant to exculpate Gilimex's leadership.

### A.    The Evidence Shows Gilimex Produced Fabricated POs in Discovery

It is now undisputed Gilimex produced fabricated POs in fact discovery. Of the 66 POs, Gilimex has confirmed at least 56 are fake. PX246. Two of the remaining ten POs are to Blazemax and, like the Blazemax PO, are not in Gilimex's weekly inventory reports. *See infra* §I.B.2; Tr. 57:22-24, 60:16-25; DX901.

The evidence at the Hearing shows Gilimex's late-breaking excuse for these fake POs— that they were fabricated by rogue employee Luong—is a lie. Luong testified he faked 56 POs and 37 demand letters and placed the paper documents in Gilimex's files. Tr. 20:14-16; PX246. He testified he provided no electronic documents to Gilimex or its counsel, Tr. 20:17-22, which, if true, would mean Gilimex scanned paper documents when it produced them to Amazon. But Amazon's metadata expert, Tappeto, testified that most of the 66 POs could not have been created by scanning paper documents. Tr. 94:8-14. The "Title" metadata field for the documents contains an Excel file name, showing the documents were created by printing to PDF in Excel. Tr. 92:11-93:5. In other words, Gilimex's story—that it produced scans of paper documents it found in its files, not knowing they were fraudulent—is false. Luong's credibility is further undermined by other nonsensical elements of his story:

- Luong allegedly fabricated demand letters and POs in English, despite testifying—through a translator—he is unable to write in English, except when needed to "help" the Chairman. Tr. 18:16-17.

- Many of the demand letters supposedly created for Luong's enrichment do not seek money at all; instead, they ask for delivery plans or estimated shipment dates for the corresponding POs. DX302-03; DX401; DX453.

- While Luong testified he needed money, the fabricated documents included legitimate email addresses and bank-account information for Gilimex suppliers—not for Luong— meaning any payment Gilimex made in reliance on these POs would have gone to someone else. Tr. 20:23-22:5.

- Gilimex purportedly promised Luong, before he was ever interviewed by Gilimex or its lawyers, Tr. 23:20-23; Dkt. 234 at 6-7, he would face no consequences for his actions on one condition—that he testify at the Hearing, Tr. 12:8-14, 23:17-19; PX186 at 5-6.

Gilimex's intentional production of fraudulent documents is clear and convincing evidence it perpetrated a fraud on the Court.

### B. <u>The Evidence Shows the Blazemax PO Is Fraudulent</u>

The evidence at the Hearing clearly and convincingly established that the Blazemax PO is fake and Gilimex has perpetrated a fraud on this Court. *See Lawrence*, 2018 WL 3611963, at *6-7 (fraudulent photographs and shifting stories supported finding of fraud).

**1.    *Gilimex cannot produce the original Blazemax PO.*** Amazon repeatedly asked Gilimex to inspect the Blazemax PO, and in the lead-up to the Hearing, Amazon requested a color scan. App. 3, 6. But Gilimex was unable to provide a color scan of DX101, instead producing a brand-new document shortly before the Hearing: the Color Blazemax PO. App. 6.

10

The Color Blazemax PO is *not* a color copy of the Blazemax PO that Gilimex scanned and produced in November 2023 (DX101)—it is a *new* version of the Blazemax PO, with different signatures and seals. DX924. Gilimex does not have an original copy of the Blazemax PO, which means that contrary to Hung's representations, the version of the Blazemax PO produced in November 2023 cannot have original "physical signatures and physical stamps." DX818 ¶4. Additionally, Gilimex's claim that the Blazemax PO and Color Blazemax PO were executed at the same time, DX826, is implausible. As Amazon's stamps expert, Chow-Callam, testified, two different stamps were used on the different versions of the Blazemax PO, suggesting the two versions were executed at different times. Tr. 117:5-119:5; *infra* §I.C.3.

Gilimex's inability to produce the original Blazemax PO—the document central to its damages claim—is clear and convincing evidence the document is inauthentic.

**2.    *The Blazemax PO is not in Gilimex's inventory reports*.** The evidence shows Gilimex kept weekly inventory reports to track its raw-materials inventory and circulated those reports internally for planning purposes. Tr. 51:20-52:10. Orozco, the forensic accountant, testified that he analyzed 29 inventory reports containing records for more than 1,400 POs from August 2021 through October 2022. DX909; DX501-29. Unlike the seven Legitimate POs from Blazemax, the $69 million Blazemax PO is not referenced in any of the 29 inventory reports, leading Orozco to conclude that it was never issued. DX901; Tr. 57:22-58:4.

**3.    *The Blazemax PO is not referenced in emails or other electronic documents*.** Orozco also testified that the Legitimate POs are referenced in supporting documents, such as emails, invoices, proofs of payment, and bills of lading. DX908; Tr. 65:5-67:23. Orozco even identified emails to Hung requesting he sign the Legitimate POs. DX220-T (May 31, 2022 Gilimex email, attaching a Legitimate PO and requesting Hung's signature); DX220-A; *see* DX223-T;

DX223-B (similar July 28, 2022 email). That is consistent with Gilimex's policies, as set by Hung, requiring that all Gilimex communications, including with Blazemax or its suppliers, be documented by email. Tr. 159:12-160:3.

Further, because Blazemax acted as an intermediary for other suppliers, Gilimex communicated directly with those suppliers regarding their pricing, ability to satisfy orders, and delivery schedules. Tr. 65:5-66:15; DX202-03; DX206-07; DX209-12. But as Orozco testified, Gilimex's production of more than 68,000 electronic documents contained no such communications regarding the Blazemax PO. Tr. 68:5-69:3.

**4.**       ***The Blazemax PO is not in Gilimex's audited financial statements.*** Orozco analyzed Gilimex's 2022 audited financial statements, the year after the Blazemax PO was purportedly placed; Hung signed the statements. DX804 at 50. In the liabilities section, Gilimex listed total payables to Blazemax of approximately $4.1 million. DX915-16. Orozco explained that, if the Blazemax PO existed, he would expect to see a liability of at least $69 million, not merely $4.1 million. Tr. 69:11-22, 70:20-71:17.

Orozco also testified that the inventories disclosed in Gilimex's financial statements were inconsistent with the Blazemax PO. Tr. 71:20-73:13. As Orozco explained, raw materials that had been ordered, but were being stored by a supplier, should be reflected in the "goods on consignment" line-item in the inventory section of the financial statements. Tr. 73:5-13. Gilimex's "goods on consignment" line-item listed inventory totaling only $2,077—not $69 million. *Id.*; DX914.

**5.**       ***The Blazemax PO is inconsistent with Gilimex's purchasing history.*** Orozco's testimony also demonstrated that the Blazemax PO is markedly inconsistent with the Legitimate POs and Gilimex's orders from other suppliers in at least four ways.

*First*, the Legitimate POs each ordered a single polyester fabric material ("**Material 672**"), but the Blazemax PO purportedly ordered Material 672 *plus* 71 different materials. DX903; Tr. 60:2-15.

*Second*, the quantity of Material 672 in the Blazemax PO was substantially higher than the quantities reflected in the Legitimate POs. DX905; Tr. 62:9-23.

*Third*, the price for Material 672 was substantially *higher* in the Blazemax PO as compared to the Legitimate POs—precisely the opposite of what one would expect from a high-volume order, which would often carry a discount. DX912; Tr. 64:9-65:3.

*Fourth*, Gilimex ordered more of the *same* materials from Blazemax and other suppliers *after* the date on the Blazemax PO, when Gilimex was purportedly paying Blazemax $162,000 per month to warehouse the same materials. Tr. 62:24-64:6; DX905-06; DX109.

These discrepancies show that the Blazemax PO is inauthentic. It would make no business sense for Gilimex to suddenly switch from purchasing materials from numerous suppliers to solely purchasing from Blazemax, which had previously only supplied Material 672, or for Gilimex to order more of the same material Blazemax was already warehousing. Tr. 60:7-15, 63:4-14. It would also make no sense for Blazemax to pay 30% more for buying huge quantities of Material 672, when Gilimex should be receiving a bulk discount. Tr. 64:14-65:3.

6.    ***Gilimex never told Amazon about a $69 Million Blazemax PO.*** Amazon Manager Jackson testified that Gilimex made multiple representations to Amazon in 2022 about its raw-materials inventory and suppliers. For example, in April 2022, Gilimex sent Amazon an Excel spreadsheet listing "purchased materials exceeding 2022 orders." DX702 and 702-A. The list included a small fraction of the raw materials in the Blazemax PO. *Compare* DX702-A, *with*

13

DX101. Gilimex then sent Amazon a list of its raw-materials suppliers—it did not include Blazemax. Tr. 32:10-17; DX703; DX703-A.

Jackson also testified about a PowerPoint presentation Gilimex gave to Amazon during a June 28, 2022 meeting. The presentation stated that Gilimex had more than 50 materials suppliers; it did not mention a large outstanding order with a single supplier. Tr. 33:19-25; DX704 at 10. Later, Gilimex sent Amazon another list of materials its suppliers supposedly had in inventory and who those suppliers were—the list did not mention Blazemax. DX603; DX603-A; Tr. 35:24-25.

Jackson further testified that at no point did Gilimex disclose a $69 million PO from a single supplier, and that such an order "would have stood out" because "it's such a huge order with one supplier." Tr. 36:18-24.

**7.** ***Gilimex originally produced $69 million of admittedly fraudulent documents.*** The 66 POs produced in fact discovery, most of which Gilimex admits are fraudulent, add up to $69 million—the same as the Blazemax PO. DX918; Tr. 108:4-13. This is no coincidence: the 66 POs were clearly produced to support Gilimex's claim for over $68 million in raw-materials damages. Compl. ¶88.ii. This is powerful evidence that the later-produced Blazemax PO—likewise totaling $69 million—is similarly fake.

**8.** ***Gilimex fabricated Excel Minutes to support the Blazemax PO.*** The Excel Minutes regarding the Blazemax PO were indisputably created for litigation. Tappeto, Amazon's metadata expert, determined from their metadata that they were created no earlier than March 19, 2023. Tr. 89:9-90:20. In other words, the only electronic documents corroborating the Blazemax PO were created after this litigation began.

**9.** ***Gilimex could not secure cooperation from Blazemax.*** If the Blazemax PO were real, and Blazemax truly had $69 million in inventory sitting in a warehouse, Blazemax would

have its own financial interest in cooperating with Gilimex, so that Gilimex could obtain damages and pay its debt to Blazemax. But Hung could not even secure cooperation from his own sister-in-law, who declined to testify at the Hearing or provide information regarding the warehouse supposedly housing $69 million in inventory—not even the address. PX245-T at 2; DX831 at 2.

### C.    The Evidence Shows Gilimex Is Committing an Ongoing Fraud on the Court

The fraud in this case extends beyond the documents themselves. Since Amazon raised concerns about the Blazemax PO, Gilimex has repeatedly shifted its story and belatedly "discovered" new hardcopy documents it claims support its latest narrative. Further, Gilimex offered demonstrably false testimony at the Hearing. It has become impossible to trust any of Gilimex's representations because they regularly change when confronted with new evidence. The perjured testimony, shifting stories, and fabricated documents are themselves continuing a fraud on the Court.[5] This "pattern of misbehavior," *Lawrence*, 2018 WL 3611963, at *6, adds to the clear and convincing evidence that Gilimex has engaged in an "unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate the action," *Network Data Rooms*, 2022 WL 17404501, at *3.

1.    *Gilimex shifted its story and offered perjured testimony on the 66 POs and Demand Letters.* When Amazon questioned the authenticity of the 66 POs and Demand Letters,

---

[5] Incredibly, beyond its ongoing fraud, Gilimex is seeking shareholder approval to (1) exempt executives and employees involved in this case from any personal liability for damages arising from this lawsuit; and (2) award bonuses to those who participated and supported the lawsuit, using 20% of any judgment it receives against Amazon, exclusive of its damages and litigation costs. Dkt. 251-1 (August 20 Gilimex shareholder proposal from Gilimex's public website); *Ide v. Brit. Airways PLC*, 529 F. Supp. 3d 73, 83 n.6 (S.D.N.Y. 2021) (noting courts may take judicial notice of "information publicly announced on a party's website where the website's authenticity is not in dispute and it is capable of accurate and ready determination"). As this shows, Gilimex's executives and employees have a financial incentive to commit perjury.

App. 3, Gilimex responded by claiming there was "no genuine question about [the] documents' authenticity" and represented the documents were hardcopies with "wet signatures and physical stamps." DX820 at 1, 3 n.8. These representations were false: Gilimex has now conceded that most of the documents are fake, and the evidence shows many of the documents have electronic signatures. PX246; Dkt. 176-5 ¶¶6-19; Dkt. 234 at 6. But before it did, Gilimex's CEO Pham swore the suppliers' allegations were wrong and the documents were authentic. Dkt. 183-4 ¶¶1-19. These representations were false too.

After the Court ordered the Hearing and it became impossible to deny the fraud, Gilimex came up with a new story: low-level employee Luong faked the documents. Dkt. 206. But Luong's testimony was demonstrably false—most of the 66 POs are PDFs created from Excel files, not scans of pieces of paper planted by Luong. *See supra* §I.A. Gilimex has thus repeatedly "eschewe[d] corrective measures even when confronted with irrefutable evidence of [its] lies." *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 460 (S.D.N.Y. 2002).

   2.   ***Gilimex shifted its story and offered perjured testimony on the Excel Minutes.***
Gilimex has taken a similar approach to the Excel Minutes. After Amazon challenged the authenticity of the Excel Minutes in its motion *in limine*, Gilimex produced, for the first time, the Black-and-White Minutes, which were a printout of a computer-generated file. DX111; App. 3. Hung swore the Black-and-White Minutes were "originals" with "physical signatures," and there were no contemporaneous electronic versions because Gilimex only had the documents in hardcopy form. DX818 ¶5.

Hung's representations were false: the Black-and-White Minutes were not originals and they did not have physical signatures. Amazon's expert Chow-Callam testified that one of the Blazemax signatures in the Black-and-White Minutes is identical to the signature in the Blazemax

PO, meaning at least one of the signatures was created electronically, not signed by hand. Tr. 112:3-21. And like the Blazemax PO, Gilimex was unable to produce an identical color scan of the Black-and-White Minutes. So days before the Hearing, Gilimex changed its story: It now claims the Black-and-White Minutes are a *copy*, and the newly-produced Color Minutes—with different signatures and seals—are the originals. DX826; DX-111-C.

Hung lied again about the Minutes at the Hearing. To explain the metadata on the Excel Minutes, Hung testified that he sent the "scanned version" of the Black-and-White Minutes to Gilimex's damages expert but "it wasn't clear enough for them to read" and that he had "somebody type it in" during the litigation. Tr. 161:7-16. But the evidence shows that is not what happened. Gilimex's expert did not disclose the Black-and-White Minutes as a document he reviewed in the appendix to his report. Dkt. 153-1, Appendix 2. And the Black-and-White Minutes are completely legible. DX111. They are also just signed printouts of the Excel Minutes, down to the exact same formatting and typos. *Compare* DX102-08, *with* DX111. For instance, the minutes for September 2022 misspell "BlazMax" in both the Excel and black-and-white versions. *Compare* DX106, *with* DX111 at 5. The March 2023 minutes likewise have the same typos, like "warehosuing" and "progess." *Compare* DX103, *with* DX111 at 7. The only credible explanation for the Black-and-White Minutes is that they were fabricated for this litigation.

3.    ***Gilimex shifted its story on the Blazemax PO and produced fake documents.***
Gilimex has also continued to make false representations regarding the Blazemax PO. Hung originally represented that the Blazemax PO is a "scanned hard copy of the physical purchase order kept in the normal course of business," with "physical signatures and physical stamps." DX818 ¶4. And in refusing Amazon's request to inspect the Blazemax PO, Gilimex claimed it had "wet signatures and physical stamps." DX820 at 1.

That was false. Gilimex does not have the signed original of the Blazemax PO and it could not produce a color scan of it. *See supra* §I.B.1. To explain away its inability to produce the original Blazemax PO, Gilimex came up yet another new story: Gilimex executed two copies of each Blazemax PO, and Gilimex kept one original and one copy in black-and-white. DX826.

This new story first surfaced after two months of litigation and filings on these issues, in which Gilimex had never produced or mentioned another version of the Blazemax PO. DX826; *cf.* Dkt. 145 at 5; DX818 ¶ 4; Dkt. 183 at 2. Gilimex has refused to explain why it produced only one version of the Blazemax PO in 2023, or why it repeatedly stated that this black-and-white copy was an original with wet signatures.

Even more, the evidence shows Gilimex's new story is also a lie, because the Color Blazemax PO, DX101-C, was not signed at the same time as the Blazemax PO, DX101. Amazon's stamps expert, Chow-Callam, testified that two different stamps were used on the documents— one stamp with a complete edge (on DX101-C), and one stamp with an edge worn over time (on DX101)—suggesting that the documents were executed on different dates. Tr. 117:5-119:3. A comparison of the two different stamps and signatures on the two Blazemax POs is below.



 

DX924.

Notably, when Amazon recently requested additional color copies of the Legitimate POs, new versions of these POs likewise emerged for the first time. DX834; DX836. Like the Color Blazemax PO, as depicted below, the new color versions had Blazemax stamps with a complete edge, compared to the worn edge on the previously produced versions.



DX927.

This evidence shows the Color Blazemax PO and the other newly-produced color POs were created for the Hearing in response to Amazon's request for color copies. Each of the newly-produced POs uses a different Blazemax stamp—one with a complete edge—as compared to the earlier produced versions. DX927; Tr. 119:12-120:18. There is no reason why Blazemax would use two different stamps when executing two copies of a document simultaneously, and no reason why all "originals" would use only one, less-worn version of the stamp. Gilimex has provided no explanation—and Hung declined to testify about—why these color versions were not produced earlier, why Gilimex claimed the Blazemax PO had physical signatures, or why the stamp on the Blazemax PO appears to match the stamp on one of the Black-and-White Minutes. Tr. 111:25-

19

112:13; DX922. Gilimex also refused to give Amazon permission for an expert to ink-date these documents—which could have shown that the newly-produced document was created in recent weeks, rather than in November 2021, as Gilimex claims. App. 8; Tr. 121:21-23. There is only one conclusion to draw: Gilimex fabricated these documents because it could not produce a signed original of the Blazemax PO.

4.      ***Gilimex produced never-before-seen scans of hardcopy documents shortly before the Hearing that are inconsistent with contemporaneous electronic documents.*** In the weeks before the Hearing, Gilimex purportedly found and produced scans of multiple hardcopy documents supposedly supporting its claims. Conveniently, because the documents are all scans of hardcopies, there is no way of determining when they were created. DX929; Tr. 95:14-96:4.

*First*, Gilimex produced a "paper" version of an August 3, 2022 PowerPoint presentation. PX137; App. 7. The presentation was an electronic document prepared by Gilimex and shown to Amazon during a Zoom meeting—there was no reason for a paper copy. Tr. 40:25-41:4, 46:11-16. Gilimex contemporaneously sent Amazon a link to the document after the presentation, but it apparently no longer has an electronic version of the presentation. PX138 at 3.[6]

This "paper" presentation appears to have been altered. The slide is almost identical to a slide from a Gilimex presentation sent to Amazon by email the month before, in July 2022. DX609; DX609-A at 7.

---

[6] This is just one of many Gilimex-created electronic documents it claims to no longer have. A significant part of Gilimex's defense appears to be that Gilimex spoliated evidence, itself a serious discovery violation. If the Court declines to grant Amazon the relief it seeks in this Motion, Amazon reserves the right to seek additional sanctions for Gilimex's discovery violations.

| PX137 at 15. | DX609-A at 7 |
|---|---|



The main difference is that Slide 14 of the August 2022 "paper" presentation refers to singular "Supplier" and a $69.04 million purchase, PX137 at 15. The July 2022 PowerPoint presentation—produced in fact discovery with metadata—includes no such reference, instead referring to plural "Suppliers," and stating that the COVID-19 pandemic and the war in Ukraine caused "**all suppliers** to stock up" materials "valued in the **millions USD**." DX609-A; Tr. 34:11-20. There is no reason to believe that the real August 2022 presentation introduced an entirely different story about Gilimex's raw materials from what was in prior Gilimex presentations to Amazon one month earlier. Indeed, Amazon Manager Jackson testified there was no new information in that presentation. Tr. 45:3-8. Without the original electronic copy of the August 2022 presentation and accompanying metadata, the "paper" copy's authenticity cannot be credited.

*Second*, in the days before the Hearing, Gilimex produced handwritten package logbooks, bound together with tape. But many aspects of the logbooks are facially suspect. Some have significant, unexplained date gaps. PX4 at 86 (skipping from July to an October Blazemax entry). One has entries for Blazemax written under the gridlines in a different pen color on November 19 and 22, 2021. PX26 at 64, 66. Another has an identical entry for Blazemax, below a crossed-out

entry written in a different pen color, for November 19. PX32 at 13. None of the logbook entries state what is being delivered or sent.

Contrary to Hung's testimony, the package logbooks are not how Gilimex kept track of multimillion dollar purchases—it did that in the financial statements and spreadsheets forensic accountant Orozco reviewed. The most the logbooks could show is that Gilimex received mail from Blazemax. But given the circumstances of their production on the eve of the Hearing, the fact that they are contradicted by Gilimex's financial and electronic records, and the ease with which they could be altered, the logbooks are suspect and unreliable. *See Doe v. City of New York*, 2024 WL 307994, at *5 (S.D.N.Y. Jan. 26, 2024) ("Insofar as the handwritten list is undated and its author unidentified, and insofar as it was suddenly produced after Defendants questioned Plaintiff's deposition testimony…the authenticity of the document is questionable.").

***

Gilimex has been caught in multiple lies related to the POs it produced in this case. Each time, it has invented new implausible stories and paper documents to try to escape the real record showing that the Blazemax PO and its raw-materials damages are made up. Gilimex's repeated lies—including by its employees at the Hearing—are not only compelling evidence that the Blazemax PO is fraudulent, but also an independent basis for severe sanctions.

## II.    GILIMEX'S FRAUD ON THE COURT REQUIRES DISMISSAL

The only appropriate sanction for Gilimex's multifaceted, continuing fraud on the Court is dismissal of its claims with prejudice. Amazon cannot fairly be expected to proceed to trial in a case where the opposing party has produced dozens of fraudulent documents, presented perjured testimony, and repeatedly shifted its explanations for its conduct. Nor should the Court or jury countenance this conduct. Dismissal is warranted, and the Court should also assess attorneys' fees and costs for the time and resources Amazon has been forced to expend because of Gilimex's fraud.

22

### A.    Gilimex's Fraud on the Court Warrants Terminating Sanctions

"When faced with a fraud upon the court," the "powerful sanction" of dismissal is "entirely appropriate." *McMunn*, 191 F. Supp. 2d at 461. Dismissal serves to both "penalize those whose conduct may be deemed to warrant such a sanction [and] to deter those who might be tempted to such conduct in the absence of such a deterrent." *Colella v. Republic of Argentina*, 2020 WL 4700930, at *10 (S.D.N.Y. Aug. 13, 2020).

To determine the proper sanction for fraud on the court, courts consider various factors, including: (1) "whether the misconduct was the product of intentional bad faith;" (2) "whether and to what extent the misconduct prejudiced the other party;" (3) "whether there is a pattern of misbehavior, rather than an isolated instance;" (4) "whether and when the misconduct was corrected;" and (5) "whether further misconduct is likely to continue in the future." *McMunn*, 191 F. Supp. 2d at 461. Each factor favors terminating sanctions.

*First*, Gilimex acted—and continues to act—in bad faith. Bad faith can be inferred where "actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 143 (2d Cir. 2012). The "submission of falsified evidence" constitutes "bad faith." *Colella*, 2020 WL 4700930, at *8; *see Rossbach*, 81 F.4th at 142; *Lawrence*, 2018 WL 3611963, at *7.

Gilimex's misconduct fits the bill. Gilimex intentionally fabricated the Blazemax PO and Excel Minutes—which are the sole basis for nearly *$70 million* in claimed damages—for the purpose of deceiving Amazon, this Court, and ultimately the jury. There are few "examples of bad faith conduct by litigants more egregious than using fake documents to secure a judgment." *Colella*, 2020 WL 4700930, at *8. Further, upon being confronted with evidence of its fraud, Gilimex commenced a cover-up. It denied the falsity of the Blazemax PO, concocted new stories, and produced new fake documents until the eve of the Hearing. It denied the falsity of the 66 POs and

Demand Letters it had produced in discovery, only to be forced to concede that at least 93 of these documents were in fact fake. App. 5. Even then, rather than admit responsibility, Gilimex conjured up an unbelievable story that low-level employee Luong created the fake documents in an inchoate attempt to defraud Gilimex. Gilimex's "pattern of evasion and untruths" and its cascade of "shifting explanations" is quintessential bad faith warranting dismissal. *Lawrence*, 2018 WL 3611963, at *6-7.

*Second*, Gilimex's misconduct prejudiced Amazon. This factor favors dismissal where, as here, a defendant would have been "on the hook for any judgments secured by [p]laintiffs' fraud" or "had to investigate and litigate" the fraud. *Colella*, 2020 WL 4700930, at *8. Here, Amazon was forced to litigate and defend Gilimex's claim for raw-materials damages based on fabricated evidence. And Amazon could have been "on the hook" for nearly $70 million in nonexistent damages. *Id.* Amazon has also been forced to devote significant resources to "investigate and litigate" Gilimex's fraud, including by retaining experts, preparing multiple rounds of briefing, and preparing for the Hearing. *Id.*; *see McMunn*, 191 F. Supp. 2d at 461-62 (finding prejudice because defendant not only had to defend the merits of plaintiff's claim, but also expend resources to prove that plaintiff "engaged in unfair litigation practices").

Moreover, Gilimex's "submission of falsified evidence substantially prejudices [Amazon] by casting doubt on the veracity of *all* of [Gilimex's] submissions throughout the litigation." *Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1180 (10th Cir. 2009) (emphasis added) (upholding terminating sanctions on that basis where plaintiff submitted four fabricated documents to bolster her claims). There is no telling how many more documents in Gilimex's production are also fake. For instance, Gilimex's damages expert relies on additional hardcopy documents only produced in expert discovery for the remainder of Gilimex's damages. Dkt. 135-1 at 9 n.31.

Allowing this case to proceed to trial would require Amazon "either to attempt independent corroboration of each submission [by Gilimex], at substantial expense of time and money, or to accept the real possibility that…documents submitted by [Gilimex] are" fabricated. *Garcia*, 569 F.3d at 1180. Gilimex's fraud has thus irrevocably corrupted this case, and neither Amazon nor this Court (or a jury) should be required to devote time and resources to a trial under these circumstances.

*Third*, Gilimex has engaged in an ongoing pattern of misconduct. As detailed above, Gilimex has not only fabricated multiple documents, it has undertaken further fraudulent efforts and offered perjured testimony to cover up its fraud. *Rossbach*, 81 F.4th at 134, 141-42 (affirming terminating sanctions where plaintiff fabricated one document and then gave false testimony about its creation); *Hargrove v. Riley*, 2007 WL 389003, at *11 (E.D.N.Y. Jan. 31, 2007) (finding pattern of misbehavior where plaintiff "fabricated the dates on" several documents and "improperly duplicat[ed] notary stamps"). Indeed, a litigant's fraud is "made more egregious" where, as here, it "double[s] down on [its] deceit" with "outlandish…arguments." *Colella*, 2020 WL 4700930, at *8. And here, even on Gilimex's telling, Gilimex has engaged in widespread spoliation of evidence, which itself is sanctionable conduct. *See Rossbach*, 81 F.4th at 139-41; *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497 (S.D.N.Y. 2016); *supra* note 6.[7] Gilimex's doubling-down on its "deceit," *Colella*, 2020 WL 4700930, at *8, and its "pattern of evasion and untruths," *Lawrence*, 2018 WL 3611963, at *6, warrant terminating sanctions.

*Fourth*, Gilimex never corrected its fraudulent conduct. Gilimex has been given numerous opportunities to come clean and acknowledge that it fabricated evidence. But at each opportunity,

---

[7] For example, Gilimex has never produced the underlying electronic documents for the Blazemax PO or the Black-and-White Minutes, despite producing numerous electronic documents from that timeframe during fact discovery.

and even after being "confronted with evidence" of its fraud, Gilimex has engaged in *even more* fraud to cover up its initial fraud. *Colella*, 2020 WL 4700930, at \*8. This misconduct demonstrates "such a total disrespect for the Court and the process by which justice is administrated that the sanction of dismissal is appropriate." *Miller v. Time-Warner Commc'ns*, 1999 WL 739528, at \*3 (S.D.N.Y. Sept. 22, 2019); *see Hargrove*, 2007 WL 389003, at \*11 (dismissal is appropriate where the litigant "continues to insist on the[] veracity" of documents he forged).

*Fifth*, Gilimex's "past pattern of misconduct and lack of admission or remorse" indicates that further misconduct is likely to continue. *DAG Jewish Directories, Inc. v. Y & R Media, LLC*, 2010 WL 3219292, at \*5 (S.D.N.Y. Aug. 12, 2010). Far from correcting any portion of its misconduct or showing remorse, Gilimex has continued to lie and perpetrate fraud on the Court. Gilimex's "lies and misconduct will [thus] almost certainly continue in the future if this action is permitted to go forward…nullifying any chance for a fair adjudication of the merits." *McMunn*, 191 F. Supp. 2d at 462 (terminating sanctions warranted where plaintiff "ha[d] shown no remorse for her deceptions, offered no apologies for her lies, and never corrected her misstatements").

All five factors therefore support dismissal. Further, terminating sanctions are especially appropriate because Gilimex's "misconduct did not concern a peripheral or an incidental matter." *Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573, 583 (S.D.N.Y. 1996). Rather, Gilimex's fraud is *central* to its claim for raw-materials damages, which in turn is a key component of each of its substantive claims. Dkt. 83 ¶¶141, 157, 170. At this point, the Blazemax PO is Gilimex's only evidence supporting over \$69 million in damages for the raw materials it supposedly purchased. Its fraud was thus directly "calculated to advance [its] claims." *Shangold v. Walt Disney Co.*, 2006 WL 71672, at \*5 (S.D.N.Y. Jan. 12, 2006). Because Gilimex "tainted evidence at the heart of [its]

dispute with Defendant[] and then sought to conceal it," "no sanction short of dismissal will suffice." *Id*.

Courts routinely impose terminating sanctions for misconduct similar to, and indeed *less* egregious than, Gilimex's actions here. In fact, this Court recently issued terminating sanctions for conduct that pales in comparison to the compound fraud Gilimex has perpetrated and continues to perpetrate here. In *Network Data Rooms*, the plaintiff submitted a doctored email chain in support of its claims. 2022 WL 17404501, at *4. This Court found that this fraud was "calculated to interfere with the judicial system's ability impartially to adjudicate the action," and held that "dismissal with prejudice [was] the only appropriate sanction." *Id.* at *5-6. Here, Gilimex's fraud is far more pervasive. In contrast to the single doctored email thread in *Network Data Rooms*, Gilimex fabricated numerous documents, orchestrated a cover-up, and offered perjured testimony at the Hearing. Gilimex's conduct here surely warrants the same sanction.

Other examples abound. In *Lawrence*, the plaintiff produced photographs she asserted were taken days after the incident at issue, and later provided conflicting testimony about the origin of those photographs at her depositions. *Lawrence*, 2018 WL 3611963, at *1. When—based in part on metadata discrepancies—it was discovered that most of the photographs were taken two years after the incident, plaintiff tried to explain away the fraud with multiple shifting and incredible excuses, as Gilimex has attempted here. *Id.* at *1-2. The *Lawrence* court imposed terminating sanctions, explaining that the "creation of staged photos" was only "the beginning of a sustained effort" to mislead the court and that plaintiff had "continue[d] a pattern of evasion and untruths." *Id.* at *6, 8-9. The court could have just as easily been talking about Gilimex and its documents.

Additionally, in *Rossbach*, the Second Circuit affirmed in relevant part the district court's imposition of terminating sanctions where plaintiff fabricated three text messages, lied about doing

so at her deposition, and spoliated underlying evidence by failing to preserve text messages and disposing of the cellphone at issue. 81 F.4th at 132-33, 142. In *Hargrove*, the court dismissed plaintiff's claims after he submitted fabricated complaint letters and grievance forms with "handwritten dates changed" and fraudulent notary stamps. 2007 WL 389003, at *3-4, 11.

These and other cases make plain that when faced with misconduct like Gilimex's, and indeed misconduct that is less pervasive and sustained, courts impose terminating sanctions.[8] Because Gilimex's misconduct has "irrevocably tainted these proceedings," dismissal is the only appropriate sanction. *McMunn*, 191 F. Supp. 2d at 462. Gilimex's "deceptive conduct and shifting excuses have completely undermined [its] credibility," rendering any prospective trial farcical and pointless. *Lawrence*, 2018 WL 3611963, at *7.

### B.    Other Sanctions Are Wholly Inadequate to Redress Gilimex's Conduct

No sanction short of dismissal is sufficient to address Gilimex's fraud. *See Network Data Rooms*, 2022 WL 17404501, at *5. For instance, a jury instruction stating that Gilimex produced fabricated documents and offered perjured testimony would still require Amazon to expend significant resources preparing for and trying the case, even when the jury would "very likely return a verdict for [Amazon.]" *Network Data Rooms*, 2022 WL 17404501, at *5; *see Lawrence*, 2018 WL 3611963, at *7 ("Any sanction less than dismissal, such as a jury instruction, would be ineffective" where plaintiff staged photographs, lied about it, and thereby lost all credibility). And merely excluding the fabricated evidence would utterly undermine the deterrent goals of sanctions. Allowing Gilimex to present the remainder of its case to the jury would send a clear signal to

---

[8] *Chalfin v. Go Big Solar, LLC*, 2025 WL 2022012, at *21-23 (S.D.N.Y. July 17, 2025) (dismissing case where plaintiff doctored a single MOU to create evidence supporting his claims); *Shangold*, 2006 WL 71672, at *1-3, 5 (same where plaintiffs fabricated materials, reiterated the lie reflected in those materials, and did "not relent" when faced with evidence of fraud); *Skywark v. Isaacson*, 1999 WL 1489038, at *13-15 (S.D.N.Y. Oct. 14, 1999) (same where plaintiff withheld discoverable documents, lied under oath, and refused to admit wrongdoing).

Gilimex and future litigants that "they have everything to gain, and nothing to lose, by continuing to submit fabricated evidence." *Lawrence*, 2018 WL 3611963, at *7. As this Court held when confronted with a less pervasive fraud, such "a lesser sanction…would be insufficient to remedy the impact of this misconduct or to deter future misconduct." *Network Data Rooms*, 2022 WL 17404501, at *5.

Moreover, precluding the *known* fabricated evidence falls far short of addressing the scope of the misconduct here. Given the extent of Gilimex's fraud, it is impossible to know how many more fake documents are in the record, and how many more misrepresentations Gilimex will make. Dismissal is the only appropriate remedy when the court has "no way of knowing what story [Gilimex] would offer" on any given issue. *Lawrence*, 2018 WL 3611963, at *7.

Finally, while the Court should impose monetary sanctions *in addition to* terminating sanctions, *infra* §III, monetary sanctions *alone* would be grossly insufficient. This would invite deep-pocketed litigants or those litigating on a contingency fee to try their hand at defrauding the Court—after all, the worst that can happen is they pay a fine. Such an outcome would destroy "the integrity of the courts," the preservation of which animates the imposition of sanctions in the first place. *Lawrence*, 2018 WL 3611963, at *8.

\*\*\*

Where, as here, "a party lies to the court and [its] adversary intentionally, repeatedly, and about issues that are central to the truth-finding process," it "forfeits [its] right to have [its] claim decided on the merits." *Id.* at *3. The Court should impose terminating sanctions and dismiss Gilimex's claims with prejudice.[9]

---

[9] If the Court concludes that a sanction less than dismissal is appropriate here, Amazon respectfully requests leave to submit supplemental briefing on such sanctions.

### III.    AMAZON IS ENTITLED TO ATTORNEYS' FEES AND COSTS

Gilimex's extensive bad-faith misconduct warrants an additional monetary sanction for fees and costs. Amazon has expended significant time and resources uncovering Gilimex's fraud, and should not have to pay the costs of doing so. *See Shangold*, 2006 WL 71672, at *6 (imposing terminating sanctions and "an award of attorneys' fees and costs" as sanction for plaintiffs' fabrication of evidence); *Cerruti*, 169 F.R.D. at 583 (similar). An "award of [attorneys'] fees and costs" is especially "appropriate given…[Gilimex's] pattern of intentional bad faith conduct and fail[ure] to correct [its] fraudulent submissions, even when confronted with evidence undermining the validity of those submissions." *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 444 (S.D.N.Y. 2002). Accordingly, Amazon requests that the Court grant it leave to seek such fees and costs.

## CONCLUSION

Amazon respectfully requests that the Court impose terminating sanctions and grant

Amazon leave to seek attorneys' fees and costs.

Dated: September 10, 2025              GIBSON, DUNN & CRUTCHER LLP
       New York, New York

By: */s/ Jordan Estes*
      Barry H. Berke
      Jordan Estes
      Grace E. Hart
      Daniel M. Ketani
      GIBSON, DUNN & CRUTCHER LLP
      200 Park Avenue
      New York, NY 10166
      Tel.: (212) 351-4000
      bberke@gibsondunn.com
      jestes@gibsondunn.com
      ghart@gibsondunn.com
      dketani@gibsondunn.com

      Andrew LeGrand (admitted *pro hac vice*)
      GIBSON, DUNN & CRUTCHER LLP
      2001 Ross Avenue
      Suite 2100
      Dallas, TX 75201
      Tel.: (214) 698-3100
      alegrand@gibsondunn.com

## CERTIFICATE OF COMPLIANCE

I, Jordan Estes, certify that Defendant Amazon.com Services LLC's Post-Hearing Brief in Support of its Motion for Sanctions complies with the requirements of Local Rule 7.1(c), as modified by § III(B)(1) of this Court's Individual Practices in Civil Cases.

I further certify that this memorandum of law was prepared with a computer.

I further certify that this Post-Hearing Brief contains 8,745 words, including any footnotes or endnotes and excluding only those sections of the brief that are exempted under Local Rule 7.1(c). In preparing this certificate of compliance, I have relied on the word count of the word-processing system used to prepare this Post-Hearing Brief.

Dated: September 10, 2025

/s/ Jordan Estes
Jordan Estes
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel.: (212) 351-4000
jestes@gibsondunn.com