UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
:
BINH THANH IMPORT EXPORT                                         :
PRODUCTION & TRADE JOINT STOCK CO.,              :
D/B/A GILIMEX, INC.,                                                          :
                                 Plaintiff,     :             23 Civ. 292 (LGS)
              -against-                                       :
                                         :     **OPINION & ORDER**
AMAZON.COM SERVICES LLC,                                    :
D/B/A AMAZON ROBOTICS,                                        :
                            Defendant.     :
----------------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

      Plaintiff Binh Thanh Import Export Production & Trade Joint Stock Company

("Gilimex") brings this action against Defendant Amazon.com Services LLC ("Amazon") arising

from Amazon's termination of its supplier relationship with Gilimex, a Vietnamese manufacturer.

Gilimex's remaining claims for trial assert breach of fiduciary duty, intentional misrepresentation

and unfair and deceptive trade practices under Massachusetts law and treble damages of

$840 million. At issue here is Amazon's motion for sanctions, which argues that Gilimex

submitted fabricated documents in support of its damages demand of $68 million for raw

materials. Following targeted discovery, briefing, a one-day evidentiary hearing and further

briefing, Amazon's motion is granted. This action is dismissed with prejudice. Amazon may file

a motion for fees and costs caused by the sanctionable conduct. Gilimex's request to sanction

Amazon is denied.

## I.      BACKGROUND

      The following facts are taken from the parties' filings, the record evidence and the

evidentiary hearing testimony.

### A.    The Underlying Action and Discovery

This action arises from Amazon's termination of its supplier relationship with Gilimex, a Vietnamese company that manufactured products for Amazon.  Gilimex's initial complaint, filed in December 2022, alleges in part that Amazon breached the parties' supply agreement and left Gilimex with over $68 million in raw materials and components that could not be returned to suppliers (the "Raw-Materials Claim").  Gilimex reiterated this claim in the First Amended Complaint (the "Complaint"), which is the operative complaint.

In discovery, Amazon served document requests, seeking "[a]ll documents and communications" on which Gilimex relied for the Raw-Materials Claim.  In response, Gilimex produced contemporaneous documents in July 2023.  These included emails to Amazon attaching spreadsheets tracking raw-materials purchases from multiple suppliers and a June 2022 PowerPoint presentation stating that Gilimex had "over 50 suppliers" for raw materials.  On July 24, 2023, Gilimex produced weekly inventory reports tracking raw materials from August 28, 2021, through October 22, 2022.

In August 2023, Gilimex produced sixty-six purchase orders and accompanying demand letters from suppliers reflecting purchases by Gilimex totaling approximately $69 million.  Metadata showed that many of these documents were created on July 31, 2023, two days before their production, and a digital forensics expert later testified that they had been created by printing Excel files to PDF.  The underlying Excel files and their metadata were never produced.  As explained below, much later -- after the evidentiary hearing on Amazon's sanctions motion had been scheduled -- Gilimex acknowledged that purchase orders representing tens of millions of dollars were fraudulent.

2

### B.    The November 2021 Purchase Order

On November 20, 2023, after fact discovery had closed and during expert disclosures, Gilimex produced for the first time a November 18, 2021, purchase order for approximately $69.04 million (the "November PO").  The November PO, a black-and-white scan of a hard copy document with stamps and signatures, purports to be a purchase order for raw materials from Blaze Max Hong Kong Limited ("Blazemax"), a Vietnamese supplier.  The November PO was accompanied by Excel files purporting to be minutes of seven meetings between Gilimex and Blazemax regarding the order (the "Excel November PO Meeting Minutes").  These documents were produced for the first time with the report of Gilimex's damages expert.

Up to this point, Gilimex had produced more than 68,000 electronic documents with metadata, and none referred to the November PO.  The weekly inventory reports produced on July 24, 2023, made no reference to a $69 million purchase order from Blazemax.  Le Thien Hung ("Hung"), Gilimex's chairman, did not mention Blazemax or the November PO in his October 2023 depositions -- either when he was deposed in his individual capacity or when he was deposed as Gilimex's 30(b)(6) witness.  Gilimex's expert relied on this new November PO, and not the previously produced purchase orders and supplier demand letters, for his opinion that Amazon owed Gilimex approximately $69 million in raw-materials damages.

### C.    Amazon's Authenticity Challenge

On May 2, 2025, Amazon challenged the authenticity of the November PO and the Excel November PO Meeting Minutes in a motion in limine to exclude that evidence.  An accompanying declaration from a forensics expert stated that according to the documents' metadata, all of the Excel November PO Meeting Minutes -- which purportedly were for seven meetings spanning the period January 5, 2022, to March 31, 2023 -- were created on

3

March 20, 2023, during fact discovery.  The declaration also stated that the November PO had no custodial metadata indicating its origin and had a file creation date of October 23, 2023.

Gilimex opposed the motion to exclude.  With its opposition, Gilimex submitted a declaration from Hung.  Hung represented that the November PO was "an authentic scanned hard copy of the physical purchase order" with "physical signatures and physical stamps."  Hung claimed that there is "no electronic version of this document."  Gilimex also produced a new version of the November PO Meeting Minutes[1] -- black-and-white scans of hard copies of the previously produced Excel files, but with stamps and signatures added (the "Black-and-White November PO Meeting Minutes").  Hung represented that these were the original minutes and that there are "no contemporaneous electronic versions."  He stated that, consistent with Vietnamese law, the documents were kept in hard copy with physical signatures and stamps.  He did not explain the existence of the Excel November PO Meeting Minutes, which lacked the stamps and signatures, or why the Excel version had been produced in the first instance.

On May 27, 2025, Amazon sent Gilimex a letter stating that the November PO Meeting Minutes appeared to have been created for the litigation, which raised "serious questions" about the November PO and other damages-related documents.  Amazon requested a physical inspection of the Black-and-White November PO Meeting Minutes, the November PO and the purchase orders and demand letters, but Gilimex refused, representing that "[o]ne glance" at the documents showed they were hard copies with "wet signatures and physical stamps."  Gilimex also stated that the Excel November PO Meeting Minutes were "copies of the hard copies" but did not provide any further explanation.

---

[1] "November PO Meeting Minutes" without specifying the version -- e.g., Excel or Black-and-White -- indicates those minutes generically, rather than any particular produced version.

On June 9, 2025, Amazon filed a pre-motion letter alleging fraud and seeking sanctions. The letter alleged that the November PO, the November PO Meeting Minutes and certain of the purchase orders and demand letters were fabricated. Amazon submitted evidence of fraud with the letter, including declarations from two of Gilimex's third-party suppliers confirming that they did not create certain purchase orders and demand letters, as well as evidence to suggest that the November PO was fabricated.

On June 17, 2025, in response to Amazon's pre-motion letter, Gilimex submitted declarations from Hung and Le Thi Kim Oanh ("Kim"). Kim is the principal of Blazemax and Hung's sister-in-law. Kim attested to the authenticity of the November PO and Black-and-White November PO Meeting Minutes, including their physical signatures and stamps. Nguyet Pham ("Pham"), Gilimex's CEO, submitted a declaration attesting to the authenticity of the two suppliers' purchase orders.

### 1.    Pre-Hearing Discovery

In response to Amazon's authenticity challenge, an evidentiary hearing was ordered along with limited pre-hearing discovery. Gilimex produced over 5,500 documents in response to Amazon's initial pre-hearing discovery requests, including seven Blazemax orders that appeared in the inventory reports produced on July 24, 2023. None of the documents referenced the November PO.

During pre-hearing discovery, each time Amazon challenged a particular document, Gilimex supplemented its production with new materials to corroborate the document's authenticity and gave new explanations for the documents. For example, after Amazon challenged the November PO and the Black-and-White November PO Meeting Minutes, Gilimex produced color versions of those documents (the "Color November PO" and "Color November

5

PO Meeting Minutes"), along with additional declarations and internal logbooks.  At this point, Gilimex changed its story completely.  Gilimex asserted that when it did business with Blazemax, the parties signed and stamped two copies of each document, generating two signed originals.  Gilimex would then keep (1) the original color version of one signed original and (2) a black-and-white version of the other signed original.  Gilimex stated that it had previously produced scans of the black-and-white copy versions, but it was now producing color scans of the original versions.  In response, Amazon pointed out that the color and black-and-white versions of the documents bore different stamps and signatures.  Amazon argued that if the two copies of each document were executed simultaneously, as Gilimex claimed, they should have the same stamp -- but they did not.

Amazon requested a physical inspection of the Color November PO and Color November PO Meeting Minutes.  Gilimex first agreed, then refused once Amazon disclosed that its expert would ink-date the documents and create "tiny pinprick holes" in them.

Meanwhile, Gilimex made a dramatic disclosure, in effect narrowing the dispute for the evidentiary hearing.  In July 2025, Gilimex stated that an internal investigation had determined that a Gilimex employee fabricated certain documents included in Gilimex's productions.  Tien Luong ("Luong"), a low-level employee in Gilimex's import-export department, purportedly had come forward and admitted fabricating numerous demand letters and purchase orders.  According to counsel, Luong's plan was to trick Gilimex into paying him for fabricated purchase orders instead of the suppliers, but Luong abandoned the plan after placing the fake hard-copy documents in Gilimex's files.  Gilimex subsequently identified over one hundred fraudulent documents attributable to Luong, including over ninety produced during fact discovery (the "Ninety Fraudulent Supplier Documents").  Gilimex asserted that Luong, acting alone and for his

own benefit, had defrauded Gilimex. Gilimex maintained that Luong had nothing to do with the November PO or the November PO Meeting Minutes and continued to assert those documents' legitimacy.

### 2.    Evidentiary Hearing

#### a.    Amazon's Witnesses

An evidentiary hearing was held on August 12, 2025, which focused on the authenticity of the $69 million November PO. Amazon called four witnesses. First, Kelly Jackson, a Supply Chain Manager at Amazon, testified about her interactions with Gilimex representatives in the spring and summer of 2022. Jackson participated in multiple calls and an in-person meeting with Gilimex during which Gilimex stated that it had over fifty raw-materials suppliers. During these communications, Gilimex never mentioned a $69 million order from Blazemax, and Blazemax did not appear on any of the supplier lists Gilimex provided to Amazon.

Next, Alberto Orozco, a Managing Director in Financial Investigations and Financial Accounting at Nardello & Co. ("Nardello"), testified as a forensic accounting expert. Orozco explained that Gilimex's 2022 audited financial statements showed only $2,077 in goods on consignment, not $69 million. Orozco testified that, if the November PO were genuine and Blazemax were holding $69 million in raw materials for Gilimex as claimed, those materials should have been reflected as goods on consignment in the financial statements. Separately, Orozco explained that Gilimex's financial statements reflected only approximately $3 million owed to Blazemax in trade payables and an additional $1.1 million owed in other payables -- far short of $69 million.

Andrew Tappeto, a Senior Director in Digital Investigations and Cyber Risk at Nardello, testified next as a digital forensics expert. Tappeto's testimony reflected that of the over one

hundred documents purportedly faked by Luong, at least thirty-six were created on July 31, 2023, and had file extensions in their title metadata -- meaning they were generated using Excel's print-to-PDF function rather than by scanning hard copy documents, as Gilimex claimed.

Finally, Amazon called Jean Chow-Callam, a Managing Director in Financial Investigations and Forensic Accounting at Nardello familiar with company seals known as "chops." Chops are used in many Asian countries, including Vietnam, to certify the authenticity of documents. A physical seal is used to stamp the document in ink, usually on top of a legal representative's signature. The chop indicates that the signator on behalf of the company has authorized the document. Each stamp and signature is expected to be unique, reflecting the use of pressure in applying the ink, the placement of the seal in relation to the signature and the fact that the same signature applied on different occasions typically is not precisely identical. Accordingly, only wet-ink signatures and seals are considered authentic.[2]

Chow-Callam demonstrated that the Blazemax chops on the November PO (purportedly from November 18, 2021) and one of the Black-and-White November PO Meeting Minutes (purportedly from March 31, 2023) were identical. This led her to conclude that one was a digital copy or electronic signature of the other -- a finding inconsistent with Gilimex's position that it had produced copies of authentic hard copy originals with unique physical stamps and signatures. Put differently, the chops on the November PO and one of the Black-and-White November PO Meeting Minutes should have been different but appeared to be the same.

Conversely, when Chow-Callam compared the Black-and-White November PO with the Color November PO, she concluded that the Blazemax chops on the documents had been created

---

[2] This description of chops relies on Chow-Callam's testimony as well as a declaration she executed on June 9, 2025. (Dkt. No. 176-5).

using different stamps.  The black-and-white chop was created with a stamp that had a worn edge, while the color chop was created with a stamp that had a complete edge.  This mattered according to Amazon because, even if Gilimex and Blazemax had been executing two copies of each document all along, as Gilimex belatedly claimed, those copies should have been executed at the same time, meaning the stamps on the black-and-white and color versions should have been the same.

### b.      Gilimex's Witnesses

Gilimex presented two witnesses.  Luong -- the employee whom Gilimex blamed for the Ninety Fraudulent Supplier Documents -- testified first and remotely from Vietnam.  Through a translator, Luong explained that he was "just an employee" in Gilimex's import-export department and had worked for Gilimex since 2018.  Luong stated that he created fake documents because at the time, his family "had great difficulty" and he "needed the money," and that he created the documents "in order to get the money out of Gilimex."

In terms of how the supposed fraud occurred, Luong testified that he had neither a Gilimex computer nor a Gilimex email account.  Instead, Luong claimed that he photographed genuine purchase orders, brought the photographs home, recreated the documents on his personal computer, altered the quantities and prices and then placed the fabricated versions in Gilimex's files.  Luong stated that he could not read or write English and that he had used Google Translate to create the English-language documents himself.  Luong denied creating any documents relating to Blazemax, testifying that Blazemax supplied goods directly to Gilimex's warehouse without his involvement.  Pursuant to his cooperation agreement with the company, Luong still worked for Gilimex as of the hearing, and Gilimex had not penalized Luong for his allegedly fraudulent conduct.

On cross-examination, Luong admitted that his monthly salary was 8,680,000 Vietnamese dong ("VND"), or approximately $373 per month,[3] that the fake documents totaled about $40 million and that he never tried to collect any money -- nor could he, as the bank information on the fake documents was Gilimex's, not his own.  Luong acknowledged that his cooperation agreement with Gilimex, which required him to testify, was executed before he first spoke to Gilimex's lawyers.  Luong testified that Hung, Gilimex's chairman, was present when Gilimex's lawyers first interviewed Luong.

Hung testified next on behalf of Gilimex.  Consistent with his previous declarations, Hung asserted that the November PO and the November PO Meeting Minutes were authentic documents.  Hung testified that the November PO was in hard copy, that he personally signed and chopped it and that it was sent by hand to Blazemax.  Hung also testified that he had reached out to Kim, his sister-in-law and the owner of Blazemax, to testify, but she declined.  Hung denied controlling Kim or Blazemax and stated that he spoke to Kim only once a year.

On cross-examination, Hung acknowledged that Gilimex employees, under his supervision, produced over ninety fraudulent purchase orders and demand letters in this case. Hung admitted that when Amazon raised concerns about the fake documents, he submitted a declaration "vehemently disput[ing] all of Amazon's accusations," which he now characterized as "our mistake" because Gilimex "didn't review the document[s] carefully enough."  He further

---

[3] This figure is based on the exchange rate reported by the United States Department of the Treasury as of June 30, 2022 -- approximately when, according to Luong's testimony, he stopped creating the fabricated documents. *See* U.S. Dep't of Treasury, *Currency Exchange Rates Converter*, https://fiscaldata.treasury.gov/currency-exchange-rates-converter/ [https://perma.cc/92KW-TUQY] (last visited July 8, 2026).  Notably, Luong's monthly income was above Vietnam's national average for male workers in 2022, which was 7,600,000 VND. *See* Thuy Dung, *Workers' Average Income in 2022 Surges*, Socialist Republic of Viet Nam Gov't News (Jan. 10, 2023), https://en.baochinhphu.vn/workers-average-income-in-2022-surges-111230110154233728.htm [https://perma.cc/CEF6-5DEM].

admitted that, although he testified at his 30(b)(6) deposition in October 2023 that Gilimex had given Amazon all the documents it requested, the Blazemax purchase orders on which Gilimex now relied had not been produced at that time.  Hung acknowledged that no emails corroborated the existence of the November PO and that the total value of the purchase orders Gilimex had produced by the time of his deposition, including the Ninety Fraudulent Supplier Documents, equaled approximately $66 to $68 million -- nearly the same amount as the subsequently produced November PO and in line with the Complaint's Raw-Materials Claim for $68 million. Hung also stated for the first time that the Excel November PO Meeting Minutes had been created and produced because the scans of the hard copies were too difficult to read, so a Gilimex employee re-typed the minutes' contents into Excel.

### 3. Post-Hearing Activity

After the evidentiary hearing, the record was supplemented with a Gilimex shareholders' resolution adopted on September 11, 2025.  Among other things, the resolution (1) absolved from liability Gilimex's executives and employees who participated in the instant lawsuit for any resulting damages to Gilimex, (2) awarded 20% of any judgment against Amazon as a success fee to the "advisory firms" defending Gilimex and (3) awarded another 20% of any remaining recovery, after deduction of Gilimex's damages and litigation expenses, to the aforementioned executives and employees, except those testifying as witnesses in the lawsuit.  These matters had previously been the subject of an April 21, 2025, resolution of Gilimex's Board of Directors.

### 4. Gilimex's Sanctions Motion

In its opposition to Amazon's sanctions motion, Gilimex sought sanctions against Amazon for continuing to "press its unfounded accusations" after Gilimex informed Amazon of

Luong's fraud.  Gilimex sought attorneys' fees and costs incurred after July 16, 2025, when Gilimex informed Amazon of "the Luong scheme."

## II.    STANDARD

"A court may sanction a party under its inherent power to deter abuse of the judicial process and prevent a party from perpetrating a fraud on the court." *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020); *accord Mazzei v. Money Store*, No. 22-1959, 2023 WL 6784415, at *4 (2d Cir. Oct. 13, 2023) (summary order).[4]  "Sanctions for fraud are warranted if it is established by clear and convincing evidence that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate the action." *Yukos*, 977 F.3d at 235.  Clear and convincing evidence of fraud on the court may be established through inconsistencies in the challenged evidence, false testimony, spoliation, credibility findings and the reasonable inferences drawn from the record.  *See, e.g.*, *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 134-35, 139-41 (2d Cir. 2023) (affirming case-terminating sanctions based on forensic inconsistencies, false testimony, spoliation and credibility findings); *Network Data Rooms, LLC v. Saulrealism LLC*, No. 22-3226, 2023 WL 7103280, at *2-3 (2d Cir. Oct. 27, 2023) ("*Network Data Rooms II*") (summary order) (same where falsified email chain "critically b[ore] on a central issue" and the actor "first falsified evidence, and then later offered false testimony both orally and in writing"); *Esposito v. Suffolk Cnty. Cmty. Coll.*, No. 21-521, 2023 WL 192671, at *2 (2d Cir. Jan. 17, 2023) (summary order) (affirming clear-and-convincing finding of forgery based on inconsistencies with the medical

---

[4] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

record and other testimony, disbelief of the plaintiff's account and permissible inferences from the evidence).

A district court exercising its inherent power has broad discretion to fashion an appropriate sanction. *Rossbach*, 81 F.4th at 141. The court may dismiss a case with prejudice. *See, e.g.*, *id.* at 141-42 (affirming dismissal where plaintiff fabricated evidence and falsely testified about its creation); *Network Data Rooms, LLC v. Saulrealism LLC*, No. 22 Civ. 2299, 2022 WL 17404501, at *7 (S.D.N.Y. Dec. 2, 2022) ("*Network Data Rooms I*") (dismissing case where plaintiff submitted a doctored email chain and lesser sanctions would not remedy the misconduct), *aff'd*, *Network Data Rooms II*, 2023 WL 7103280. The court may impose monetary sanctions against a party or its counsel. *See, e.g.*, *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 991 F.3d 361, 367-70 (2d Cir. 2021) (vacating denial of inherent-power sanctions where district court assumed it could not impose sanctions unless party committed "fraud on the court," noting that such a finding is not necessary). A court may also give an adverse jury instruction. *See, e.g.*, *Klipsch Grp. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 629 & n.5 (2d Cir. 2018) (upholding adverse-inference instructions and other discovery sanctions where defendant engaged in persistent discovery misconduct and willfully spoliated electronically stored information).

"Because of its potency, however, a court's inherent power 'must be exercised with restraint and discretion.'" *Int'l Techs.*, 991 F.3d at 368 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). Before a court may invoke its inherent power to sanction, the party facing sanctions must be provided with "adequate notice and an opportunity to be heard." *Shepherd v. Annucci*, 921 F.3d 89, 97 (2d Cir. 2019); *accord Flycatcher Corp. Ltd. v. Affable Avenue LLC*, No. 24 Civ. 9429, 2026 WL 306683, at *11 (S.D.N.Y. Feb. 5, 2026). A sanction of dismissal

13

with prejudice must be supported by "clear evidence of misconduct and a high degree of specificity in the factual findings." *Mitchell v. Lyons Pro. Servs., Inc.*, 708 F.3d 463, 467 (2d Cir. 2013); *accord Rossbach*, 81 F.4th at 141-42. The court must find "willfulness, bad faith, or reasonably serious fault" and must "at least consider lesser remedial measures." *Rossbach*, 81 F.4th at 141-42.

## III.    DISCUSSION

Amazon's motion for sanctions is granted. The record establishes, by clear and convincing evidence, that Gilimex committed fraud on the court. Such conduct warrants dismissal of this action with prejudice. Amazon may seek attorneys' fees and costs related to investigating and litigating the fraud. Gilimex's request for sanctions against Amazon is denied.

### A.    Gilimex's Fraud

The evidence of Gilimex's fraud falls into three categories: (1) the fabrication of the Ninety Fraudulent Supplier Documents produced during fact discovery, which Gilimex admits are fake, (2) the presentation of false and incredible testimony to excuse that fraud and (3) the fabrication of the November PO. Taken as a whole, the parties' filings, the hearing testimony and the record evidence support a finding by clear and convincing evidence that Gilimex acted with "willfulness, bad faith, or reasonably serious fault." *Id.* at 142.

### 1.    Initial Fabrication of the Supplier Documents

The first fabrication, shown by clear and convincing evidence, was the creation of the Ninety Fraudulent Supplier Documents Gilimex produced in response to Amazon's discovery requests. These purchase orders and demand letters showed Gilimex purchases of roughly $40 million, but metadata revealed that many of the documents were created two days before their

14

production and were likely generated using Excel's print-to-PDF function -- not scanned from paper originals, as Gilimex claimed.

Gilimex argues that the Ninety Fraudulent Supplier Documents do not matter because an employee later admitted to forging them, and Gilimex's expert did not rely on the documents for his damages opinion. But the focus of the inherent-power inquiry is "the *intent* of the potentially sanctionable conduct, not on its *effect*." *Int'l Techs.*, 991 F.3d at 368. Gilimex produced these documents in direct response to Amazon's discovery requests to substantiate its $69 million Raw-Materials Claim. Gilimex cannot escape responsibility by blaming a low-level employee whose testimony was implausible, far-fetched and utterly lacking credibility.

### 2.      Fabrication of Coverup to Excuse the Fraudulent Supplier Documents

The second fabrication is the creation of a coverup story -- presented directly to the Court via declaration and perjured testimony -- to excuse the Ninety Fraudulent Supplier Documents produced during fact discovery. Gilimex claims that Luong, a low-level employee without a Gilimex computer or email account, created the fake English-language documents by photographing genuine purchase orders, recreating them on his personal computer using Google Translate and planting hard copies of the fabrications in Gilimex's files. Not only is that account incredible on its face, but it is also inconsistent with the evidence. Tappeto testified that many of the Ninety Fraudulent Supplier Documents Luong allegedly planted were created two days before their production using Excel's print-to-PDF function. If Luong had created paper documents and placed them in Gilimex's files, there would be no reason for those documents to appear as Excel-generated PDFs. Gilimex's response, which strains credulity, is that the company "scanned" many of its hard copy documents for production by photographing the documents, converting those images to Excel files and then printing to PDF.

15

Luong's stated motive is equally implausible.  It is not credible that an employee earning approximately $373 per month, above the average wage in Vietnam, would independently devise and execute a $40 million document-fabrication scheme.  Luong claimed he created the documents because he "needed the money," yet he never tried to divert the payments from Gilimex to its suppliers.

The circumstances giving rise to Luong's testimony raise additional questions.  Luong's cooperation agreement requiring him to testify predated his first discussions with Gilimex's lawyers, and Hung (Gilimex's chairman) was present when Gilimex's lawyers first interviewed Luong.  Despite admitting to a $40 million fraud against Gilimex, Luong still worked for the company at the time of the hearing.  Crucially, even by Luong's own account, the November PO and November PO Meeting Minutes were not his work.  Luong's testimony, even if accepted, narrows the question but leaves the most damaging November PO evidence untouched.

### 3.    Fabrication of the November 2021 Purchase Order

The third fabrication, established by clear and convincing evidence, was the November PO.  After producing the Ninety Fraudulent Supplier Documents during fact discovery, Gilimex without explanation produced in their stead, for the first time with its expert report, a single purchase order in roughly the same amount to support its Raw-Materials Claim.  Gilimex had represented to Amazon during the parties' business dealings that Gilimex had more than fifty suppliers and produced invoices from many suppliers supporting a $68 million damages claim -- then relied on a single invoice in roughly the same amount from a single supplier that happened to be owned by Hung's sister-in-law.

The versions of the November PO and the November PO Meeting Minutes produced, and Gilimex's shifting story surrounding the documents, are inculpatory.  Gilimex produced two

16

versions of the purchase order:  first a black-and-white version and then a color version.  Gilimex initially claimed that the black-and-white November PO was a scan of the original, submitting a sworn declaration from Hung to that effect.  Gilimex later changed its story when producing the Color November PO, offering the convoluted explanation that there were actually two original copies of the purchase order all along, and that the Color November PO was a color scan of one of the originals, whereas the November PO was a scan of a black-and-white copy of the other original.  Yet, even putting aside the implausibility of this account, Chow-Callam testified that the chops on the Color November PO and the November PO had been created with different stamps -- a puzzling result if both original copies of the purchase order were executed at the same time, as Gilimex claims.

Gilimex produced three versions of the November PO Meeting Minutes:  first Excel spreadsheets in native format, then a black-and-white version, then a color version.  All three versions have suspect explanations and features.  Gilimex claimed for the first time at the evidentiary hearing that the Excel spreadsheets had been produced in the first instance because Gilimex did not have a high-quality scanner and had trouble creating legible scans of the hard-copy minutes, so an employee re-typed the minutes into Excel.  But the later-produced Black-and-White November PO Meeting Minutes were legible, refuting Gilimex's account of why the Excel November PO Meeting Minutes had been created.  The Excel November PO Meeting Minutes and the Black-and-White November PO Meeting Minutes had the exact same formatting and typos, which Amazon argued was evidence that the latter were actually "signed printouts" of the former that were fabricated for the litigation.  Additionally, the Color November PO Meeting Minutes bore different chops from the Black-and-White November PO Meeting Minutes.  Chow-Callam also testified that the chop on the November PO was identical to the chop on one of the

17

Black-and-White November PO Meeting Minutes, and that one appeared to be a digital copy or electronic signature of the other, further calling into question the documents' authenticity.

That Gilimex runs a "hard copy" business in Vietnam does not explain the absence of the November PO from ordinary business records, inventory logs, financial records and contemporaneous communications, nor why the chops on the November PO and the later-produced Color November PO are different, nor why identical chops appeared on the November PO and one of the Black-and-White November PO Meeting Minutes when the chops should have been unique.

Kim, as the principal of Blazemax, might have authenticated the November PO from the supplier side. But she declined to testify at the hearing, choosing instead to submit only a declaration through counsel stating that the November PO and Black-and-White November PO Meeting Minutes were authentic and had been "signed and authorized" by her. That a supposed $69 million creditor would forgo the opportunity to support recovery of that sum by providing remote testimony further undermines the claim that the November PO reflects a real transaction.

The mail delivery logbooks Gilimex presented do not prove the existence of the November PO. The logbooks are handwritten and have five consistently populated columns -- the date, the sender, the recipient, the department and a signature presumably indicating delivery. The logbooks do not state what was delivered nor the contents of any document; they state only that Gilimex sent or received mail on certain days. Gilimex asserts that PX-32 at -21409 and PX-26 at -22036 reflect the transmission of the November PO to and from Blazemax on November 19 and November 22, 2021, respectively. The relevant entry in PX-32 is third from the bottom on -21409 and reflects a delivery on "19/11" from an individual at Gilimex to "Ms. Quyen Blaze Max." The relevant entry in PX-26 is at the bottom of -22036 and reflects a

18

delivery on "22/11/21" from "Blaze Max" to an individual at Gilimex. This information is insufficient to prove the existence of the November PO, particularly given the wealth of evidence to the contrary.

Gilimex's position that weekly inventory reports were mere "raw material status reports," reflecting raw materials in production during the relevant period and not total inventory on hand, does not change the fact that a $69 million purchase order should appear *somewhere* in contemporaneous internal records -- and not for the first time during expert discovery.

Gilimex's refusal to permit ink-dating of the hard-copy documents may carry limited weight alone, but viewed alongside Gilimex's shifting explanations, implausible testimony and dearth of corroborating evidence, the refusal contributes to the weight of evidence. *See, e.g.*, *Rossbach*, 81 F.4th at 134-36 (assessing fabrication based on forensic inconsistencies, shifting testimony and the absence of corroborating evidence); *Chalfin v. Go Big Solar, LLC*, No. 24 Civ. 4768, 2025 WL 2022012, at *21-23 (S.D.N.Y. July 17) (evaluating authentication evidence against the totality of the record), *appeal docketed*, No. 25-1967 (2d Cir. 2025).

Gilimex's own financial records also undercut the veracity of the November PO. Gilimex contends that Orozco incorrectly relied on International Financial Reporting Standards rather than Vietnamese Accounting Standards in interpreting the "goods on consignment" line item. Regardless of the applicable accounting standard, Gilimex identifies nothing in its 2022 audited financial statements that reflects a $69 million purchase of raw materials, assets of $69 million in raw materials or any corresponding payment obligation to Blazemax. The financial statements reflect only approximately $3 million owed to Blazemax in trade payables and an additional $1.1 million owed in other payables.

19

Gilimex's communications with Amazon do not fill the gap. Gilimex points to a July 21, 2022, email and an August 3, 2022, PowerPoint in which Gilimex told Amazon of raw-materials exposure exceeding $68 million. Even taken at face value, those documents show only generalized supplier-held raw-materials exposure (consistent with purchase orders and demand letters produced during discovery). They do not reference a singular purchase order, identify Blazemax as the supplier or otherwise authenticate the November PO.

In sum, the physical evidence does not support Gilimex's claim that the November PO and November PO Meeting Minutes are authentic. Taken together, the forensic evidence, the absence of any contemporaneous corroboration and Gilimex's implausible, ever-changing explanations establish by clear and convincing evidence that the documents are not authentic and were fabricated.

Gilimex contends that Amazon's theory of fraud "makes no sense" because Amazon does not explain Gilimex's motive in first creating the Ninety Fraudulent Supplier Documents to support its supplier damages claim in July 2023 during fact discovery, and then just a few months later fabricating the November PO during expert disclosures to support the same damages claim. But that gap corresponds to one in Gilimex's narrative. Gilimex has not explained why it left the Ninety Fraudulent Supplier Documents with Amazon when Gilimex discovered the documents were fake; why the Gilimex expert relied exclusively on an entirely different, never-produced document, apparently generated by the company of Hung's sister-in-law, to support the $68 million Raw-Materials Claim; or when Gilimex conducted its "internal investigation" uncovering the "Luong scheme," which Gilimex disclosed only when the sanctions hearing was scheduled.

Putting aside these unanswered questions, Gilimex's argument misses the mark.  The respective fabrications of the Ninety Fraudulent Supplier Documents and the November PO need not reflect a single premeditated and coordinated plan.  Clear and convincing evidence shows that both sets of documents were fabricated and that the fabrication was intentional -- not something like a typographical error that could have been the product of error or negligence.  Clear and convincing evidence also shows that Gilimex produced the documents to its adversary in this litigation and then presented false testimony directly to the Court about the Ninety Fraudulent Supplier Documents and the authenticity of the November PO.

Gilimex cites cases in which the court declined to impose sanctions.  These cases are highly fact-specific and involved either isolated misconduct or a thin record -- unlike the repeated fabrications and cover-up present here.[5]

**B.      Remedies**

Because the record establishes fraud on the court by clear and convincing evidence, the remaining question is the appropriate sanction.  Gilimex had "adequate notice and an opportunity to be heard," as demonstrated by the extensive record including the evidentiary hearing.

---

[5] In *Bravia Capital Partners Inc. v. Fike*, the court found no pattern of intentional bad faith and instead noted the conduct could be "separate, isolated instances of negligence."  No. 9 Civ. 6375, 2015 WL 1332334, at *17-18 (S.D.N.Y. Mar. 25, 2015).  In *Duka v. Alliance Tri-State Construction, Inc.*, the motion rested on an alleged attempt to bribe a single witness, but inconsistent statements and text messages did not clearly and convincingly establish wrongdoing.  No. 20 Civ. 6648, 2021 WL 4461019, at *4-5 (S.D.N.Y. Sep. 29, 2021).  In *Kortright Capital Partners LP v. Investcorp Investment Advisers Ltd.*, the movant offered "little evidence[,] much less clear and convincing evidence," of a deliberate scheme or bad faith.  327 F. Supp. 3d 673, 687-89 (S.D.N.Y. 2018).  In *Passlogix, Inc. v. 2FA Technology, LLC*, the sanctions dispute centered on two anonymous emails, but the record did not clearly and convincingly establish that the defendant authored either one.  708 F. Supp. 2d 378, 401-07 (S.D.N.Y. 2010).  And in *Yoomi Babytech, Inc. v. Anvyl, Inc.*, the plaintiff did not deny the at-issue document modifications and offered the responsible party for deposition once the issue arose.  No. 20 Civ. 7933, 2023 WL 1516573, at *9 (S.D.N.Y. Feb. 3, 2023).

*Shepherd*, 921 F.3d at 97.  That record warrants terminating the case and assessing against Gilimex the costs Amazon incurred to investigate and prove the fraud.

### 1.    Dismissal

Dismissal with prejudice is warranted given Gilimex's "willfulness, bad faith, or reasonably serious fault."  *Rossbach*, 81 F.4th at 142.  Lesser sanctions would not suffice, as the remaining claims cannot be cleanly separated from the tainted proof.  *See id.* at 135 (affirming dismissal where "trying the case would be a pointless waste of judicial resources, because the jury would learn that [plaintiff] fabricated the limited documentary evidence of her sexual harassment claims").

A lesser sanction -- such as exclusion of the tainted exhibits, an adverse inference, dismissal of only the Raw-Materials Claim or a monetary sanction -- would be "insufficient to remedy the impact of [the] misconduct or to deter future misconduct."  *Id*. at 141.  As in *Rossbach*, exclusion would remove certain exhibits but not the credibility problem.  *See id*. at 141-42 (noting that "no reasonable juror who learned of [plaintiff]'s campaign of willful fabrication and deception would credit her testimony or evidence" at trial).  Gilimex's factual narrative on any remaining claims would implicate the same corporate witnesses who authenticated and defended the false documents, including Hung (the chairman) and Pham (the CEO).  Any trial would require the factfinder to assess those witnesses' credibility after their repeated false or evolving stories about a major damages theory.  *See id*.  Excluding the tainted exhibits would mean excluding critical evidence bearing on credibility.

In the same vein, an adverse inference would leave a trial consumed by the authenticity and credibility disputes caused by Gilimex's fraud.  *See id.*  Striking only the Raw-Materials

Claim would understate the seriousness of the repeated fabrication and cover-up. And fees alone would not restore the integrity of a proceeding that still depends on tainted witnesses.

Dismissal without prejudice would not adequately address the abuse; it would permit Gilimex to refile after imposing substantial costs on Amazon and on the judicial process. *See id.*; *Network Data Rooms I*, 2022 WL 17404501, at \*5 (where "fraudulent conduct was plainly intentional and the foundation of [p]laintiff's case," dismissal with prejudice was "the only appropriate sanction"); *Shangold v. Walt Disney Co.*, 275 F. App'x 72, 74 (2d Cir. Apr. 28, 2008) (summary order) ("While dismissal is a harsh sanction, it is appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party."). Dismissal with prejudice is the only sanction that accounts for the scope of the fraud, protects the integrity of the judicial process and ensures that Gilimex does not benefit from the very misconduct that necessitated this inquiry.

### 2.    Attorneys' Fees and Costs

Amazon may seek to recover the fees and costs it incurred to investigate and litigate the fraud. An inherent-power fee award is compensatory, not punitive, and generally must be tied to fees that "would not have been incurred but for the bad faith." *Trs. of the N.Y. State Nurses Ass'n Pension Plan v. White Oak Glob. Advisors, LLC*, 102 F.4th 572, 615 (2d Cir. 2024); *see also Rossbach*, 81 F.4th at 135-36, 142-45 (affirming fee award aimed at "restor[ing] the prejudiced parties to the same position they would have been in" absent misconduct). Gilimex's argument that Amazon's delay in exposing the fraud bars fee-shifting carries little weight. Delay may

23

affect the scope of a fee award but does not eliminate the entitlement to fees for costs that the fraud caused. *See White Oak*, 102 F.4th at 614-17.[6]

### C.    Gilimex's Request for Sanctions

Gilimex's request to sanction Amazon by assessing attorneys' fees and costs incurred after July 16, 2025, when Gilimex informed Amazon of "the Luong scheme," is denied. As a preliminary matter, Gilimex did not properly move for that relief under this District's local rules and the Court's individual rules. Gilimex filed neither a pre-motion letter nor a notice of motion. *See* Individual Rule III.A.1; Local Civil Rule 7.1(a).

The request also fails on the merits. Sanctions under a court's inherent power require that "a party advanced a colorless claim and did so for improper reasons." *Int'l Techs.*, 991 F.3d at 369; *see Chambers*, 501 U.S. at 45-46 ("[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."). The "Luong scheme" accounts only for the Ninety Fraudulent Supplier Documents produced during fact discovery and a handful of additional documents produced during pre-hearing discovery. Luong did not address the November PO except to say he had nothing to do with it. The November PO has been the focus, both at the evidentiary hearing and in the parties' briefing, since Gilimex

---

[6] Although a court may sanction counsel sua sponte under its inherent authority, such sanctions require clear evidence and an explicit finding that counsel acted in bad faith. *See Rossbach*, 81 F.4th at 143-44; *White Oak*, 102 F.4th at 583-84, 616-17. While Kasowitz's conduct certainly raises questions, it does not warrant sanctions on the current record -- even considering the supplemental filings. The September 2025 shareholder resolution's promise of success fees and liability protection for the "advisory firms" involved in the litigation raises concern about motive and alignment, but the resolution does not identify counsel by name and appears to have been introduced to Gilimex's Board before Amazon's fraud allegations. While the resolution may be probative of incentive and why Kasowitz continued the representation and made certain arguments, the resolution offers little insight into counsel's actual or constructive knowledge of the fraud. *Cf. Lawrence v. City of New York*, No. 15 Civ. 8947, 2018 WL 3611963, at *5-6 (S.D.N.Y. July 27, 2018) (declining to sanction counsel where counsel's production of client-fabricated evidence was careless but not objectively unreasonable).

admitted that the Ninety Fraudulent Supplier Documents were fraudulent.  The timing of Amazon's sanctions motion, filed as the parties were preparing for trial, does not make the motion sanctionable under the circumstances.  Nor did Amazon need to disprove every Gilimex explanation before filing.  That Amazon continued to press its sanctions motion was not in bad faith, as evidenced by this Opinion.  Gilimex's request to impose sanctions on Amazon is denied.

## IV.    CONCLUSION

For the foregoing reasons, Amazon's motion for sanctions is **GRANTED**.  This action is hereby **DISMISSED** with prejudice.  By **August 10, 2026**, Amazon may file a motion to recover fees and costs incurred in investigating and litigating the fraud.

Gilimex's request to sanction Amazon is **DENIED**.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 252 and to close this case.

Dated: July 9, 2026
      New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**